# No. 09-50323

# In the United States Court of Appeals for the Fifth Circuit

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

v.

BENJAMIN ALVAREZ,

*Defendant-Appellant.*

————————

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS

————————

**BRIEF OF DEFENDANT- APPELLANT**

————————

ROBERT J. PEREZ
210 N. Campbell
El Paso, Texas 79901
Tel.: (915) 542-1222
Fax: (915) 532-2041

*Attorney for Defendant-Appellant*

## CERTIFICATE OF INTERESTED PERSONS

### United States v. Benjamin Alvarez
### No. 09-50323

The undersigned counsel of record certifies that the persons having an interest in the outcome of this case are those listed below:

1.  **Benjamin Alvarez,** Defendant-Appellant;

2.  **Johnny Sutton,** U.S. Attorney;

3.  **Jose Luis Acosta,**  Assistant U.S. Attorney,  who represented Plaintiff-Appellee in the district court;

4.  **Robert J. Perez,**  Attorney who represented Defendant-Appellant in the district court and before this court.

5.  **Gary Weiser and John Gates,** counsel for Defendant Carlos Perea before the district court and the appellate counsel;

6.  **Vivek Grover and Maria B. Ramirez,** counsel for Defendant Manuel Cardoza before the district court and the appellate counsel;

7.  **Francisco F. Macias,** counsel for Defendant Eugene Mona;

8.  **Ken Del Valle and Joe Spencer Jr.,** counsel for Defendant Said Francisco Herrera before the district court and the appellate counsel;

i

9.  **Leonard Morales and Patrick A. Lara,** counsel for Defendant Arturo Enriquez before the district court and the appellate counsel.

This certificate is made so that the judges of this Court may evaluate possible disqualification or recusal.

_____

ROBERT J. PEREZ
*Attorney for Defendant-Appellant*

ii

## STATEMENT REGARDING ORAL ARGUMENT

The issue on appeal in this case are largely dependent upon the facts in the case and involves a RICO conspiracy for which Defendant received a sentence of life.  The record is long and extensive and oral argument would assist the court  to have a clear understanding of the factual background of the case, and to answer any questions the Court may have with respect to the particular facts that may pertain to Defendant.

# TABLE OF CONTENTS

<div align="right">Page</div>

CERTIFICATE OF INTERESTED PERSONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

STATEMENT REGARDING ORAL ARGUMENT . . . . . . . . . . . . . . . . . . . . . iii

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . vi

SUBJECT MATTER AND APPELLATE JURISDICTION . . . . . . . . . . . . . . . . . 1

ISSUES PRESENTED FOR REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF THE CASE

    1.   Nature of the Case. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    2.   Course of Proceedings and Dispositions in the Court Below. . . . . . . . . . 4

    3.   Statement of Facts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

SUMMARY OF THE ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

ARGUMENT AND AUTHORITIES

    The evidence presented to support the conviction under 18 U.S.C. 1962(c)
    was not sufficient to sustain a conviction beyond a reasonable doubt **.** . . . . . 29

    The Evidence presented to support the conviction under 18 U.S.C. 1962(d)
    was not sufficient to sustain a conviction beyond a reasonable doubt . . . . . . 33

    The Evidence presented to support the conviction under 18 U.S.C. 1956 was
    not sufficient to sustain a conviction beyond a reasonable doubt . . . . . . . . . 35

    The Evidence presented to support the conviction under 21  U.S.C. §§ 841
    and 846 was not sufficient to sustain a conviction beyond a reasonable doubt**.**
    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

<div align="center">iv</div>

The District Court's decision to empanel an anonymous jury violated tainted Defendant's presumption of innocence and affected his ability to choose a jury in violation of his Constitutional Rights under the 5th and 6th Amendments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

The trial court committed error by failing to consider the statutory factors set forth in 18 U.S.C. 3553(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

The trial court committed error by admitting into evidence Government Exhibits 353 and 354 in violation of defendant's constitutional right to confrontation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

# TABLE OF AUTHORITIES

Page

## Cases

*Crawford v. Washington,*
    541 U.S. 36, 53-54, 124 S.Ct. 1354, 158 L.Ed. 2d 177 (2004) . . . . . . . . . . . 45

*Gall v. United States,*
    128 S.Ct. 586 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*Salinas v. United States*,
    522 U.S. 52, 61-66, 118 S.Ct. 469, 139 L.Ec. 2d 352 (1977) . . . . . . . . . . . 34

*United States v. Alvarado-Valdez,*
    521 F.3d 337, 341 (5th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

*United States v. Booker*,
    543 U.S. 220, 261 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*United States v. Branch*,
    91 F.3d 699, 724 (5th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*United States v. Burns*,
    162 F.3d 840, 847 (5th Cir. 1998.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*United States v. Conner,*
    537 F.3d 480, 484 (5th Cir. 2008.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*United States v. Erwin,*
    793 F.2d 656, 670 (5th Cir. 1986.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*United States v. Fernandez*,
    559 F.3d 303, 313 (5th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*United States v. Jimenez,*
    464 F.3d 555, 558 (5th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

*United States v. Krout,*

66 F.3d 1420, 1426 (5th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*United States v. McCord*,
    33 F.3d 1434, 1439 (5th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . 29, 33, 35, 37

*United States v. Posada-Rios*,
    158 F.3d 832, 855 (5th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . 29, 30, 33-35, 37

*United States v. Salazar*,
    66 F.3d 723, 728 (5th Cir. 1995.) . . . . . . . . . . . . . . . . . . . . . . . . 29, 33, 35-37

*United States v. Salvatore*,
    110 F.3d. 1131, 1143 (5th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . 39, 40

*United States v. Sanchez*,
    74 F.3d 562, 564 (5th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*United States v. Smith*,
    417 F.3d 483, 489-90 (5th Cir. 2005.) . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

## Statutes

18 U.S.C. § 1951 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

18 U.S.C. § 1956 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 5, 26, 35, 36

18 U.S.C. § 1962 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

18 U.S.C. § 1962 (c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 25, 30

18 U.S.C. § 1962 (d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 25, 33, 34

18 U.S.C. § 3231 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

18 U.S.C. § 3742(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

18 U.S.C. § 3553 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 28

18 U.S.C. § 3553(a) and (c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 27, 44

21 U.S.C. §§ 841 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 26

21 U.S.C. §§ 841 (a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

21 U.S.C. §§ 846 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 26

28 U.S.C. § 1291 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**Rules**

Federal Rule of Appellate Procedure 4(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Fifth Circuit Rule 31.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

## SUBJECT MATTER AND APPELLATE JURISDICTION

1.    **Subject Matter Jurisdiction in the District Court.** This case arose from the prosecution of an alleged offense against the laws of the United States. The district court had jurisdiction under 18 U.S.C. § 3231.

2.    **Jurisdiction in the Court of Appeals.** This is a direct appeal from a final decision of the U.S. District Court for the Western District of Texas, entering judgment of criminal conviction and sentence under the Sentencing Reform Act of 1984. This Court has jurisdiction of the appeal under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a).

Under Federal Rule of Appellate Procedure 4(b), a criminal defendant must file notice of appeal in the district court within 10 days after the entry of either the judgment or the order being appealed. The rule further provides that a notice of appeal filed after the announcement of a decision, sentence, or order—but before entry of the judgment or order—is treated as filed on the date of and after the entry. In this case, the judgment was signed by the Court on April 14, 2009. A motion for new trial was filed on April 9, 2009. The district court denied Defendant's motion for new trial on June 8, 2009. The notice of appeal was filed on June 17, 2009.

## ISSUES PRESENTED FOR REVIEW

1.  Whether the evidence was sufficient to support a verdict of guilty on the RICO violation alleged in the indictment .

2.  Whether the evidence was sufficient to support a verdict of guilty on the RICO conspiracy charge alleged in the indictment.

3.  Whether the evidence in the case was sufficient to support a verdict of guilty on the money laundering charge alleged in the indictment.

4.  Whether the evidence in the case was sufficient to support a verdict of guilty on the conspiracy to possess and distribute heroin, cocaine and marijuana as alleged in the indictment.

5.  Whether the Court committed error by empaneling an anonymous jury.

6.  Whether the Court committed error by failing to consider the factors set forth in 18 U.S.C. § 3553.

7.  Whether the Court committed error by allowing crucial evidence to be presented without allowing Defendant to confront and cross examine the evidence.

## STATEMENT OF THE CASE

**1.    Nature of the Case.**

Benjamin Alvarez was found guilty of a RICO and a conspiracy to commit RICO. In addition, he was also convicted of money laundering and of conspiracy to distribute narcotics.  The case involves allegations of organized crime regarding the "Barrio Azteca."  Defendant was found guilty on all counts and was sentenced to life imprisonment. On appeal, Benjamin Alvarez challenges the sufficiency of evidence to find him guilty as to all counts and challenges the trial court's use of an anonymous jury.  Alvarez also complains of a *Brady* violation by the Government and cumulative error that deprived him of a fair trial and of his due process rights.  These last two issues cannot be properly briefed in this appeal because the issues have not been ruled upon by the district court.  The facts supporting these two issues became apparent after the Government filed a notice with the district court on December 22, 2009 of information that was not provided to counsel in violation of *Brady and Giglio.* This information was provided to counsel while he was working on this appeal and before his brief was due.  Thus, Defendant Alvarez filed a motion for a stay of the appellate proceedings pending disposition of the new issues before the district court.  Defendant reserves the right to present these issues to the court of appeals on direct appeal.

**2.    Course of Proceedings and Dispositions in the Court Below.**

Benjamin Alvarez was charged in four counts of a ten count indictment with engaging in the affairs of an enterprise through a pattern of racketeering activity in violation of 18 U.S.C. 1962(c); with conspiracy to conduct the affairs of an enterprise through a pattern of racketeering activity in violation of 18 U.S.C. 1962(d), with conspiracy to launder monetary instruments in violation of 18 U.S.C. 1956, and with conspiracy to possess with intent to distribute more than 1 kilogram of heroin, more than 5 kilograms of cocaine and more than 100 kilograms of marijuana in violation of 21 U.S.C. §§ 841, and 846. (2R. at 1)  The case was tried to a jury before the Honorable David Briones. Id.  On December 2, 2008, the jury returned its verdict of guilty as to all counts involving Defendant Alvarez. (15R.).  On April 13, 2009,  the trial court  sentenced Defendant Benjamin Alvarez to life imprisonment. (16R. 24-36;CR. 1561-1565) On April 9, 2009, Defendant Alvarez filed a motion for new trial that was denied on June 8, 2009.(CR. 1553-1558)  Notice of appeal was filed on June 17, 2009. (CR. 1624).   Benjamin Alvarez now appeals.

## 3.   Statement of Facts.

Benjamin Alvarez was charged with a RICO violation and with conspiracy to commit a RICO violation.  In these counts, Alvarez was charged with committing and conspiring to commit RICO violations with Carlos Perea, Manuel Cardoza, Said

Francisco Herrera, Eugene Mona, and other members of the Barrio Azteca. The acts that he is alleged to have committed consist of the following:

A.    18 U.S.C. §1951 (extortion and conspiracy to commit extortion);

B.    18 U.S.C. §1956 (money laundering and conspiracy to launder monetary instruments); and multiple acts involving narcotics trafficking, including heroin, cocaine, and marijuana, in violation of United States law, namely,

C.    21 U.S.C. §§ 841(a)(1); involving narcotics trafficking and conspiracy to commit narcotics trafficking, including heroin, cocaine, and marijuana; and multiple charges under the following provisions of state law;

D.    Texas Penal Code, Section 19.02(b)(Murder). (C..R. 471-472.)

At trial, the evidence demonstrated that during the time periods of the alleged conspiracy, the alleged Capos of the Barrio Azteca, namely Carlos Perea, Manuel Cardoza, and Benjamin Alvarez were imprisoned. (6R. 217; 10R. 15-16, 30-31.) The Governments theory was that the Capos would send notes to the BA members in the free world and would direct their affairs from prison. (4R. 14,21, 27-28.) During the trial, the Government brought in numerous cooperating witnesses to testify against the Defendants. It was established that Benjamin Alvarez was imprisoned in the highest level security facility in the United States, namely the "Super Max" facility in Florence, Colorado. (7R. 35-139.) All of Alvarez' communications were subject to recording and monitoring. (7R. 135-139.) During the course of the trial, several Barrio Azteca members testified against the alleged

5

Capos.  None of the people who testified stated that they had ever received an order or directive from Benjamin Alvarez  This fact was acknowledged by the case agent, FBI Special Agent Mikeska.(11R. 32-34) Special Agent Mikeska stated that this was because Benjamin Alvarez did his communications with the gang members through the use of a lady by the name of Sandy New. (11R. 34.).  Mikeska further stated that Alvarez' discussions with Sandy New speak for themselves.(11R. 32.)   In the communications presented to the jury between Sandy New and Benjamin Alvarez, Benjamin Alvarez does not give Sandy New any instructions or directions for the Barrio Azteca, and indeed tells her that he wants no part of it when she tries to read him a letter from the gang. (7R. 130, 160-168). FBI Special Agent Mikeska testified as follows:

> Q.  Now, you–like we said and discussed earlier, you had all of Ben Alvarez's communications, all his letters, all his phone calls.  And I know you testified that it was Robert Duran who had received a letter from Ben Alvarez, right?
>
> A.  Yes sir,
>
> Q.  And in that letter what he is saying is, "I'm looking for Chicho," correct?
>
> A.  Correct.
>
> Q.  Okay.  Now in all of these conversations and letters, you don't have any conversations between Ben Alvarez and Chicho, do you?
>
> A.  No, sir, I do not.

Q. You don't have any communications between Ben Alvarez and Tavo, Gustavo Gallardo, do you?

A. No, sir, I do not.

Q. You don't have any conversations or communications between Ben Alvarez and Tablas, do you?

A. No, sir, I do not.

Q. You don't have any conversations or letters between Ben Alvarez and Josue Aguirre, Casper, do you?

A. No, sir, I do not.

Q. You don't have any directives or conversations or communications between Ben Alvarez and Eduardo Ruiz, do you?

A. No, sir, I do not.

Q. You don't have any conversations, any letters, any phone calls between Ben Alvarez and Mr. Michelletti, do you?

A. No, sir.

Q. And you also had Spider come in here and testify. And you don't have any communications between Ben Alvarez and–and Spider, do you?

A. No, sir, I do not.

Q. And Mr. Saucedo. Again, you have no directives, no conversations, any letters, any phone calls between Ben Alvarez and Eric Saucedo?

A. No, sir, I do not.

Q. Same thing with Gerardo Hernandez?

A. That is correct.

7

Q.  So all of these guys are the guys that came forward in telling you what they were doing out there in the streets, right?

A.  Yes, sir.

Q.  And you don't have Ben Alvarez communicating with any of them.

A.  He communicated through Sandy New. And Sandy New communicated Ben Alvarez's directives and orders to Tablas.

Q.  Okay.  So–and we can–we have the Sandy New conversations, don't we?

A.  Yes, sir.

Q.  So, the jury can listen to those and make up their own determination with respect to those conversations.

A.  That is correct.

11R. 32-34.

The first of the BA gang members to testify in the case was Johnny Michelletti. (2R.157.)  Michelletti described one of the objectives of the BA gang to collect from non BA drug dealers, known as tiendas, protection money. (2R.174-179.) The money was supposed to be collected on a regular basis and was then turned over to the gang which in turn was supposed to send it to members of the gang who were in prison or to be turned over to the Captains.  (2R. 174-180.)  Michelletti testified that he had heard of Benjamin Alvarez but that he never met him, and that he had never had any communications with him. ( 3R. 130).

8

Johnny Michelletti, identified himself as a BA member.(2R. 157). On direct examination, Michelletti described one of the objectives of the BA organization as collecting from "tienda" and explaining that "A tienda (i.e. store) is a -- is a reference to a non-BA drug dealer who is paying -- who is paying its protection to the Barrio Azteca."(2R, 174-179). He indicated in his testimony that he would collect from several tiendas on a regular basis and then turn the money over to another Barrio Azteca member. When asked what was supposed to occur when these non-BA drug dealers did not pay their "cuota," Michelletti explained: "You're supposed to show a little force or intimidation." (2R.at 177).

During cross-examination, the defense established though Michelletti sold small quantities of drugs for his own benefit (characterizing himself as "small time") and that this is what he did for a living. (2R. 212, 231). He also admitted that he himself was a cocaine user and that when he went to BA meetings he would be "coked up." (2R. 222). When asked if he would pay the cuota for his drug dealing activities, Michelletti replied that he did not and when asked why, explained that he did not have to pay any cuota "Because I am -- I am an Azteca."(2R. 222,231).

He also testified that "the reason the BA was formed as a prison gang for protection was because the guys from Houston and the guys from Dallas had no respect for the guys from El Paso." (2R.220). Also on cross-examination, defense

9

counsel established that the amount collected as a "cuota" varied and would range from $10 per day from the "tienda" they were collecting from on up to $200 per week and that he collected from these "tiendas" about a thousand dollars a week from the area he collected from.(2R.221-222,230). When asked, Michelletti denied that he "skimmed" any of the money and instead testified that he turned over all of the money to a ranking BA lieutenant in the BA organization.(2R. 231).

Another member of the BA to testify for the Government was Jose Martin Garcia. (3R.125). Like Michelletti, he claimed to also collect cuotas for the BA and testified to having collected on average the sum of $700 per week from the east side area from which he conducted his collection activities. (3R.143). Garcia also talked about an ex-member of the BA from Juarez against whom a hit had been put out by the *linea* in Juarez (referring to a drug cartel), which offered to pay $10,000.00 for the killing of this individual. (3R. 158-159). Garcia, who identified himself as an *indio,* confirmed that "some people" in Juarez were the people who wanted the killing performed. (3R. 127). He also testified to having hired one Michael Worman to transport 18 pounds of heroin to New York. (3R. 170-171). When asked if he had to pay the BA a cuota for this transaction, Garcia's reply was "No." (3R.171-172). On cross, defense counsel objected to the introduction of this testimony "inasmuch as it's individual conduct on this man's part that has nothing to do with the racketeering accusation in this case."

(3R.176). This objection was sustained by the trial court. (3R.177) . Garcia also admitted to having a long-time addiction to heroin before and after he joined the BA. 181-190. Garcia testified that he was a Barrio Azteca for 10 years. (3R. 137.) He said he never met Ben Alvarez.(3R. 130.)

A third witness called as a Government witness was Robert Duran, a BA member for 11 years. (3R.268-269). Duran testified that he had met Ben Alvarez when they were in jail together in 1981. (3R.274.) He said that they played cards, and were work out partners.   Duran testified that years later he received a letter from Ben Alvarez looking for Chicho.(3R.297-300; 313-314.)

He said Chicho took the letter, didn't read it, and that Chicho handed him $100.00 and told him to send it to Ben Alvarez. (3R. 300, 313-215.)  The letter had no directives and made no mention of rentas, drugs, green lights or any Barrio Azteca business. (3R. 313-314.)  Duran said that he went to 30 or 40 Barrio Azteca meetings and that there were never any letters presented or read from Ben Alvarez. (3R. 318.)

A fourth witness provided by the Government was Manuel Davila. (4R. 139). He testified that it was more or less 2003 that he made two heroin purchases from David Uzeta and one heroin purchase from Charlie Valdez with money provided to him by the U.S. Government, stating that these purchases involved approximately an ounce of heroin. (4R.140-148)  For these purchases, he was paid a fee of $3,000 by the

11

Government. (4R 140). Davila admitted that none of the defendants on trial in the case were involved in these transactions, and that he did not know Ben Alvarez. (4R.150-151).

Barrio Azteca member Gustavo Gallardo was also called as a cooperating witness for the Government. (4R. 169)  Gallardo testified that he met David Merez (a.k.a. "Chicho") when he got out of prison. (4R 178) . He was told after leaving prison that he was going to report to him. (4R. 179). Gallardo further testified that he first began helping Merez by collecting the *cuotas* for the BA. (4R. 180). He identified himself as a lieutenant with the BA and Merez as a captain. (4R.181).  Regarding letters he observed written between BA members, Gallardo testified that all the letters he saw (which he said were written in 2004 and 2005) were "pure negative" stuff relating to the power struggle between David Merez (Chicho) and Angel Esqueda about who was to run the BA organization in El Paso. (4R. 188).  Gallardo testified that during the period of 2003-2008, he heard Ben Alvarez mentioned a couple of times. (4R. 187.) He stated he mailed money to Ben a few times. (4R. 292.)  He further stated that he never saw a letter from Alvarez, never spoke to him on the phone, and never took an order from Alvarez. (3R. 293.)

Gallardo also identified the meaning of a "bridge," stating that it was where letters go when they are sent from prison. (4R. 189-190). He identified one bridge  as a

Jefferson Street residence address, to which letters sent from prison could be addressed. (4R. 190). Gallardo further indicated that the person to whom these BA letters would be written was a "Sally Cardoza," a pseudonym he claimed that Eugene Mona used. Id., (4R. 190-191). When asked, Gallardo admitted that he had never attended a BA meeting. (4R. 192). Gallardo was also asked to describe how cuotas were collected, at which time he indicated that various non-ranking BA members (soldiers) would go to the tiendas where the cuotas were collected; they would then turn the money over to the sergeants, who would then turn over the money to their lieutenants; and that these lieutenants would then turn over the money to the captains of the BA. (4R. 195-199). With regard to this collection process, Gallardo admitted there were problems, in that "a lot of the soldiers, the BA soldiers, they would -- they would steal ... some of the money from the stores." (4R.201). From 2003 up through 2008, Gallardo testified that he sent between $3,200 and $4,000 to BA members in prison. (4R. 200). Gallardo admitted that he would not use his name or residence in making these money orders, since he did not want law enforcement to know that money orders he was sending to BA members were coming from him.(4R. 204). Gallardo further stated that he would send this money to both federal and state prison facilities. (4R.212).

13

Gallardo also admitted to having been busted for 100 kilos of cocaine on November 8, 2006. (4R. 246). Gallardo claimed that he had received this cocaine from Tablas, Ed Ravelo, a Barrio Azteca in Juarez. According to Gallardo, all instructions and orders come from the Coffield unit. (4R.295.) Gallardo indicated that there were a lot of Barrio Azteca groups, and that there was no real chain of command. (4R. 298.) According to Gallardo, there was a Barrio Azteca in Juarez, and that they collect $100,000.00 a week in cuota. (4R. 299). The person in charge of Juarez was Ravelo, aka Tablas. (4R. 302; 5R.23.) Tablas had over 50 body guards, a mansion, and that Tablas would give him direct orders. (4R. 302-303.) Gallardo stated that the Capos would give direct orders to Tablas. (4R. 302-303.) He also testified that Azteca loyalty was to those who had the most money. (5R. 22.) Gallardo admitted to receiving and following orders from Tablas to kidnap and take three B.A. members to Mexico where they were to be dealt with by Tablas. (5R. 46-53.)

Gerardo Hernandez was yet another BA member to testify for the Government. (5R.252). Hernandez testified that he became a BA member while in prison, while serving a prison sentence for attempted murder. (5R.252.) On direct, a BA member with the rank of sergeant, Hernandez testified that his job after leaving prison was to start running meetings and to open up tiendas, in the northeast area of El Paso.(5R.279-280, 285, 293) Hernandez described there being a problem with Chicho (David Merez), a capo, with the money being collected from the tiendas, as he was not

14

sending it out for a time. (5R.289). Hernandez claimed that Chicho called him on one occasion when he needed some dope for himself and further stated that Chicho would use everything from marijuana to heroin. (5R. 291).

Another cooperating witness called by the Government in its case-in-chief was Eric Saucedo, a BA member. (8R. 56).Saucedo testified about a murder involving a Barrio Azteca by the name of Adam Munoz.  Saucedo was asked about the first time he met Adam Munoz. (8R.83-84).  Saucedo responded that it was in December of 2006, when Munoz called him after had moved from the lower valley to a new residence.(8R.83-84). Saucedo explained that Munoz had picked him up after the phone call, told him that that he was the person that picked up the cuotas in central, and that Munoz had then taken him to an address located at Frutas and Copia, where there were apartments. (8R.85) On this first occasion, Saucedo claims he was there to assist Munoz attempt to collect a cuota. (8R.87) A second attempt to collect at this address was made within days of the first attempt, but this time Munoz brought along Saucedo and three other BA members. (8R.88) On this occasion, Saucedo claims that they talked to the person living at the apartment address they had identified as a store or tienda, but the persons at this address would not let them come inside. (8R.88). Munoz then called Saucedo to accompany him on a third attempt to collect from this apartment address. (8R.90-91) This time Saucedo encountered a "carnal", a third

person Munoz had brought along whom he did not know.(8R.91-92)     After picking

Saucedo up, Saucedo testified that Munoz drove to Memorial Park where Munoz

parked his car, got out of the car, and begin putting on gloves he took out from a

duffel bag in the car. (8R.93) The other individual began putting on  gloves as

well.(8R.93) . Saucedo testified that Munoz had suggested that they put on gloves

"because [even though they] were going to the Frutas again to get money .... if the

money wasn't in full, we were going to get appliances, like TVs, DVDs, VCRs, stuff

like that." (8R.93)   Saucedo next testified that he and Munoz approached the

apartment and convinced the occupant to open the screen door. (8R.97) The occupant,

a male, then gave Munoz $20 and asked him to come back later for the rest because

he had bought gifts for his kids, but Munoz pulled out a gun and pointed it at him.

(8R.98) In response, the male occupant of the apartment attempted to grab the gun

Munoz was holding, at which time a bullet from the gun discharged into his

person.(8R.98)  According to Saucedo, Munoz then discharged a second bullet into

the victim, killing him . (8R.99-102) Saucedo claimed at trial that he did not know that

Munoz was even packing a gun prior to the shooting. (8R.100)

On cross-examination, defense counsel asked Saucedo the following series of

questions:

Defense Counsel :   Nobody authorized anybody to kill anybody that night, did
                    they?

16

Defense Counsel:    Nobody in your group expected a shooting to go down that night; is that correct?

Saucedo:    I believe Adam did, if he had the gun with him –

Defense Counsel:    Other than Adam.

Saucedo:    -- in the apartment.

Defense Counsel:    Other than Adam, correct?

Saucedo:    Yeah.

Defense Counsel:    Certainly you didn't, and the third person didn't, correct?

Saucedo:    I wasn't expecting it.

Defense Counsel:    And Chicho wanted to know what was this all about, correct?

Saucedo:    He wanted to know what happened.

Defense Counsel:    Nobody high up in the Barrio Azteca ordered you to do a killing that night?

Saucedo:    They didn't order me, but I'm pretty sure they ordered Adam, probably.

Defense Counsel:    Do you know that?

Saucedo:    He killed him.

Defense Counsel:    Do you know that the order went out?

Saucedo:    No.

(8R.159-160)

Andres Sanchez, the gang investigations officer for the El Paso Police Department testified on behalf of the Government. (6R.168.) According to Sanchez, Ben Alvarez was serving time in the ADX Super Max facility in Florence Colorado. (7R. 135.) He testified that this was the highest security facility in the United States and that Alvarez was in 23 hour lockdown, had no contact with other inmates, could not receive phone calls and that all contact that he had with the outside world was monitored. (7R. 135-139.) Sanchez said that Alvarez received $400.00 from money orders during the entire period of the conspiracy. (7R. 136.) This testimony was corroborated by FBI agent Lorraine Fryberger. (4R. 138.) Mr. Sanchez testified that he received from the ADX about 30 to 40 hours of recorded conversations of Ben Alvarez from the facility. (6R.168.) Government exhibits 196 and 197 were introduced into evidence and contained Ben Alvarez's conversations with Sandy New. The conversations were played to the jury. In the conversations with New, Alvarez said that he was basically in the dark and that any letters he may have would not go out. (7R.130.) The testimony showed that New was trying to get Alvarez to chime in on what was going on with the Aztecas. Alvarez's basic response was that he would get around to it. (7R.142-143.) That letter never left. Alvarez also is heard saying that he should not get involved and that they should handle things among themselves. (7R. 161.) This exchange took place during cross examination:

18

Q. Again, he's– he's reiterating that he told his family, as well,"I can't be dealing with this stuff;" isn't that right?

A. He's–he can't be going out with that, yes, sir.

Q. And then he tell them–the very next sentence is, "That kind of–well, I told you-all settle that amongst yourselves.  You know what I mean?

A. That's correct.

Q. Isn't that correct?

A. Yes sir.

Q. So again, he's telling them, "That's your deal.  You handle that on your own. That's not my problem;" isn't that right?

A. That's what he stated, yes.

(7R. 161.)

Officer Sanchez testified that he had no orders coming out from Ben Alvarez.

(7R. 147.)  Sanchez testified as follows:

Q. If you had a letter where Ben Alvarez was giving instructions to people, you'd have that letter, wouldn't you?

A. We probably would have had it, yes.

Q. And you don't have it, do you?

A. I don't have it, sir.

(7R. 148).

Officer Sanchez even acknowledged that there was evidence suggesting that Ben Alvarez was being abandoned by the Barrio Azteca. (7R. 168.)

FBI Special Agent Samantha Mikeska testified that she had spoken to many soldiers, sergeants, lieutenants, and captains in the Bario Azteca. (10 R. 4.) According to Government Exhibit 89, the exhibit was from Josue Aguirre and it showed a gang member list. (10R.5.) Ben Alvarez was not on the list.

In her testimony, Mikeska testified to a self proving affidavit from the Bureau of Prisons that showed the banking records of Ben Alvarez and Carlos-Perea. (Government Exhibit 353.)(9R. 293-295.) This exhibit was objected to on the basis of hearsay and that the exhibit violated Defendant's right to confrontation. (9R.296-299). An objection was also made that the exhibit had no source data with respect to where the money came from. (9R.297.) The exhibit was admitted over objection of counsel. In connection with this exhibit, the Government also offered exhibit 354 which was a cumulative spread sheet that was prepared by Special Agent Mikeska. This exhibit was also objected to on the same grounds in that the evidence supporting the exhibit contained hearsay and in that the information could not be cross-examined in violation of the Defendant's right to confrontation. (10 R. 354.) The objection was over-ruled. In Special Agent Mikeska's opinion, the exhibit highlighted what she termed to be a pattern of deposits that showed that much of the money in the bank

20

accounts had been deposited by the Barrio Azteca on behalf of Perea and Alvarez. (10

R. 16-36.) Mikeska testified that the money to be deposited first had to be sent to Des

Moines, Iowa. (11R. 10.) The exhibit showed when money made it into the account,

not when the money was sent. It was Mikeska's opinion that the exhibit showed a

pattern of activity that to her showed that a portion of the money in the accounts of

Carlos Perea and Ben Alvarez had come from the Barrio Azteca. (11R. 12.) Mikeska

testified that she had access to everything that Ben Alvarez received or sent out in the

mail, and had access to all of his phone calls. (11R. 14.) She admitted that she had

received some information in her interviews that the leadership in the Barrio Azteca

wanted to "x" out Benjamin Alvarez from the Azteca gang. (11R.14.)

Another BA member to testify on behalf of the Government was Josue Aguirre,

an individual who joined the BA in January of 1993 in prison while serving a sentence

for criminal attempted murder. (9R. 19.) Aguirre testified that he began cooperating

with the Government in 2003 in a RICO investigation, after he was released from

prison. (9R. 20-21) . At the time of trial, he testified that he had been paid the sum of

$75,000 for his services as an FBI informant, and that these payments covered the

period spanning from 2003 until shortly before the start of the trial.(9R. 21) Like other

BA members, he admitted to having used cocaine, marijuana, and heroin in the past

and testified that he did not stop using illegal drugs until 2006. (9R.147-148) Aguirre

testified that during the period he was collecting money for the BA, he would turn in between a $1,300 and $1,800 per week. (9R. 79.) He also confirmed that there was an ever-continuing power struggle between Chicho (David Merez) and Angel Esqueda during the period relevant to the indicted RICO conspiracy. (9R. 80-81). On some occasions Chicho would produce a letter from capos in prison stating that Chicho was to run the streets of El Paso while on other occasions Esqueda would produce his own letters from capos stating that he was to be in charge. This power struggle went back and forth, with power switching hands several different times. (9R. 80-81.) Aguirre was asked about a hit put out to murder the owner of Truck Town. (9R. 82.). According to Aguirre, he and other BA members met in order to accomplish this task. (9R. 83.) On direct, Aguirre stated that "they" gave us the description of the trucks that he had and told them where Truck Town owner's shop was. (9R83) BA members were also told that if they got somebody else to carry out the hit, they would be paid $15,000.00, but that if they did it themselves, they would be paid $25,000.00. (9R. 83.). On re-direct examination, Aguine clarified that the killing of this Truck Town owner was not considered BA business in the following exchange:

Prosecutor:    Now, going back to the Truck Town incident, did you talk to Esqueda about not doing that hit?

Aguirre:    Yes. But he still want to do it, because he said it was money for all of us.

Prosecutor: And what did you tell hm in order to try to dissuade him from it?

Aguirre:    To try to get it to somebody else, that it wasn't BA business, it was *linea.*

(9R. 244-245)

On October 31, 2008, a status conference was held by the district court to discuss logistical concerns and legal issues that may arise in the case. (1R.)  Before any motion were considered, the district court informed defense counsel (none of the defendant's were present) that the jury in the case was going to be an anonymous jury panel. (1R.13.)  The court did not have a hearing on the issue.  The court also instructed counsel that there was going to be an electric stun device on each defendant, and that there would be one United States Marshal for each defendant. (1R. 1-12.) The court also told counsel that the jury would be meeting a secure location where they would be brought to court every morning by United States Marshals, and that the jurors would not be allowed to leave the building until the U.S. Marshals took them back  to their "secure parking." (1R. 18.)  There is nothing in the record to show that the district court instructed the marshals not to have any conversations with the jurors and the court did nothing to admonish the jurors as to why they were being treated with heavy security. (1R.; 2R.)  Counsel objected to the lack of information with respect to the juror information being provided and to the whole process regarding the jury.  (1R. 15; 42-49.) The objections were over-ruled.  When counsel objected under

23

the Sixth Amendment, due process and the suggestion to the jury about the

defendant's being dangerous and suggests that the defendant is a criminal who needs

to be convicted just because of that the court  replied: "Well they are criminals." (1R.

48) The judge also stated, "I want them  to feel safe about serving." (1R. 44.) Counsel

made a motion for judgment of acquittal and the end of the Government's case and the

end of all the evidence. (11 R. 162-165; 12R. 206.)  The Court over-ruled the motions

for judgment of acquittal. Over objection of the parties, the court allowed 20 minutes

for argument. (12 R. 233.)   Counsel in their objections requested an evidentiary

hearing for sentencing in that the PSR contained information that was not presented

at trial or in discovery. (See objections to PSR.)  At sentencing, the trial court had no

evidentiary  hearing  and  summarily  over-ruled  any  objections  counsel  had  and

sentenced Defendant to life in prison.(16R. 24-36.)  The Court did not consider any

of the 18 U.S.C. 3553(a)and (c) factors.

# SUMMARY OF THE ARGUMENT

**I.    The Evidence presented to support the conviction under 18 U.S.C. 1962(c) was not sufficient to sustain a conviction beyond a reasonable doubt**

The Government alleged that Defendant was involved in a RICO organization. There was no evidence presented to demonstrate that defendant was involved with any racketeering act. Defendant was housed in the highest level security prison in the United States and the Government had access to all of Defendant's communications with the outside world. In the communications that the Government had, there was no evidence that defendant knew or directed any of the activities of the Barrio Azteca.

**II.    The Evidence presented to support the conviction under 18 U.S.C. 1962(d) was not sufficient to sustain a conviction beyond a reasonable doubt**

The Government alleged that Defendant was involved in a RICO conspiracy. There was no evidence presented to demonstrate that defendant was involved with any racketeering act or that he agreed to become involved with any conspiracy. Defendant was housed in the highest level security prison in the United States and the Government had access to all of Defendant's communications with the outside world. In the communications that the Government had, there was no evidence that defendant knew or directed any of the activities of the Barrio Azteca or that Defendant was aware of any conspiracy.

25

**III.     The Evidence presented to support the conviction under 18 U.S.C. 1956 was not sufficient to sustain a conviction beyond a reasonable doubt**

The Government accused Defendant of money laundering.  The Government believed that money from the racketeering activities of the Barrio Azteca was being placed in his account with the Bureau of Prisons.  There is no evidence to show that Defendant knew that any of the money being placed in his account was the proceeds of illegal activity.  The money in Defendant's account was never directly received by him.  Any funds in Defendant's account had to be sent to Des Moines, Iowa, from where the funds were then placed in Defendant's account.  Defendant had no way of knowing from where the money in his account came from and the evidence was insufficient to show that defendant knew that he was receiving the proceeds of illegal conduct.

**IV.     The Evidence presented to support the conviction under 21 U.S.C. §§ 841 and 846 was not sufficient to sustain a conviction beyond a reasonable doubt**

The Government presented evidence regarding various drug trafficking activity that was occurring outside of the ADX high security where Defendant was being housed.  There was absolutely no evidence presented to show that Defendant entered into any conspiracy to possess and distribute narcotics.  The Government had access to all of Defendant's communications with the outside world.   There is no communication where Defendant ever discussed drugs, and there is no evidence to

26

even suggest that Defendant was aware of the drug trafficking activities of the Barrio Azteca. The evidence is insufficient as a matter of law to support this conviciton.

**V.     The District Court's decision to empanel an anonymous jury violated tainted Defendant's presumption of innocence and affected his ability to choose a jury in violation of his Constitutional Rights under the 5th and 6th Amendments**

The district court in this empaneled an anonymous jury without any motion by the United States and without the benefit of a hearing. In addition, the court imposed extreme security which included that the jurors were transported to the court everyday from a secure military installation under guard by United States Marshals. The Court's actions with respect to the anonymous jury imparted a presumption of guilt in the case. Further, although counsel had jury questionnaires, the information in the questionnaires was limited. Counsel did not even know in what part of town the jurors lived. Counsel's ability to conduct an intelligent and informed voir dire was thus curtailed. The empanelment of an anonymous jury in this case constituted an abuse of discretion that requires reversal and remand for a new trial.

**VI.     The trial court committed error by failing to consider the statutory factors set forth in 18 U.S.C. 3553(a)**

The district court did not allow Defendant's to have an evidentiary hearing with respect to material in the PSR that was not adduced at trial and which was not provided in discovery. It appeared that the sentencing hearing was just a pro forma procedure to announce a sentence the district court had already decided upon. Further,

the district court completely failed to take into account the factors set forth in 18 U.S.C. 3553. Accordingly, the sentence imposed in this case must be reversed and remanded for re-sentencing.

**VII.    The trial court committed error by admitting into evidence Government Exhibits 353 and 354 in violation of defendant's constitutional right to confrontation**.

The district court admitted two exhibits into evidence without giving defendant the right to cross examine and confront the source of the information in the exhibits. The Special Agent in this case was then allowed to use the material in these exhibits to use and draw conclusion which were presented to the jury. The use of this evidence cannot be considered to be harmless because the evidence in these two exhibits and the conclusions drawn from the exhibits constituted what was likely the only viable evidence presented against Defendant. Reversal and remand for new trial is thus required.

## ARGUMENT AND AUTHORITIES

### I.  The Evidence presented to support the conviction under 18 U.S.C. 1962(c) was not sufficient to sustain a conviction beyond a reasonable doubt

#### A.  Standard of Review

In reviewing a case for sufficiency of the evidence, the Court views the evidence and all inferences to be drawn from it in the light must favorable to the verdict to determine if a rational trier of fact could have found the essential elements of the offense alleged beyond a reasonable doubt. *United States v. Posada-Rios,* 158 F.3d 832, 855 (5th Cir. 1998).  The evidence need not exclude every reasonable hypothesis of innocence, See *United States v. McCord,* 33 F.3d 1434, 1439 (5th Cir. 1994), but if the evidence "gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence," the conviction must be reversed.  *United States v. Salazar,* 66 F.3d 723, 728 (5th Cir. 1995.)

#### B.  Elements of the Offense

The substantive RICO  provisions under which Defendant Alvarez was charged, 18 U.S.C. 1962, prohibits "any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the  conduct of such enterprises's affairs through a pattern of racketeering activity or collection of unlawful debt." "To establish a violation of § 1962 (c) the government must prove (1) the existence of an

29

enterprise that affects interstate or foreign commerce, (2) that the defendant was 'employed by' or 'associated with' the enterprise, (3) that the defendant participated in the conduct of the enterprise's affairs, and (4) that the participation was through 'a pattern of racketeering activity.'" *Posada Rios,* at *158 F.158 F.3d at 855 (*citing *United States v. Erwin,* 793 F.2d 656, 670 (5th Cir. 1986.)

C.     **The evidence presented by Government failed to prove that Defendant was associated by the enterprise or that he participated in the conduct of the enterprises's affairs**

The evidence presented against Defendant Alvarez was circumstantial and weak at best. There was evidence presented that once upon a time, Defendant Alvarez was a member of Barrio Azteca. However, there was no evidence to satisfy element number three and four of the essential elements. There was absolutely no evidence that Defendant participated in the conduct of the enterprises affairs or that such participation was through a pattenr of racketeering activity. The evidence at trial demonstrated that Defendant was being housed in the highest security level prison in the United States. Defendant was in lock down isolation and had no contact with any other inmates. Alvarez also could not receive or sent out any mail that was not examined and monitored. The same was true for all of Alvarez's contact with the outside world, in other words any contact that Alvarez had with anybody out of his prison cell. Although a number of cooperating witnesses testified at trial, none of the

30

witnesses testified that Ben Alvarez ever gave or delivered any gang directives to the Barrio Azteca. Further, there is no evidence that Ben Alvarez ever had any contact or communication with any of the co-defendants in this case. This fact is important in that it was testified to that before any significant decisions regarding the gang were made, that the so called Capos had to agree to the proposed action. In this case, there is absolutely no evidence of any such communication. Indeed, there is much evidence that the decisions regarding what was to happen within the gang was coming from Juarez, Mexico from a man known as "Tablas." Thus, there is no evidence that Defendant participated in the racketeering activity.

Evidence adduced in trial suggests that Defendant was no longer included in the gang. Agent Mikeska admitted that she had heard evidence that the leaders of the gang wanted to "x-out" defendant from the Barrio Azteca. This possibility was also acknowledged by El Paso Police Officer Andres Sanchez who acknowledged that there was evidence suggesting that Alvarez was being abandoned by the Barrio Azteca. Sanchez testified that the investigation had access to all of Ben Alvarez's conversations and letters to the outside world. If Alvarez had given an order or directive regarding gang activity, he would have had it. Sanchez acknowledged that he was in possession of no such evidence.

31

FBI Special Agent Mikeska acknowledged that if there was any communications between Alvarez and the Barrio Azteca that the communications were conducted through Sandy New. When the communications with Sandy New are listened to, (Government Exhibits 196, 197) it is clear that Ben Alvarez tries to distance himself from the gang. New in the conversations tries to get Alvarez to give an opinion about the problems that are taking place within the gang. Alvarez repeatedly tells her that it is not his problem and that they should settle their problems among themselves. If anything, the conversations between Alvarez and New strongly suggest that Defendant Alvarez was no longer involved with gang activity and that he indeed had been abandoned or X'd out of the gang.

The only evidence that suggests that Defendant was involved with the Barrio Azteca is that the Government believes that Defendant was receiving money from the gang. Again, there is absolutely no evidence to show that Defendant knew he was receiving money from the Barrio Azteca. Defendant would receive some money into his Bureau of Prison account, but there is no evidence to show that Alvarez knew where the money was coming from or to show that he knew the money was the proceeds of illegal activity.

The evidence in this case against Defendant Alvarez is circumstantial. As stated supra, if evidence "gives equal or nearly equal circumstantial support to a

theory of guilt and a theory of innocence," the conviction must be reversed.  The evidence in this case arguably suggests that Alvarez is not guilty and that he had been removed from the gang.  Also, there is no evidence to show that he participated in gang activities.  Thus, the evidence in this case equally supports a theory of innocence and Defendant's conviction under this count must be reversed and the conviction should be vacated.

## II.    The Evidence presented to support the conviction under 18 U.S.C. 1962(d) was not sufficient to sustain a conviction beyond a reasonable doubt

### A.  Standard of Review

In reviewing a case for sufficiency of the evidence, the Court views the evidence and all inferences to be drawn from it in the light must favorable to the verdict to determine if a rational trier of fact could have found the essential elements of the offense alleged beyond a reasonable doubt. *United States v. Posada-Rios,* 158 F.3d 832, 855 (5th Cir. 1998).  The evidence need not exclude every reasonable hypothesis of innocence, See *United States v. McCord,* 33 F.3d 1434, 1439 (5th Cir. 1994), but if the evidence "gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence," the conviction must be reversed. *United States v. Salazar,* 66 F.3d 723, 728 (5th Cir. 1995).

33

## B.  Elements of the Offense

The RICO Act criminalizes the conspiracy to violate any of its substantive provisions.  18 U.S.C. § 1962(d).  To prove a RICO conspiracy, the government must establish (1) that two or more people agreed to commit a substantive RICO offense and (2) that the defendant knew of and agree to the overall objective of the RICO offense."  *Posada-Rios,* 158 F.3d 857-58.  These elements may be established by circumstantial evidence. *Id.*  The conspirator need not have committed or agreed to commit the two predicate acts.  *Salinas v. United States,* 522 U.S. 52, 61-66, 118 S.Ct. 469, 139 L.Ec. 2d 352 (1977).  The Defendant need only have known of and agreed to the overall objective of the RICO offense.  *Posada-Rios,* 158 F.3d at 857.

As stated in the previous section, there is no evidence to show that Defendant knew and agreed to the overall objective of the RICO offense.  To find the Defendant guilty there had to be some evidence that he knew of the racketeering scheme and that he agreed to the overall objective of the RICO offense.  In this case, there is no evidence that Alvarez ever gave any directives to the gang of which he was allegedly a capo or captain.  Counsel acknowledges that Defendant need not have committed or agreed to commit two predicate acts and that to be found guilty, he only need known of and agreed to the overall objective of the RICO offense.  That, however, is the problem with the Government's case.  There is no evidence that Alvarez ever discussed or

knew about the conspiracy in this case. The Government had access to all of Defendant communications with the outside world and no where in those communications is there evidence that Alvarez knew and agreed to what the Barrio Azteca was doing in the outside world. Indeed, Alvarez's communications suggest that Defendant had been abandoned or X'd out by the gang. Accordingly, there is insufficient evidence to support Defendant's conviction under the RICO conspiracy and his conviction under this count should be reversed and his conviction should be vacated.

## III.     The Evidence presented to support the conviction under 18 U.S.C. 1956 was not sufficient to sustain a conviction beyond a reasonable doubt

### A.  Standard of Review

In reviewing a case for sufficiency of the evidence, the Court views the evidence and all inferences to be drawn from it in the light must favorable to the verdict to determine if a rational trier of fact could have found the essential elements of the offense alleged beyond a reasonable doubt. *United States v. Posada-Rios,* 158 F.3d 832, 855 (5th Cir. 1998). The evidence need not exclude every reasonable hypothesis of innocence, See *United States v. McCord,* 33 F.3d 1434, 1439 (5th Cir. 1994), but if the evidence "gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence," the conviction must be reversed. *United States v. Salazar,* 66 F.3d 723, 728 (5th Cir. 1995)

35

### B.  Elements of the offense

In order to find that the defendant committed the offense of money laundering under 18 U.S.C. § 1956, the government must prove that the defendant: (1) conducted or attempted to conduct a financial transaction, (2) which the defendant knew involved the proceeds of unlawful activity, and (3) which the defendant knew was designed to conceal or disguise the nature, location, source, ownership, or control of the proceeds of the unlawful activity.  *United States v. Burns,* 162 F.3d 840, 847 (5th Cir. 1998.)

### C.  The Government did not present sufficient evidence to show that Defendant was involved with money laundering

As stated supra, Defendant received money in his bank account that the Government believed to be from the Barrio Azteca. However to be found guilty of laundering, the Government had to show that the defendant knew the money he was receiving involved the proceeds of unlawful activity, and which the defendant knew was designed to conceal or disguise the nature of the unlawful activity. There is nothing in the evidence to show that Defendant knew who was sending him money, and nothing to show that Defendant knew he was receiving money from the Barrio Azteca that was the proceeds of racketeering activity.  As the evidence demonstrated, the money that would go into Alvarez account with the BOP first had to go to Des Moines, Iowa.  The money would then be placed in his account.  Thus, Defendant never directly received that letters that contained the money or checks that he was

36

receiving.  Defendant had no way of knowing for sure who had sent him the money or where it came from.  As such, there is no evidence to show that Defendant Alvarez knew that the money he was receiving involved the proceeds of unlawful activity and his conviction under this count must be reversed and the conviction must be vacated.

**IV.     The Evidence presented to support the conviction under 21 U.S.C. §§ 841 and 846 was not sufficient to sustain a conviction beyond a reasonable doubt**

**A.  Standard of Review**

In reviewing a case for sufficiency of the evidence, the Court views the evidence and all inferences to be drawn from it in the light must favorable to the verdict to determine if a rational trier of fact could have found the essential elements of the offense alleged beyond a reasonable doubt. *United States v. Posada-Rios,* 158 F.3d 832, 855 (5th Cir. 1998).  The evidence need not exclude every reasonable hypothesis of innocence, See *United States v. McCord,* 33 F.3d 1434, 1439 (5th Cir. 1994), but if the evidence "gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence," the conviction must be reversed.  *United States v. Salazar,* 66 F.3d 723, 728 (5th Cir. 1995)

**B.  Elements of the Offense**

37

To prove a conspiracy, the government must show "(1) an agreement between two or more persons to pursue an unlawful objective; (2) the defendant's knowledge of the unlawful objective and voluntary agreement to join the conspiracy; and (3) an overt act by one or more of the members of the conspiracy in furtherance of the objective of the conspiracy." *United States v. Fernandez,* 559 F.3d 303, 313 (5th Cir. 2009) *citing United States v. Conner,* 537 F.3d 480, 484 (5th Cir. 2008.)

### C.   The Government did not present any evidence that Defendant conspired with anyone to possess and distribute drugs of any kind

There is no evidence in this case that Defendant Alvarez ever discussed drugs or illegal narcotics with anyone.  Despite the fact that the Government had access to all of Defendant's communications with the outside world, there is no evidence that Defendant ever discussed illegal drug activity or that he knew about any illegal drug activity. There is no evidence that Defendant ever agreed to take part in any narcotics conspiracy or to show that he was aware of any such conspiracy.  Indeed, much of the activity involving drugs in this case was conducted on an individual basis by various Azteca members in the outside world.  There is nothing to suggest that Defendant was part of this activity or that he was aware of any such activities.  Thus, Defendant's conviction under this count must be reversed and vacated.

### V.    The District Court's decision to empanel an anonymous jury violated tainted Defendant's presumption of innocence and affected his ability to

**choose a jury in violation of his Constitutional Rights under the 5th and 6th Amendments**

## A.  Standard of Review

A district court's decision to empanel an anonymous jury is entitled to significant deference, and is reviewed for abuse of discretion.  *United States v. Sanchez,* 74 F.3d 562, 564 (5th Cir. 1996); *United States v. Krout,* 66 F.3d 1420, 1426 (5th Cir. 1995), cert. denied, 116 S.Ct. 963 (1996).    This Court has previously noted that empanelment of an anonymous jury is a "drastic measure" that should be utilized only in limited circumstances. *United States v. Salvatore,* 110 F.3d. 1131, 1143 (5th Cir. 1997);  See *Krout,* 66 F.3d at 1427.  Accordingly, this court  has ruled that such a practice is constitutional when necessary "to ensure against a serious threat to juror safety" so long as the defendants are not stripped of their rights to conduct an effective voir dire and to maintain the presumption of innocence.  *Id.*  The district court must base its decision to empanel an anonymous jury on "more than mere allegations or inferences of potential risk."  *Id.*  However, the decision will be affirmed when "the evidence at trial supports the conclusion that anonymity was warranted. *Id.*

The factors that may justify impanelment of an anonymous jury include:

(1) the defendant's involvement in organized crime; (2) the defendant's participation in a group with the capacity to harm jurors; (3) the defendants' past attempts to interfere with the judicial process or witness; (4) the potential that, if convicted, the defendants will suffer a lengthy incarceration and substantial monetary penalties; and (5) extensive publicity that could enhance the possibility that jurors' names would become public and expose them to intimidation and harassment. *Salvatore* 110 F.3d at 1143. The decision to empanel an anonymous jury should be based on the totality of the circumstances. *United States v. Branch,* 91 F.3d 699, 724 (5th Cir. 1996). The decision to affirm a district court's decision to empanel an anonymous jury has been affirmed when there is no showing that the use of an anonymous jury when there is no showing that the defendant was either prejudiced or that its use undermined the defendant's presumption of innocence. *Id, at* 724-725.

In this case, the court never held a hearing to allow both sides to present evidence for or against why an anonymous jury was needed. Indeed, the Government never filed a motion requesting such a jury. It is possible that the Government requested an anonymous jury in their sealed communications to the court, but Defendant has no way of knowing if this took place. As the record reflects, Defendant filed a motion to unseal those communications or at the least, to have the appellate court have access to those communications to determine if Defendant was allowed to have such

40

communications. Thus, there is no evidence to determine if the court weighed the above listed factors. The Court's decision to have an anonymous jury either was decided upon *sua sponte* or on the basis of sealed communications with the Government. In any event it appears that the decision to move forward with an anonymous jury violated defendant's due process rights under the 5th Amendment to the United States Constitution.

The district court's decision to have an anonymous jury caused the presumption of innocence to be stripped, and indeed the court in its actions with respect to the jury created a presumption of guilt. In addition to having an anonymous jury, the district court had extreme security imposed with respect to the defendants, and the jury. The court also instructed counsel that there was going to be an electric stun device on each defendant, and that there would be one United States Marshal for each defendant. (1R. 1-12.) The court also told counsel that the jury would be meeting a secure location where they would be brought to court every morning by United States Marshals, and that the jurors would not be allowed to leave the building until the U.S. Marshals took them back to their "secure parking." (1R. 18.) There is nothing in the record to show that the district court instructed the marshals not to have any conversations with the jurors and the court did nothing to admonish the jurors as to why they were being treated with heavy security. (1R.; 2R.) Normally, United States Marshals do not have

this type of contact with jurors. When court CSO's take charge of a jury, the court instructs them not to make comments to the jury. There is no evidence in this case that the court ever instructed the Marshals not to communicate with the jury panel with respect to the case or with respect to the security measures. When counsel objected under the Sixth Amendment, due process and the suggestion to the jury about the defendant's being dangerous and the implied suggestion that the defendant is a criminal who needs to be convicted just because of that, the court replied; "Well they are criminals." (1R. 48) Having the jurors brought to trial everyday from a secure military base under escort of armed marshals, with their identities being kept secret, the presumption of innocence was converted into a presumption of guilt. The jury selection process also stripped Defendant and his counsel's ability to conduct an effective voir dire. Although the court did provide jury questionaires, the questionaires did not give any information with respect to what part of town the jurors lived in. Not even their zip codes was supplied. The questionaires in this case were not detailed and extensive as was done in cases where an anonymous jury was allowed. Thus, counsel in this case did not have a meaningful opportunity to conduct an intelligent informed voir dire. The trial court's actions with respect to the anonymous jury and all the security imposed in this case was an abuse of discretion

42

which violated Defendant's right to a jury trial and the presumption of innocence and requires that this case be reversed and remanded for new trial.

## VI.    The trial court committed error by failing to consider the statutory factors set forth in 18 U.S.C. 3553(a)

A.    Standard of Review

Pursuant to the dictates of *United States v. Booker*, 543 U.S. 220, 261 (2005), "reasonableness" became the substantive standard in reviewing a sentence. This Court has equated Booker's "unreasonableness" standard with the abuse-of-discretion standard that governed the review of departure decisions before Congress amended the sentencing statute in 2003. *United States v. Smith*, 417 F.3d 483, 489-90 (5th Cir. 2005.) The trial courts actions are reviewed for abuse of discretion.

## B.    The Trial Court failed to consider the factors set forth in 18 U.S.C. 3553(a)

The United States Supreme Court in the case of *Gall v. United States,* 128 S.Ct. 586 (2007), stated that "after giving both parties an opportunity to argue for whatever sentence they deem appropriate, the district judge should then consider all of the §3553(a) factors to determine whether they support the sentence requested by a party." In the footnote 6 which immediately follows this quote, the Supreme court lists the seven factors that the sentencing court ***must*** consider. In *Gall,* the Supreme Court did not say that the District Court had the discretion not to take the statutory

43

factors into consideration.  The Court stated that the Sentencing Court must take the

factors into consideration in reaching its sentence.

The factors in 18 U.S.C. §3553(a) include:

(1)  the nature and circumstances of the offense and the history and characteristics of the defendant;

(2)  the need for the sentence imposed-

    (A)  to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

    (B)  to afford adequate deterrence to criminal conduct;

    (C)  to protect the public from further crimes of the defendant; and

    (D)  to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;....

(6)  the need to avoid unwarranted sentence disparities among defendants among defendants with similar records who have been found guilty of similar conduct,......

As the record at the sentencing hearing shows, counsel objected to the sentencing

procedure.  It was apparent that the court had made up its mind with respect to

sentencing prior to the sentencing hearing and the sentencing process was largely a

pro forma hearing. (16R. 24-36.) The trial court never considered the 3553(a) criteria.

(16R.24-36.)   Accordingly, because the trial court did not consider the mandated

3553(a) criteria, the sentence is this case should be vacated, and this case should be remanded for re-sentencing.

**VII.     The trial court committed error by admitting into evidence Government Exhibits 353 and 354 in violation of defendant's constitutional right to confrontation.**

### A.  Standard of review

This Court reviews a Confrontation Clause challenge de novo.  *United States v. Alvarado-Valdez,* 521 F.3d 337, 341 (5th Cir. 2008).  Such claims however are subject to harmless error review.  *Id.; see also United States v. Jimenez,* 464 F.3d 555, 558 (5th Cir. 2006).

The Confrontation Clause of the Sixth Amendment requires that an accused has the right to be confronted with the witnesses against him. *U.S. Const. Amend. VI.*  This right has been recognized by the United States Supreme Court.  *Crawford v. Washington,* 541 U.S. 36, 53-54, 124 S.Ct. 1354, 158 L.Ed. 2d 177 (2004).  In her testimony, Special Agent Mikeska testified to a self proving affidavit from the Bureau of Prisons that showed the banking records of Ben Alvarez and Carlos-Perea. (Government Exhibit 353.)(9R. 293-295.)  This exhibit was objected to on the basis of hearsay and that the exhibit violated Defendant's right to confrontation. (9R.296-299).  An objection was also made that the exhibit had no source data with respect to where the money came from. (9R.297.)  The exhibit was admitted over objection of

45

counsel. In connection with this exhibit, the Government also offered exhibit 354 which was a cumulative spread sheet that was prepared by Special Agent Mikeska. This exhibit was also objected to on the same grounds in that the evidence supporting the exhibit contained hearsay and in that the information could not be cross-examined in violation of the Defendant's right to confrontation. (10 R. 354.) The objection was over-ruled.  In Special Agent Mikeska's opinion, the exhibit highlighted what she termed to be a pattern of deposits that showed that much of the money in the bank accounts had been deposited by the Barrio Azteca on behalf of Perea and Alvarez. (10 R. 16-36.) Mikeska testified that the money to be deposited first had to be sent to Des Moines, Iowa. (11R. 10.) The exhibit showed when money made it into the account, not when the money was sent.  It was Mikeska's opinion that the exhibit showed a pattern of activity that to her showed that a portion of the money in the accounts of Carlos Perea and Ben Alvarez had come from the Barrio Azteca. (11R. 12.)  The use of this testimony presented evidence that the Defendant had no opportunity to cross examine or to confront.  As such, counsel was unable to examine how the information was compiled, where the deposits came from or where and when the money was received from.  This evidence was crucial with respect to Defendant Alvarez because the Government as scant other evidence against Defendant.  To allow Special Agent Mikeska to testify and give her conclusions from the spread sheet in Government

Exhibit 354 that was derived from a document (Government Exhibit 353) that Defendant had no ability to confront and cross examine, constituted error that cannot be deemed harmless.  Had Defendant been able to cross examine the maker of Government Exhibit 353, he may have been able to develop when and from where the deposits made into Defendant's account came from,  and been able to refute the conclusions that Special Agent Mikeska was making with respect to the deposits into Ben Alvarez's BOP account.  These  two exhibits present the strongest evidence and arguably the only evidence that the Government had against Defendant.  For this reason, the court's decision to allow this evidence to be admitted violated Defendant's right to confrontation and cannot be considered harmless.  For this reason, this error requires that this case be reversed and remanded for new trial.

## CONCLUSION

Because the evidence in this case under all the counts of conviction failed to prove guilt beyond a reasonable doubt, all of the counts of conviction must be reversed and the counts of conviction must be vacated.  In addition, the district court's use of an anonymous jury panel was an abuse of discretion that warrants a new trial.  Furthermore, evidence regarding Defendant BOP account was introduced against Defendant's right of confrontation which warrants a new trial.  Finally, the district court failed to take into consideration the factors in 18 U.S.C. 3553(a), and

Defendant's sentence should be vacated and the case should be remanded for re-sentencing.

                                            Respectfully submitted.


                                            ROBERT J. PEREZ
                                            210 N. Campbell
                                            El Paso, Texas 79901
                                            Tel.: (915) 542-1222
                                            Fax: (915) 532-2041

                                            *Attorney for Defendant-Appellant*

# CERTIFICATE OF SERVICE

On January 13, 2009 I served two copies of this Brief on Johnny Sutton, U.S. Attorney for the Western District of Texas (Attn: Joseph H. Gay Jr., Assistant U.S. Attorney), by mailing them to his office at 601 N.W. Loop 410, Suite 600, San Antonio, Texas 78216-5512. I also served on counsel a diskette containing the brief, in compliance with Fifth Circuit Rule 31.1.

<div style="margin-left:auto; width:50%;">

_____

ROBERT J. PEREZ
*Attorney for Defendant-Appellant*

</div>

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

1.    This brief complies with the type-volume limitation FED. R. APP. P.32(a)(7)(B) because this brief contains 11,854 words, including the parts of the brief exempted by FED.R.APP.P. 32(a)(7)(B)iii).

2.    This brief complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type style requirements of FED. R. APP. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Word Perfect 10 software in 14 point font size and Times New Roman font style.


ROBERT J. PEREZ
*Attorney for Defendant-Appellant*
January 14, 2010