No. 09-50323

## In the United States Court of Appeals for the Fifth Circuit

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

SAID FRANCISCO HERRERA,

*Defendant-Appellant.*

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS

**BRIEF OF DEFENDANT-APPELLANT**

JOE A. SPENCER, JR.
*Attorney for Defendant-Appellant*
1009 Montana
El Paso, Texas 79901
Tel.: (915) 532-5562
Fax: (915) 532-7535

# CERTIFICATE OF INTERESTED PERSONS

## United States v. Said Francisco Herrera
## No. 09-50323

The undersigned counsel of record certifies that the persons having an interest in the outcome of this case are those listed below:

1.    **Said Francisco Herrera,** Defendant-Appellant.

2.    **Joseph H. Gay, Jr.,** U.S. Attorney;

3.    **Jose L. Acosta,** Assistant U.S. Attorneys, who represented Plaintiff-Appellee in the district court.

4.    **Francisco F. Macias,** trial court counsel and court-appointed appellate counsel for Defendant-Appellant, Eugene Mona.

5.    **John David Gates**, appellate counsel for Carlos Perea.

6.    **Patrick A. Lara**, appellate counsel for Arturo Enriquez.

7.    **Robert J. Perez**, appellate counsel for Benjamin Alvarez.

8.    **Maria B. Ramirez**, appellate counsel for Manuel Cardoza.

9.    **Joe A. Spencer Jr.,** appellate counsel for Said Francisco Herrera.

This certificate is made so that the judges of this Court may evaluate possible disqualification or recusal.

JOE A. SPENCER
*Attorney for Defendant-Appellant*

ii

## STATEMENT REGARDING ORAL ARGUMENT

Appellant, Said Herrera, requests oral argument in this case. It is Counsel's belief that oral argument will be helpful to the Court, given the voluminous evidence adduced at trial which relates to the RICO conspiracy of which Herrera was convicted.

# TABLE OF CONTENTS

Page

CERTIFICATE OF INTERESTED PERSONS ........................................................... ii

STATEMENT REGARDING ORAL ARGUMENT ................................................ iii

TABLE OF AUTHORITIES .................................................................................... vi

SUBJECT MATTER AND APPELLATE JURISDICTION ................................. 1

ISSUES PRESENTED FOR REVIEW ................................................................... 2

STATEMENT OF THE CASE

    1. Nature of the Case ...................................................................................... 3

    2. Course of Proceedings and Disposition in the Court Below. ........................... 3

    3. Statement of Facts ...................................................................................... 4

SUMMARY OF THE ARGUMENT .................................................................... 16

ARGUMENT AND AUTHORITIES

    1.   There is insufficient legal and factual evidence to sustain the Appellant's

    convictions in this case and the convictions must be reversed .................................. 17

    2.   The Trial Court erred in allowing documentary evidence to be presented to

    the jury based on improper authentication and poor quality to be of probative

    value to the jury. .................................................................................................... 26

    3.   The Trial Court erred in sentencing the Appellant based on improper

information in the Pre-Sentence Report and failure to consider the entire

spectrum of sentencing guidelines.................................................................35

**CONCLUSION**.................................................................................................45

**CERTIFICATE OF SERVICE**......................................................................46

**CERTIFICATE OF COMPLIANCE WITH RULE 32(a)**......................................47

# TABLE OF AUTHORITIES

Page

**Cases**

*Apprendi v. New Jersey*, 530 U.S. 466 (2000) .................................................. 41, 43

*Blakely v. Washington*, 542 U.S. 296 (2004) .......................................... 46

Buchanan, 70 F.3d at 827 (5th Cir. 1995) ................................................ 31

*Burks v. U.S.*, 437 U.S. 1, 16-17, 98 S. Ct. 2141, 57 L. Ed. 2d. 1 (1978).............. 23

*Coughlin v. Capitol Cement Co.*, 571 F.2d 290, 306-08 (5th Cir. 1978)................ 34

*In Re Winship*, 397 U.S. 358, 364, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970) ......... 23

*Jackson v. Virginia*, 443 U.S. 307, 99 S. Ct. 2781, 61 L. Ed. 2d. 560 (1979)........ 23

*re Winship*, 397 U.S. 358, 364 ............................................................. 41

*Stirone v. United States*, 361 U.S. 212, 218, 4 L. Ed. 2d 252, 80 S. Ct. 270 (1960)

................................................................................................ 28

Thompson, 130 F.3d at 683 ................................................................. 31

Thompson, 130 F.3d at 683 (5th Cir. 1997) ......................................... 31

*U.S. v. Olano*, 507 U.S. at 736 ............................................................. 45

*U.S. v. Wang*, 222 F.3d at 234, 243-44 .................................................. 28

*United States v. Aderholt*, 87 F.3d 740 (5th Cir. 1996) .......................... 47

*United States v. Aderholt*, 87 F.3d 740, 744 (5th Cir. 1996) .................. 48

vi

*United States v. Alarcon*, 261 F.3d 416, 423 (5th Cir. 2001)................................. 48

*United States v. Atkinson*, 297 U.S. 157, 80 L. Ed. 555, 56 S. Ct. 391 (1936)....... 45

United States v. Beason, 690 F.2d 439 (5th Cir. 1982) ......................................... 36

United States v. Biggins, 551 F.2d 64 (5th Cir. 1977).......................................... 31

*United States v. Blake*, 488 F.2d 101, 105-06 (5th Cir. 1973) ............................... 34

*United States v. Booker*, 543 U.S. 220 (2005) ....................................................... 45

*United States v. Bright*, 630 F.2d 804, at 829 (5th Cir. 1980) ............................... 26

United States v. Buchanan, 70 F.3d 818, 827 (5th Cir.) cert denied, 477 U.S. 906

(1986) ................................................................................................................ 31

*United States v. Calverley*, 37 F.3d 160 (5th Cir. 1994)........................................ 42

United States v. Carbone, 798 F.2d 21, 24 (1st Cir. 1986) ................................... 31

*United States v. Cauble*, 706 F.2d 1322 (5th Cir. 1983) ........................................ 27

*United States v. Cauble*, 706 F.2d 1322, 1331 (5th Cir.1983) ............................... 27

United States v. Citron, 783 F.2d 307 (2d Cir. 1986) ............................................ 36

*United States v. Collins*, 40 F.3d 95, 98-101 (5th Cir. 1994).................................. 24

*United States v. Cotton*, 535 U.S. 625, 631 (2002)................................................ 43

*United States v. Creech*, 408 F.3d 264, 271-72 (5th Cir. 2005) ............................ 44

*United States v. Cruz*, 765 F.2d 1020 (11th Cir.1985)........................................... 38

*United States v. Curtin*, 489 F.3d 935 (9th Cir. 2007)........................................... 35

vii

*United States v. DeLeon*, 247 F.3d 593, 597-98 (5th Cir. 2001) ........................... 43

*United States v. Denton*, 556 F.2d 811, 816 (6th Cir. 1977)................................ 32

*United States v. DiCarlantonio*, 870 F.2d 1058, 1061 (6th Cir.1989).................... 28

*United States v. Elliott*, 571 F.2d 880, 897-99 (5th Cir.), cert. denied, 439 U.S. 953,

    99 S. Ct. 349, 58 L. Ed. 2d 344 (1978)................................................................. 26

*United States v. Elliott*, 571 F.2d 880, 902 (5th Cir. 1978...................................... 28

*United States v. Elliott*, supra, 571 F.2d at 899 n.23 ............................................. 26

*United States v. Franks*, 46 F.3d 402 (5th Cir. 1995) ............................................ 45

*United States v. Garcia*, 242 F.3d 593, 599-600 (5th Cir. 2001)........................... 44

*United States v. Garcia-Duarte,* 718 F.2d 42 (2d Cir. 1983) ................................. 35

*United States v. Gonzales*, 327 F.3d 416, 419 (5th Cir. 2003) .............................. 41

*United States v. Gracia-Cantu*, 302 F.3d 308, 313 (5th Cir. 2002)........................ 48

*United States v. Marshall,* 762 F.2d 419 (5th Cir. 1985)........................................ 34

*United States v. McMillan*, 508 F.2d 101, 105 (8th Cir.), cert. denied, 421 U.S.

    916, 95 S.Ct. 1577, 43 L.Ed.2d 782 (1974)......................................................... 37

*United States v. McWaine*, 243 F.3d 871, 875 (5th Cir. 2001) .............................. 43

*United States v. Miranda*, 248 F.3d 434, 444-46 (5th Cir. 2001) .......................... 43

*United States v. Misher*, 99 F.3d 664, 667 (5th Cir.1996) ..................................... 25

*United States v. Olano*, 507 U.S. 725, 123 L. Ed. 2d 508, 113 S. Ct. 1770 (1993) 42

*United States v. Onori*, 535 F.2d 938 (5th Cir.1976)............................................. 37

*United States v. Phillips*, 219 F.3d 404, 409 (5th Cir. 2000)................................... 25

*United States v. Phillips*, 664 F.2d 971, 1011 (5th Cir.1981)................................. 27

*United States v. Posada-Rios*, 158 F.3d 832, 857 (5th Cir. 1998)......................... 24

United States v. Puma,  937 F.2d 151, 160 (5th Cir. 1991), cert. denied, 112 S. Ct.

    1165, 117 L. Ed. 2d 412 (1992) .......................................................... 47

*United States v. Robinson*, 707 F.2d 872, 878 (6th Cir. 1983) .............................. 32

*United States v. Robinson*, 763 F.2d 778, 781 (6th Cir. 1985) .............................. 31

*United States v. Sanders*, 749 F.2d 195, 197-98 (5th Cir. 1984) ........................... 34

*United States v. Smith*, 264 F.3d 518, 520 (5th Cir. 2001) .................................... 42

*United States v. Sotelo*, 97 F.3d 789 (5th Cir.)..................................................... 25

*United States v. Sutherland*, 656 F.2d 1181 (5th Cir.1981)................................... 38

United States v. Thompson, 130 F.3d 676, 683 (5th Cir. 1997) cert. denied 118

    S.Ct. 2307 (1998)........................................................................ 30

*United States* v. *Tucker,* 404 U.S. 443, 447 ....................................................... 42

*United States v. Valencia*, 957 F.2d 1189 (5th Cir. 1992) ................................... 38

United States v. Weinstein, 762 F.2d 1522 (11th Cir. 1985)................................. 36

*United States v. West*, 948 F.2d 1042, 1044  (6th Cir. 1991)................................. 31

ix

**Statutes**

18 U.S.C. § 3742(e) ............................................................. 42

18 U.S.C. § 1951 ................................................................... 5

18 U.S.C. § 1962 ................................................................. 44

18 U.S.C. § 1962(a),(c), (d) ................................................ 19

18 U.S.C. § 1963(a) ....................................................... 44, 45

18 U.S.C. § 3231 ................................................................ viii

18 U.S.C. § 3742(a) .............................................................. 2

18 U.S.C. §1951 ................................................................. 21

18 U.S.C. §1951(a) ....................................................... 19, 23

18 U.S.C. §1962(a), (c) and (d) .......................................... 40

18 U.S.C. §3742(e) ............................................................. 41

18 U.S.C.A. § 1961(1) ........................................................ 26

18 U.S.C.A. § 1962(c) ........................................................ 25

21 U.S.C. § § 846 and 841(a)(1) ........................................... 6

21 U.S.C. § 841 ................................................................. 24

21 U.S.C. § 841(b)(1)(D) .................................................... 44

21 U.S.C. § 846 ................................................................. 25

8, §1B1.2(d) and §1B1.2 .................................................... 47

Section 1961 (1) and 1961(5) of Title 18, United States Code .................................. 5

Texas Penal Code, Section 19.02(b)(Murder) ........................................................ 6

U.S.S.G §3D1.2 ............................................................................................... 47

U.S.S.G. §  1B1.3 (a)(1)(B) ............................................................................... 47

U.S.S.G. §  2D1.4 ............................................................................................ 47

U.S.S.G. §§3D1.2 and 3D1.3 ............................................................................ 47

U.S.S.G. §1B1.3 ............................................................................................... 39

U.S.S.G. §3D1.2(c) .......................................................................................... 39

U.S.S.G. Chapter V, part A. See PSR p.72 ........................................................... 39

**Rules**

FED. R. CRIM. P. 32(C)(3)(D) ............................................................................ 47

Fed. R. Crim. P. 52(b) ...................................................................................... 42

Fed. R. Evid. 1006 ........................................................................................... 32

Fed.R.Evid. 1002 ........................................................................................ 33, 35

Fed.R.Evid. 801 ............................................................................................... 35

Fed.R.Evid. 803(6) ...................................................................................... 33, 35

Fed.R.Evid. 901(a) ...................................................................................... 33, 35

Federal Rule of Appellate Procedure 4(b) ............................................................. 2

Federal Rule of Evidence 1006 ................................................................. 32

Rule 32 of the Federal Rules of Criminal Procedure ............................... 47

Rule 803(6) ................................................................................................. 34

## SUBJECT MATTER AND APPELLATE JURISDICTION

1. **Subject Matter Jurisdiction in the District Court.** This case arose from the prosecution of an alleged offense against the laws of the United States. The district court therefore had jurisdiction to hear this case pursuant to 18 U.S.C. § 3231.

2. **Jurisdiction in the Court of Appeals.** This is a direct appeal from a final decision of the U.S. District Court for the Western District of Texas, entering judgment of criminal conviction and sentence under the Sentencing Reform Act of 1984. This Court has jurisdiction of the appeal under 18 U.S.C. § 3742(a) and 28 U.S.C. § 1291.

Under Federal Rule of Appellate Procedure 4(b), a criminal defendant who wishes to appeal a district court judgment must file notice of appeal in the district court within 10 days after the entry either of the judgment or order appealed from, or a notice of appeal by the Government. In this case, written judgment was entered on April 14, 2009, a motion for new trial was filed on April 16, 2009, and notice of appeal was filed on April 24, 2009.

## ISSUES PRESENTED FOR REVIEW

1.  There is insufficient legal and factual evidence to sustain the Appellant's convictions in this case and the convictions must be reversed.

2.  The Trial Court erred in allowing documentary evidence to be presented to the jury based on improper authentication.

3.  The Trial Court erred in sentencing the Appellant based on improper information in the Pre-Sentence Report and failure to consider the entire spectrum of sentencing guidelines.

## STATEMENT OF THE CASE

### 1. Nature of the Case.

The Appellant, Said Francisco Herrera, was arrested and charged with a RICO conspiracy offense in an indictment filed on January 9, 2009. (See CR, Docket Entry 11)[1] The case against Herrera was based on allegations that he and other Barrio Azteca members conspired to conduct and participate in the conduct of the affairs of an enterprise which engaged in such activities as murder, extortion, drug trafficking, and other racketeering activities. Id.

### 2. Course of Proceedings and Disposition in the Court Below.

On November 3, 2008 the jury trial of Herrera's RICO conspiracy charge began, along with that of several other alleged co-conspirators and other defendants who were charged in the same indictment. (See R 2 at 1). The case was tried before the Honorable Judge David Briones. Id. On December 2, 2008, the jury returned its verdict in the indictment counts applicable to Herrera (Counts 1, 2, 3 & 5) finding him guilty of the RICO conspiracy alleged. (See R 15 at 14). 31, p. 71). Sentencing in Herrera's case held on April 13, 2009, at which time the district court sentenced Appellant to life in prison. R 16 at 1, 40.) On April 14, 2009, the district court's judgment and commitment was entered. CR, Docket Entry 671. Thereafter, on April 24, 2009, Appellant timely filed his notice of appeal with the

3

district court.  CR, Docket Entry 696.

## 3. STATEMENT OF FACTS.

Appellant, Said Francisco Herrera, one of six individual defendants tried together, was charged with intentionally conspiring with Carlos Perea, Manuel Cardoza, Benjamin Alvarez, Eugene Mona, Arturo Enriquez and/ or with other unknown members of the Barrio Azteca Enterprise, to conduct and participate directly and indirectly in the conduct of the affairs of that enterprise through a pattern of racketeering activity, as that term is defined in Section 1961 (1) and 1961(5) of Title 18, United States Code, consisting of multiple acts "indictable under the following provisions of federal law" (CR 471-472), which are identified as follows:

A. 18 U.S.C. § 1951 (extortion and conspiracy to commit extortion);

B. 18 U.S.C. § 1951 (money laundering and conspiracy to launder monetary instruments); and multiple acts involving narcotics trafficking, including heroin, cocaine, and marijuana, in violation of the laws of the United States, namely,

C. 21 U.S.C. § § 846 and 841(a)(1)(involving narcotics trafficking and conspiracy to commit narcotics trafficking, including heroin, cocaine, and marijuana; and multiple acts chargeable under the following provisions of state law;

D. Texas Penal Code, Section 19.02(b)(Murder).  CR, 472. This count of the indictment further alleged that "It was part of the conspiracy that each defendant agreed that a conspirator would commit at least two acts of racketeering activity in the conduct of the affairs of the enterprise. CR, 472.

At trial, the evidence established that Carlos Perea, Manuel Cardoza, and Benjamin Alvarez, all alleged capos of the Barrio Azteca organization (hereafter referred to as "BA", were imprisoned through the entire period of the conspiracy. R 6, 217; R 10, 15-16; 30-31. The evidence established at trial regarding these alleged capos is that they would send notes to BA members in the free world for the purpose of directing the affairs of the BA. R 4 14, 21, 27-28. The Government case was based on several different witnesses, one of whom was Johnny Michelletti, himself a BA member. R 2, 157. On direct examination, Michelletti described one of the objectives of the BA organization as collecting from "tienda" and explaining that "A tienda (i.e. store) is a -- is a reference to a non-BA drug dealer who is paying -- who is paying its protection to the Barrio Azteca." R 2, 174-179. He indicated in his testimony that he would collect from several tiendas on a regular basis and then turn the money over to another Barrio Azteca (referred to as "BA") member. Id.

When asked what was supposed to occur when these non-BA drug dealers did not pay their "cuota," Michelletti explained: "You're  supposed to show a little force or intimidation." Id., at 177.

Another member of the BA to testify for the Government was Jose Martin Garcia. RR 3, 125. Garcia claimed to have observed Mona one time at a BA

5

meeting at which high ranking BA members attended in order to settle issues about who was going "to be in charge of doing what" and so "we could know each other in person.". R 3, 154-155. He also claimed to have talked to Mona on two separate occasions. RR 3, 199.   During the period that the meeting occurred, Garcia explained that a power struggle during this time period was occurring between two high-ranking members of the Azteca. Id., at 143.

Garcia also talked about an ex-member of the BA from Juarez against whom a hit had been put out by the *linea* in Juarez (referring to a drug cartel), which offered to pay $10,000.00 for the killing of this individual. R 3, 158-159. Garcia, who identified himself as an *indio*, confirmed that "some people" in Juarez were the people who wanted the killing performed. RR 3, 127. He also testified to having hired one Michael Worman to transport 18 pounds of heroin to New York. RR 3, 170-171. W

A third witness called as a Government witness was Robert Duran, a BA member for 11 years. RR 3, 268-269.  During his testimony, he made no mention of Mona, either on direct or on cross-examination. R 3, 267-329.

A fourth witness provided by the Government was Manuel Davila. RR 4, 139. He testified that it was more or less 2003 that he made two heroin purchases from David Uzeta and one heroin purchase from Charlie Valdez with money

provided to him by the U.S. Government, stating that these purchases involved approximately an ounce of heroin. RR 4, 140-148 For these purchases, he was paid a fee of $3,000 by the Government. RR 4, 140. Defense counsel complained that none of these purchases were listed or identified as overt acts in the indictment. RR 4, 147. Davila admitted that none of the defendants on trial in the case were involved in these transactions. RR 4, 150-151.

BA member Gustavo Gallardo was also called as a cooperating witness for the Government. RR 4, 169. Gallardo testified that he met David Merez (aka "Chicho") when he got out of prison. RR 4, 178. He was told after leaving prison that he was going to report to him. Id., at 179. Gallardo further testified that he first began helping Merez by collecting the *cuotas* for the BA. Id., at 180. When asked how people gain rank with the BA organization, Gallardo testified, "Well, they see what you start doing, you know, what you start doing for the organization." Id. He identified himself as a lieutenant with the BA and Merez as a captain. Id., at 181. Regarding letters he observed written between BA members, Gallardo testified that all the letters he saw (which he said were written in 2004 and 2005) were "pure negative" stuff relating to the power struggle between David Merez and Angel Esqueda about who was to run the BA organization in El Paso. RR 4, 188.

7

Like other cooperating witnesses, Gallardo admitted that he had entered into an agreement with the Government in exchange for his testimony which limited the amount of time he would serve in prison for his BA-related activities. R 4, 219-220; RR 2, 224-225 (Michelletti); RR 3, 193 (Garcia).

Gallardo was also asked to identify the persons in prison he sent money orders to as a lieutenant for the BA.. R 4, 251. He then identified these four capos or captains as Benjamin Alvarez, Carlos Perea, Manuel Cardoza, and Manuel Torres. Id.

Another BA member to testify was Edward Ruiz. R 5, 131. Ruiz testified that he had been paid between $15,000 and $20,000 to testify for the FBI. Id., at 132. Ruiz further explained that he began working for ICE when "he went for a fare" and was caught picking up an illegal alien. Id., at 135. Like many of the other BA members, he claimed to have become a BA member while in prison. Id., at 136. Ruiz told the jury that the bridge address where the pseudonym "Sally Cardoza" was used was his house. Id., at 154. He explained that his family members would give him the mail coming to that residence address to "Sally Cardoza" and that he in turn would give this mail to Mona. Id., at 154-156. Over roughly the 4 years Ruiz stated he was working for the FBI, he testified that he turned over about 30 to 40 letters addressed to "Sally Cardoza" to the FBI. Id., at

8

157. He also claimed in 2002 to have sent money to BA members in prison. Id., at 174. Ruiz, who worked with Mona, also described the heroin addiction which afflicted Chicho (David Merez) as pretty bad. Id., at 178.

When asked if he had ever purchased cocaine at the instructions of the FBI, Ruiz admitted that he had. Id., at 183. He then testified that he had purchased from "Tavo" or Gallardo a rock of cocaine. Id. Ruiz also acknowledged that he had been sentenced to 10 years in prison in 1994 for a delivery of cocaine charge and for an illegal investment charge, in which he was caught with $35,000.00. Id., at 189-190. After being sent to prison, Ruiz testified that he joined the BA for protection against physical abuse since he had run into trouble while imprisoned in the Texas Department of Corrections. Id., at 192-193. As with many of the BA members, Ruiz also admitted to having a drug problem. Id, at 231. With regard to the handling of cuota money, Ruiz testified that he was given around $30,000 to hold in 2002 or 2003 and that some of the money was skimmed by Mona to use to repair his truck. R 5, 174-176.

Gerardo Hernandez was another BA member to testify for the Government. Id., at 252. Hernandez testified that he became a BA member while in prison, while serving a prison sentence for attempted murder. Id. On direct, a BA member with the rank of sergeant, Hernandez testified that his job after leaving prison was

9

to start running meetings and to open up tiendas, in the northeast area of El Paso. R 5, 279280, 285, 293.

Hernandez' testimony on this point was largely corroborated by Andres Sanchez, a police officer for the City of El Paso, Texas. R 6, 168. He testified that for the entire period of the conspiracy (2003 through 2008), capo Ben Alvarez, while in prison, received only $400 from BA money orders sent to his commissary. R 7, 130, 137. Similarly, Agent Mikeska testified that the Government could only trace the sum of $500.00 which had been sent to Carlos Perea's commissary account from the BA over the period spanning 2003 through 2008. R 10, 29-31.

In its case-in-chief, the Government attempted to prove through the content of a March 10, 2008 BA letter (proposed exhibit 74) that it was the other capos of the BA (i.e. Cardoza, Torres, and Alvarez) who had put the hit out or green light on capo David Merez (i.e. Chicho) and thereby brought about his death. R 6, 3, 102. Although the letter was never read, defense counsel established later during his cross-examination that the letter was never passed on to BA members in the free world because it was intercepted by FBI. R 6, at 106-107. Further, defense counsel established through Hernandez that he never passed on the instructions in the letter about the "green light" as it pertained to David Merez and ascertained through Hernandez that only Hernandez and agent Mikeska knew about this letter.

Id.  No evidence was adduced throughout the trial as to who caused Merez' death or why he was killed. (See R volumes 1 through 11).

On cross-examination, Hernandez admitted that he was involved in drug running as a BA member. R 6, 45. He identified "Spider" and Christina, two persons who assisted him in this task and also mentioned a Columbian with whom he was working. Id., at 46.

Two other witnesses for the Government were Deborah Zalokar, an El Paso police officer and Saul Ambriz. R 7, 256, 273. Zalokar testified that on September 28, 2006, a BA gang member she identified as Said Herrera walked up to her and other law enforcement officers while they were off-duty, seated inside Smokies, a restaurant/bar and asked them if they were having a "cop party" afterward telling them that "No, this is an F-ing Barrio Azteca party." Id., at 261-263. Sheriff's Deputy Saul Ambriz, who was seated at the same table with Officer Zalokar, confirmed that Zalokar was present when this occurred, as well as four other law enforcement officers. Id., at 275-280.

The Government next called Ramon Arce, Jr. as a witness. R 7, 281. Arce was asked to confirm that BA member Said Herrera (Appellant) had punched and knocked to the ground another male individual late in the evening while at a Whataburger located at North Loop and Zaragosa on or about January 26, 2006. R

11

7, 289-300. According to Arce, the male assaulted by Said Herrera was rendered unconscious after Herrera continued to stomp on his head as he lay on the ground in a pool of blood. Id., at 301, 308. The identity of the person being stomped by Herrera or of the other person with him were never identified by Arce. R 7, 281-318. The Government revealed the identity of this male assaulted by Said Herrera through Christopher Cortez, its next witness. R 8, 3-4, 13-16. Cortez, who was himself assaulted, identified the male individual being stomped on the ground as his first cousin, Jose Manuel Acuna and confirmed that the assault occurred just as they arrived at a Whataburger restaurant after spending the night out together socializing and drinking alcohol at local clubs. R 8, 9-11, 16. The next witness called by the Government in its case-in-chief was Eric Saucedo, a BA member. R 8, 56. Saucedo admitted on the witness stand that he had agreed to cooperate with the Government in the case at trial in exchange for a lower sentence in a criminal case pending against him. Id., at 61. While on direct, Saucedo was asked about the first time he met Adam Munoz. Id., at 83-84. Saucedo responded that it was in December of 2006, when Munoz called him after had moved from the lower valley to a new residence. Id. Saucedo explained that Munoz had picked him up after the phone call, told him that he was the person that picked up the cuotas in central, and that Munoz had then taken him to an address located at Frutas and Copia, where

12

there were apartments. Id., at 85. On this first occasion, Saucedo claims he was there to assist Munoz attempt to collect a cuota. Id., at 87. A second attempt to collect at this address was made within days of the first attempt, but this time Munoz brought along Saucedo and three other BA members. Id., at 88. On this occasion, Saucedo claims that they talked to the person living at the apartment address they had identified as a store or tienda, but the persons at this address would not let them come inside. Id. Munoz then called Saucedo to accompany him on a third attempt to collect from this apartment address. Id., at 90-91. This time Saucedo encountered a "carnal", a third person Munoz had brought along whom he did not know. Id., at 91-92. After picking Saucedo up, Saucedo testified that Munoz drove to Memorial Park where Munoz parked his car, got out of the car, and begin putting on gloves he took out from a duffel bag in the car. Id., at 93. The other individual began putting on gloves as well. Id. Saucedo testified that Munoz had suggested that they put on gloves "because [even though they] were going to the Frutas again to get money.... if the money wasn't in full, we were going to get appliances, like TVs, DVDs, VCRs, stuff like that." Id., at 93. Saucedo next testified that he and Munoz approached the apartment and convinced the occupant to open the screen door. Id., at 97. The occupant, a male, then gave Munoz $20 and asked him to come back later for the rest because he had bought gifts for his

kids, but Munoz pulled out a gun and pointed it at him. Id., at 98.  In response, the male occupant of the apartment attempted to grab the gun Munoz was holding, at which time a bullet from the gun discharged into his person. Id. According to Saucedo, Munoz then discharged a second bullet into the victim, killing him.. Id., at 99, 102.  Saucedo claimed at trial that he did not know that Munoz was even packing a gun prior to the shooting. Id., at 100.

Another BA member to testify on behalf of the Government was Josue Aguirre, an individual who joined the BA in January of 1993 in prison while serving a sentence for criminal attempted murder. R 9, 19.  Aguirre testified that he began cooperating with the Government in 2003 in a RICO investigation, after he was released from prison. Id., at 20-21. At the time of trial, he testified that he had been paid the sum of $75,000 for his services as an FBI informant, and that these payments covered the period spanning from 2003 until shortly before the start of the trial. Id., at 21. Like other BA members, he admitted to having used cocaine, marijuana, and heroin in the past and testified that he did not stop using illegal drugs until 2006. Id., at 147-148.

At the end of the trial, the district court submitted a jury charge which tracked word-for-word the language of Count 2 of the indictment. See CR, 471-472.  The referenced charge did not require the jury to find the Defendants guilty

14

of any of the specific racketeering activities alleged in Count 2 of the indictment count. Id.

The pre-sentence report prepared in this case recommended that Appellant be assessed a life sentence on the basis of the murder and illicit drug dealing racketeering activities alleged in Count 2 of the indictment. (This pre-sentence report, which was sealed, is not contained within the official appellate court record).

## SUMMARY OF THE ARGUMENT

1.  <u>There is insufficient legal and factual evidence to sustain the Appellant's convictions in this case and the convictions must be reversed.</u>

A minor amount of the evidence presented in this case was related to the Appellant and any alleged involvement in the conspiracy. In fact, the only significant direct evidence offered against the Appellant was from the Appellant's father In Law, which only proved his involvement with Barrio Azteca members. Further, the fight and confrontation involving Appellant was in self defense and was never demonstrated to be acts in furtherance of the conspiracy counts Appellant was convicted by the jury.

2.  <u>The Trial Court erred in allowing documentary evidence to be presented to the jury based on improper authentication and poor quality to be of probative value to the jury.</u>

The Trial Court erred in allowing numerous letters into evidence allegedly authored by the members of the Barrio Azteca to other  BA members on trial. These letters were the Government's primary evidence in demonstrating the links between the Appellant and other conspirators of which none involved Appellant. In addition, numerous translations were provided to the jury which the Honorable Judge himself questioned before the jury.

3.  <u>The Trial Court erred in sentencing the Appellant based on improper information in the Pre-Sentence Report and failure to consider the entire spectrum of sentencing guidelines.</u>

16

The pre-sentence report prepared in Appellant's case contained voluminous information not related to the evidence presented in trial or against this Appellant. Further, the trial record indicates that the Court in the sentencing conducted only a cursory and incomplete analysis of the evidence in determining the sentencing guidelines in violation of the holdings in both *Booker* and *Apprendi* cases.

## ARGUMENT AND AUTHORITIES

1.    <u>There is insufficient legal and factual evidence to sustain the Appellant's convictions in this case and the convictions must be reversed.</u>

The Appellant in the instant case was convicted of 4 counts of an indictment based on 18 U.S.C. § 1962(a),(c), (d), as well as 18 U.S.C. §1951(a). These statutes are known as the "RICO" or "organized crime" statutes used to dismantle criminal organizations. In this case, the arrests were based on the alleged activities of the Barrio Azteca gang. The statutes read as follows:

**a)** It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt in which such person has participated as a principal within the meaning of section 2, title 18, United States Code, to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce. A purchase of securities on the open market for purposes of investment, and without the intention of controlling or participating in the control of the issuer, or of assisting another to do so, shall not be unlawful under this subsection if the securities of the issuer held by the purchaser, the members of his immediate family, and his or their

17

accomplices in any pattern or racketeering activity or the collection of an unlawful debt after such purchase do not amount in the aggregate to one percent of the outstanding securities of any one class, and do not confer, either in law or in fact, the power to elect one or more directors of the issuer;

**(c)** It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

**(d)** It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.

The main allegation as alleged members of the Barrio Azteca was that Appellant participated in transferring communications from the leadership to the "street soldiers" via letters and other communications. However, the only incident adduced through trial was an altercation between Appellant and Jose Manuel Acuna. This fight, taking place at an El Paso Whataburger, was alleged to have taken place because of an unpaid quota to the Barrio Azteca. R.VIII;1-30. However, testimony adduced at trial indicated that the fight was not Azteca related. R.VIII;30. Appellant also took the witness stand and explained that the fight was not gang related and that Acuna was the aggressor. R.XII;126. Appellant also explained how he was in fear of his life and fought back in self defense. R.XII; 139-144.

18 U.S.C. §1951 reads as follows:

18

(a)     Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined under this title or imprisoned not more than twenty years, or both.

In the instant case, the fight that Appellant was involved in was never directly linked to Azteca membership. Id. Also, independent witnesses offered by Appellant stated that he did not start the fight. R.XII;12-96.

El Paso Police Department expert Andy Sanchez testified of the Appellant that he was not aware of any wrongdoing on his part. R.VII;198-199. In addition, There were no mention of the Appellant on over 500 hours of intercepted tape in the investigation. R.VII;202. During critical debriefings of known and confirmed gang members cooperating with the Government, there were no references, either by name or by Appellant's alleged nickname "Shorty" in the evidence. R.VIII;117-119. Witness Aguirre also testified that he had no knowledge of Appellant's activities in the Azteca organization. R.IX;98-99, see also R.X;219-221. In fact the Court found it necessary to strike this witness's testimony based on the fact that the Court determined he was NOT a co-conspirator. R.IX; 99-101.

In this trial, it was determined that over 150 government investigation reports, known and referred to as "302" reports, did not mention the Appellant in any way. R.IX;228. Also, there was never any mention of Appellant making

collections or sales for drugs as alleged in the indictment. R.IX; 229. The only other link the Government makes to Appellant's involvement with the Barrio Azteca is with alleged participation in the distribution of drugs for the prison gang.

There is no mention of the Appellant collecting at a local rim shop where drug action and collection was implied to have taken place. Id. In fact, a majority of the information obtained by witness Aguirre, a large figure in the Azteca organization, was solely based on hearsay and not on any form of direct knowledge. R.IX; 273. There was never any positive ID by an admitted major co-conspirator of the Appellant. R.III; 264-67. The critical fact in this trial remains that a majority of the case against the Appellant was made through evidence offered by either confidential sources or by paid cooperating members of the organization testifying under agreements for lighter sentences.

Appellant would demonstrate that based on the evidence offered against him at trial, he was convicted of the four counts of the indictment with legally and factually insufficient evidence. In *In Re Winship*, 397 U.S. 358, 364, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970), the Supreme Court ruled that the due process clause protects the accused against conviction from proof that is not beyond a reasonable doubt of every fact necessary to constitute a charged crime. In addition, in *Jackson v. Virginia*, 443 U.S. 307, 99 S. Ct. 2781, 61 L. Ed. 2d. 560 (1979), the Court

made clear that the federal courts have a duty to examine the entire record to "assess the historic facts" and to determine whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt. That standard is also applicable to the district courts as well. See *Burks v. U.S.*, 437 U.S. 1, 16-17, 98 S. Ct. 2141, 57 L. Ed. 2d. 1 (1978).

In example, The United States Court of Appeals for the Fifth Circuit, in construing the contours of 18 U.S.C. §1951(a), has stated that "Criminal acts directed toward individuals may violate section 1951(a) only if: (1) the acts deplete the assets of an individual who is directly and customarily engaged in interstate commerce"; (2) "the acts cause or create the likelihood that the individual will deplete the assets of an entity engaged in interstate commerce; or (3) if the number of individuals victimized or the sum at stake is so large that there will be some 'cumulative effect on interstate commerce.'" See *United States v. Collins*, 40 F.3d 95, 98-101 (5th Cir. 1994). The Government in this case has failed to meet any of these 3 prongs of the test.

To prove a RICO conspiracy the government must establish (1) that two or more people agreed to commit a substantive RICO offense and (2) that the defendant knew of and agreed to the overall objective of the RICO offense. *United States v. Posada-Rios*, 158 F.3d 832, 857 (5th Cir. 1998). There was no evidence

adduced at trial that Carlos Perea, Manuel Cardoza, Benjamin Alvarez, or Said Francisco Herrera, the alleged co-conspirators named in Count 2, agreed to commit a substantive violation of 21 U.S.C. § 841. The trial record instead reflects that Perea, Cardoza, and Alvarez were all incarcerated during the 5 year period alleged in the RICO conspiracy of Count 2 (January 1, 2003 until the date of the return of the indictment (January 9, 2008). The trial record further reflects that none of these three alleged capos or Said Herrera discussed drug dealing activities with each other or any other person named in the indictment.

Under the standard of review, a conviction must be allowed to stand if, after viewing the evidence in the light most favorable to the prosecution, the reviewing court finds that a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *United States v. Sotelo*, 97 F.3d 789 (5th Cir.), cert. denied, --- U.S. ----, 117 S.Ct. 620, 136 L.Ed.2d 543 (1996). The essential elements of a conspiracy under 21 U.S.C. § 846 are (1) an agreement between two or more persons to violate the narcotics laws, (2) a defendant's knowledge of the agreement, and (3) his voluntary participation in that agreement. *United States v. Misher*, 99 F.3d 664, 667 (5th Cir.1996).

In this case, no evidence was adduced from trial that the Appellant had any voluntary participation in any agreement, no overt acts, as well as an intent to

violate any narcotic laws. As such, his convictions as to these counts of the indictment must be overturned. The United States Court of Appeals for the Fifth Circuit reviews the legal sufficiency of a conviction de novo. *United States v. Phillips*, 219 F.3d 404, 409 (5th Cir. 2000). The evidence the Government needs to prove a substantive RICO violation under 18 U.S.C.A. § 1962(c) consists of the following elements: (1) proof of the existence of an enterprise which affects interstate or foreign commerce; (2) proof that the defendant "associated with" the enterprise; (3) proof that the defendant participated in the conduct of the enterprise's affairs; and (4) proof that the participation was through a pattern of racketeering activity, i. e., by committing at least two acts of racketeering activity designated in 18 U.S.C.A. § 1961(1). See *United States v. Bright*, 630 F.2d 804, at 829 (5th Cir. 1980); *United States v. Elliott*, 571 F.2d 880, 897-99 (5th Cir.), cert. denied, 439 U.S. 953, 99 S. Ct. 349, 58 L. Ed. 2d 344 (1978).

The RICO statute does not criminalize engaging in a pattern of racketeering activity standing alone; the gravamen of a RICO offense is the conduct of an enterprise through a pattern of racketeering activity. *United States v. Elliott*, supra, 571 F.2d at 899 n.23. The two predicate crimes (i.e. racketeering activities) alleged need not be related to each other but must be related to the affairs of the enterprise. Id. It does not matter that each defendant participated in the affairs of the enterprise

through different or unrelated crimes, so long as an inference may be drawn that each crime was intended to further the enterprise's affairs. Id. at 902-03.

To establish a section 1962(c) violation, the government must prove the existence of an enterprise, the defendant's employment by or association with that enterprise, and the defendant's conduct of or participation in the conduct of the enterprise's affairs through a pattern of racketeering activity. *United States v. Cauble*, 706 F.2d 1322, 1331 (5th Cir.1983); *United States v. Phillips*, 664 F.2d 971, 1011 (5th Cir.1981). The "enterprise" is not synonymous with the "pattern of racketeering activity," but is an entity separate and apart from the pattern of activity in which it engages.

Thus, in every case the government must prove not only that there was a pattern of racketeering activity, but that it was conducted through a defined enterprise. Cauble, 706 F.2d at 1331. Section 1962(d) makes it illegal to conspire to violate the above-described substantive provision of RICO. Both section 1962(d) and section 1962(c) require that the enterprise affect interstate commerce. Cauble, 706 F.2d at 1331.In this case, the evidence shown and offered the jury at trial did not demonstrate in any form or fashion that any of the alleged participants in this case had an intent or even an idea that they were furthering any interest in the Barrio Azteca. In *United States v. Cauble*, 706 F.2d 1322 (5th Cir. 1983), the

24

Fifth Circuit held that a defendant does not "conduct" or "participate in the conduct of an enterprise's affairs" unless (1) the defendant has in fact committed the racketeering acts as alleged, (2) the defendant's position in the enterprise facilitated his commission of the racketeering acts, and (3) the predicate acts had some effect on the enterprise. Id. at 1332-33.

Thus, the Fifth Circuit in *United States v. Elliott*, 571 F.2d 880, 902 (5th Cir. 1978, held that "The object of RICO conspiracy is to violate a substantive RICO conviction -- here, to conduct or participate in the affairs of an enterprise through a pattern of racketeering activity -- and not merely to commit each of the predicate crimes necessary to demonstrate a pattern of racketeering activity."

In order to prevail under a Hobbs Act violation, as alleged in the indictment in this case, the Government must prove two elements: 1) interference with interstate commerce, which is a jurisdictional issue; and, 2) the substantive criminal act, which in the instant case is [a conspiracy to commit] robbery." *U.S. v. Wang*, 222 F.3d at 234, 243-44 (Hood, J., concurring) (citing *Stirone v. United States*, 361 U.S. 212, 218, 4 L. Ed. 2d 252, 80 S. Ct. 270 (1960)). When a conspiracy is charged under the Hobbs Act, the government needs to prove that the scheme would have affected interstate commerce had it been carried out. See *United States v. DiCarlantonio*, 870 F.2d 1058, 1061 (6th Cir.1989). In the instant

25

case, the Government's evidence is completely absent of interstate commerce

evidence as well as each members role in affecting said interstate commerce.

2.   The Trial Court erred in allowing documentary evidence to be presented to
     the jury based on improper authentication and poor quality to be of probative
     value to the jury.

Upon the commencement of trial in this case, numerous objections were

made as to incomplete and improper foundation in documentary evidence. During

this trial, voluminous transcripts were introduced of calls intercepted by the

Government without proper foundation. R.III; 116-122. Another problem exists in

the translation of evidence, both audio and documentary, from Spanish to English.

R.III; 123-125, R.V; 268-73. Appellant was improperly identified without proper

evidentiary or testimony foundation in both compact dics and photos. R.III; 264-

67, R.VI; 206-08.

In addition, handwriting samples alleged to be from the Appellant were

admitted by the Trial Court without proper identification or foundation.

Specifically, records from the El Paso County Jail Annex were introduced over

objection. R.IV; 48-53. Documents were also introduced that had not been

tendered to the defense in this case and objection was overruled. R.IV; 80-82.

Compact disc recordings were played for the jury where foundation was not

properly followed and the quality of the recording was poor and of no probative

value. R.IV; 104-7, 158, 162, 168.

Numerous documents were also introduced where they were objected to because they were outside the dates of the alleged conspiracy. R.V; 161, 185, 242-43, 268-273. The Trial Court also struck a document from evidence because the Court itself recognized the translation from Spanish to English to be improper. R.VI; 88-91. The problem arose again in other documents. R. VII; 34-40. Other evidence was admitted over objection that had no connection to the indictment allegations. R.IX; 98-99. In fact, the only evidence where allegations of the Appellant was involved in money transactions with Barrio Azteca were admitted over objection to foundation. R.IX; 296-303.

Appellant would demonstrate that the numerous and voluminous evidence introduced by the Government in this case was improperly admitted based on improper foundation and over objection. Further, Appellant would show that letters and recordings were admitted without proper language translation. As such, because of the volume and importance of this evidence, Appellant was denied due process and a fair trial in his case.

Admission of tape recordings falls within the sound discretion of the district court. United States v. Thompson, 130 F.3d 676, 683 (5th Cir. 1997) cert. denied 118 S.Ct. 2307 (1998). The Court will reverse a decision to admit tape recordings

27

only if the trial court abused its discretion as indicated by relying on an incorrect view of the law or clearly erroneous factual findings. See id.; see also, United States v. Buchanan, 70 F.3d 818, 827 (5th Cir.) cert denied, 477 U.S. 906 (1986). As explained in Thompson, 130 F.3d at 683 (5th Cir. 1997), tape recordings are admissible in a criminal trial if they are reliable. The government must establish that the tape recordings are accurate, authentic and trustworthy. See id. (citing United States v. Carbone, 798 F.2d 21, 24 (1st Cir. 1986).

Generally, this burden requires the government to demonstrate (1) the operator's competency, (2) the fidelity of the recording equipment, (3) the absence of material alterations, and (4) the identification of relevant sounds or voices. See Buchanan, 70 F.3d at 827 (5th Cir. 1995)(citing United States v. Biggins, 551 F.2d 64 (5th Cir. 1977)).  The party challenging the recordings bears the burden of demonstrating that the tapes are inaccurate.  See Thompson, 130 F.3d at 683. As a general rule, "taped recordings are admissible unless the incomprehensible portions of the tapes are so substantial as to render the recordings as a whole untrustworthy." _United States v. West_, 948 F.2d 1042, 1044 (6th Cir. 1991), cert. denied, 117 L. Ed. 2d 447, 112 S. Ct. 1209 (1992) (citing _United States v. Robinson_, 763 F.2d 778, 781 (6th Cir. 1985) ("Robinson II")).

The decision to admit tapes, including a composite tape, is within the sound

discretion of the trial judge. A composite is admissible, assuming that it clears the intelligibility hurdle, when it saves the trial court "much time and inconvenience" and when "the prosecution [has] laid the proper foundation on the accuracy and authenticity of the composite tape for its admission into evidence" and has complied with the requirements of Federal Rule of Evidence 1006. n5, *United States v. Denton*, 556 F.2d 811, 816 (6th Cir. 1977); see also Robinson II, 763 F.2d at 781.

n5 "The contents of voluminous . . . recordings . . . may be presented in the form of a . . . summary . . . . The originals, or duplicates, shall be made available for examination or copying, or both, by other parties at reasonable time and place." Fed. R. Evid. 1006.

When tapes are unintelligible, however, a transcript intended as an aid to the jury inevitably becomes, in the minds of the jurors, the evidence itself. *United States v. Robinson*, 707 F.2d 872, 878 (6th Cir. 1983) ("Robinson I"). As is required whenever a transcript is used and there is no stipulation as to its accuracy, the trial court here gave a cautionary instruction to the jury regarding the limited use to be made of the transcript. Id. Such an instruction does not suffice, however, to erase the prejudice created by "shepherding hearsay to the jury via the transcript[]. . . . The better course would have been for the agents [and informants] involved to testify regarding their recollection of the conversations so that the jury

29

could be afforded an opportunity to assess their credibility." Id. In this case, none

of the transcripts were offered and admitted without any proper analysis and

without the aid of transcripts. As such, the quality of the recordings and their

content were of such concern that the Court itself ruled to exclude some of the

content.

As to foundation, Fed.R.Evid. 1002 provides:

Requirement of Original
To prove the content of a writing, recording, or photograph, the original writing, recording, or photograph is required, except as otherwise provided in these rules or by Act of Congress.

Fed.R.Evid. 901(a) provides:

Requirement of Authentication or Identification
(a) General provision. The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims;

Fed.R.Evid. 803(6) provides:

Hearsay Exceptions; Availability of Declarant Immaterial
The following are not excluded by the hearsay rule, even though the declarant is available as a witness:

(6) Records of regularly conducted activity. A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. The term "business" as used in this paragraph includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit.

The testimony of a custodian or other qualified witness is ordinarily essential to prove the nature of such record and what it purports to show if not self-evident, 4 Weinstein on Evidence, para. 803(6)[02] (1984), and admissibility of such a record should be denied unless evidence adequately authenticates the record's accuracy or if "the sources of information or other circumstances indicate lack of trustworthiness," Rule 803(6), when the record is sought to be authenticated for its admission, Id., para. 803(6)[07].  See *United States v. Sanders*, 749 F.2d 195, 197-98 (5th Cir. 1984); *Coughlin v. Capitol Cement Co.*, 571 F.2d 290, 306-08 (5th Cir. 1978); *United States v. Blake*, 488 F.2d 101, 105-06 (5th Cir. 1973).

In *United States v. Marshall,* 762 F.2d 419 (5th Cir. 1985),  it was error to allow a witness's opinion based upon business records that were not introduced to establish that items were stolen. The Court noted in *Marshall* that "…the error of permitting introduction of this evidence can even more clearly be seen by the subsequent course of the trial. At the oral argument on appeal, the government's counsel conceded that the records themselves were "gibberish" and could not be understood "without explanation." Id.

The objection as formulated by Marshall's defense counsel was both to the hearsay nature of the testimony when based on statements in records outside the evidence, Fed.R.Evid. 801.  Also, the admission of evidence as to the contents of a

31

record without production of the document itself into evidence, Fed.R.Evid. 1002, with moreover a failure to authenticate the record by showing that it was what the proponent claims, Fed.R.Evid. 901(a) which, in the case of a business record such as was involved, further required a showing of its trustworthiness for the purpose offered, Fed.R.Evid. 803(6). Appellant would show that these exact instances surround Counsel Ken Del Valle's objections that were ruled upon during trial. Many of the letters and intercepts in this case were properly objected to without any foundation and overruled by the Trial Court.

Other examples demonstrate where improper foundation and authentication were absent, reversal was required. *In United States v. Garcia-Duarte,* 718 F.2d 42 (2d Cir. 1983), the foundation was insufficient for a records exception where a book of drug transactions together with money and cocaine were found in an apartment of a recent murder offense. Also, in *United States v. Curtin*, 489 F.3d 935 (9th Cir. 2007) the court's failure to personally examine the entirety of each pornographic story found in the defendant's possession and admitted into evidence constituted a failure to properly balance their probative value against the danger of unfair prejudice. The admission of five pornography stories violated defendant's due process and fair trial rights, where the court read the entirety of only two of the admitted stories and relied on the government's offer of excerpts as to the other

three.

In <u>United States v. Citron</u>, 783 F.2d 307 (2d Cir. 1986), rev'd on other grounds, #853 F.2d 1055 (2d Cir. 1988) This case was reversed where a summary chart that contained a figure for cash-on-hand, which was obviously the product of calculation, was admitted into evidence even though the government provided no explanation in the form of worksheets, testimony, or other methods of elucidation showing how it derived the figure. In <u>United States v. Weinstein</u>, 762 F.2d 1522 (11th Cir. 1985), it was error to allow the government to introduce a letter that was not authenticated but was merely stapled to another document.

Finally, in <u>United States v. Beason</u>, 690 F.2d 439 (5th Cir. 1982), an NFRTR certificate that was executed by the custodian of weapons registration would not support an unlawful making of a firearm by not paying the making tax, since custodian did not have custody of tax stamp records to determine if the tax had been paid. Appellant would firmly demonstrate that these examples parallel the instances in the record where the alleged Azteca letters and recordings were allowed into evidence without the proper determination of content, authentication, and foundation that the aforementioned cases require.

In the issue of transcriptions, Appellant would demonstrate that the record is silent as to proper conversion from Spanish to English. The need or desire for

transcripts arises generally from two circumstances. First, portions of a tape may be relatively inaudible. Second, without the aid of a transcript, it may be difficult to identify the speakers. In either of these cases, it has been said that it is within the discretion of the trial court to allow a transcript to be used by the jury "to assist the jury as it listens to the tape." *United States v. McMillan*, 508 F.2d 101, 105 (8th Cir.), cert. denied, 421 U.S. 916, 95 S.Ct. 1577, 43 L.Ed.2d 782 (1974) (emphasis added).  Additionally, in *United States v. Onori*, 535 F.2d 938 (5th Cir.1976); it was noted by this Court that "when both a tape and a transcript are admitted, or a transcript is used by the jury as an aid when listening to the tape, the jury is generally given a limiting instruction that if it encounters a discrepancy between the tape and the transcript, the tape controls. Of course, such a limiting instruction is only useful when the jury can understand the tape itself. And, in this case, a limiting instruction would have been the obverse: that when the Spanish speaking jurors encountered a discrepancy, the transcript, not the tape, controls. See also *United States v. Sutherland*, 656 F.2d 1181 (5th Cir.1981); *United States v. Cruz*, 765 F.2d 1020 (11th Cir.1985).

In *United States v. Valencia*, 957 F.2d 1189 (5th Cir. 1992), this Court noted again that "[i]n most cases little or no purpose would be served by playing to a jury in a United States courtroom a tape of a conversation in a language other than

34

English. It is arguable, however, that the particular circumstances of a case would make it material and relevant to play such a tape to a jury that does not understand the substance of the conversation to show the mood or tone of the speakers, or the general context or ambiance of their conversation." Appellant would also demonstrate that the record is silent as to transcriptions as well as any corrective efforts on behalf of the government to correct the translations. In fact, the Court, *sua sponte*, was required to comment on the translations and question the content of the letters and recordings.

3.    The Trial Court erred in sentencing the Appellant based on improper information in the Pre-Sentence Report and failure to consider the entire spectrum of sentencing guidelines.

After the verdicts had been rendered in this case, the U.S. Probation Department prepared several Pre-Sentence Reports (hereinafter referred to as "PSR") in relation to all the defendants, specifically Said Herrera. These reports have been sealed, but are part of the record and enclosed in Appellant's record excerpts. On April 9th, 2009, a final version of the PSR was tendered to defense counsel Ken Del Valle. The PSR then begins to explain the conduct that the Probation Department believed was part of the entire conspiracy. See PSR 5-62. In the fifty-seven pages of narrative, only 11 of 233 paragraphs mention and describe conduct by the Appellant. In addition, majority of the paragraphs mentioning the

Appellant are based on hearsay information listed from a confidential source. A minimal amount of the information provided in the PSR was actually proven in the trial which resulted in the Appellant's four (4) convictions. As a result, Pursuant to U.S.S.G. §1B1.3, the relevant conduct provision, Appellant was held responsible for 67.1 kilograms of heroin, 258 grams of cocaine, and 1075.64 kilograms of marijuana of which little was actually proven in the jury trial. See PSR pp. 53-55.

The probation officer, Sonia Lujan, then grouped the offense together pursuant to U.S.S.G. §3D1.2(c) and used the highest offense to base the group offense level. See PSR p. 54. In paragraph 324 of the PSR, the maximum level of offense conduct to be considered is 43 pursuant to U.S.S.G. Chapter V, part A. See PSR p.72. A criminal category of III was assessed with six (6) criminal history points. See PSR. P.78. The report also outlined numerous hardships and substance abuse problems that Appellant had experienced in his life. See PSR pp. 82-86. In paragraph 368 of the PSR, the probation department assessed the statutory provisions as life imprisonment for the three (3) convictions under 18 U.S.C. §1962(a), (c) and (d). See PSR p.87.

On April 1, 2009, the Trial Court held the sentencing hearing in this case. The Trial Court, over multiple objections, refused to hear the objections and the argument of Counsel to the relevant conduct argument, mitigating factors, as well

36

as any other pertinent information. See R. XVI; 5. In addition, the Court also gave full indication that the only consideration in this case would be a life sentence. See R. XVI; 5, 16-19. Over strenuous objection by defense counsel, the Trial Court denied hearing any argument or evidence on the numerous and voluminous information that was not proven or mentioned in trial. See R. XVI; 42. Defense counsel then tried to demonstrate to the Court that a majority of the information was from cooperating witness Gallardo and was not relevant conduct. See R. XVI; 45. Appellant would strongly demonstrate to this Honorable Court that, in light of weeks of testimony, numerous witnesses, voluminous exhibits and documents, as well as a 90 page Pre-Sentence report, the hearing that he received violated the basic principles in Federal Sentencing pursuant to the 18 U.S.C. §3742(e), as well as the holdings in the *Apprendi* and *Booker* cases. As such, Appellant is entitled to a new hearing in the sentencing of his case. See cites *Supra*.

In *Apprendi v. New Jersey*, 530 U.S. 466 (2000) "any fact (other than prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt." Id. at 476 (quotation marks omitted). After Apprendi, terms such as "offense" and "elements," and "sentence enhancement" and "sentencing factors," are "conclusions, not reasons for a conclusion." *United States v. Gonzales*, 327 F.3d

416, 419 (5th Cir. 2003). A court must not carelessly toss these labels around, but instead must examine concretely how all the facts in the statutory text affect the sentence. If a fact increases the statutory maximum, it may be called an "element"; if not, it may be called a "sentencing factor." "What matters, though, is the effect of the fact on the statutory maximum." Id. at 420.

The *Fourteenth Amendment* right to due process and the *Sixth Amendment* right to trial by jury, taken together, entitle a criminal defendant to a jury determination that he is guilty of every element of the crime with which he is charged, beyond a reasonable doubt. *E.g., In re Winship*, 397 U.S. 358, 364. The historical foundation for these principles extends down centuries into the common law. In sentencing, such discretion is bound by the range of sentencing options prescribed by the legislature. See, *e.g., United States* v. *Tucker*, 404 U.S. 443, 447. The historic inseparability of verdict and judgment and the consistent limitation on judges' discretion highlight the novelty of a scheme that removes the jury from the determination of a fact that exposes the defendant to a penalty exceeding the maximum he could receive if punished according to the facts reflected in the jury verdict alone.

A sentence based on the Sentencing Guidelines must be upheld unless the Appellant demonstrates that it was imposed in violation of the law, was imposed as

a result of an incorrect application of the guidelines, or was outside the range of the applicable guidelines and was unreasonable.  18 U.S.C. § 3742(e). If a ground of error not raised below, the judgment may be reversed only upon a finding of plain error. Fed. R. Crim. P. 52(b); *United States v. Olano*, 507 U.S. 725, 123 L. Ed. 2d 508, 113 S. Ct. 1770 (1993); *United States v. Calverley*, 37 F.3d 160 (5th Cir. 1994)(en banc).

The Fifth Circuit has regularly applied plain-error review to sentencing challenges that the defendant failed to raise in the district court. See, e.g., *United States v. Smith*, 264 F.3d 518, 520 (5th Cir. 2001); *United States v. Miranda*, 248 F.3d 434, 444-46 (5th Cir. 2001); *United States v. DeLeon*, 247 F.3d 593, 597-98 (5th Cir. 2001); *United States v. McWaine*, 243 F.3d 871, 875 (5th Cir. 2001). Under a plain error analysis, this Court can correct an error not raised at trial only if there is (1) error, (2) that is plain, and (3) that affects the appellant's substantial rights, and further, if all three of these conditions are met, the court may exercise its discretion to notice the forfeited error only if (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings. *United States v. Cotton*, 535 U.S. 625, 631 (2002).  However, Appellant would argue to this Court that any failure to lodge objections was due to the Trial Court's refusal to hear argument on any sentencing issue below.

39

The failure of the district court to require the jury to specifically identify which racketeering offenses it was basing its guilty verdict on deprived the Appellant of his right under *Apprendi v. New Jersey*, 530 U.S. 466 (2000) to have the jury decide every element of the offense with which he was charged. In *Apprendi*, the U.S. Supreme Court held that: "Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury and proved beyond a reasonable doubt." Id., at 490.

Since several counts of the indictment alleges that the Appellant (and other co-defendants) allegedly committed the RICO conspiracy beginning on January 1, 2003, the sentencing guidelines are considered mandatory in this case. See *United States v. Creech*, 408 F.3d 264, 271-72 (5th Cir. 2005). Under this mandatory sentencing guideline, where a fact was not alleged in the indictment which increased the sentencing range, this Court looked to the statutory maximum set out by the default provision in the United States Code for the given offense, rather than to the sentencing guidelines. See e.g. *United States v. Garcia*, 242 F.3d 593, 599-600 (5th Cir. 2001) (applying 21 U.S.C. § 841(b)(1)(D) as the "default provision" for a drug charge involving marijuana). In this case, the default provision for a

violation of 18 U.S.C. § 1962 is set forth in 18 U.S.C. § 1963(a), which states in relevant part:

> "*Whoever violates any provision of section 1962 of this chapter shall be fined under this title or imprisoned not more than 20 years (or for life if the violation is based on a racketeering activity for which the maximum penalty includes life imprisonment), or both ....*"

Consequently, the assessment of a life sentence in Herrera's case was a fact which had to be alleged in the indictment and proven to the jury under *Apprendi* because this fact enabled the district court to assess a sentence which exceeded the 20 year statutory maximum for a RICO conspiracy offense as set forth under the default provision of 18 U.S.C. § 1963(a) for prosecuting such an offense.

The Court should correct a plain error when the error "seriously affects the fairness, integrity or public reputation of judicial proceedings." *U.S. v. Olano*, 507 U.S. at 736 (quoting *United States v. Atkinson*, 297 U.S. 157, 80 L. Ed. 555, 56 S. Ct. 391 (1936)). In light of the sentencing calculation errors, we think the fairness and integrity of this judicial proceeding were seriously affected. *United States v. Franks*, 46 F.3d 402 (5th Cir. 1995).

In *United States v. Booker*, 543 U.S. 220 (2005), the Court ruled that the Sixth Amendment right to jury trial requires that, other than a prior conviction, only facts admitted by a defendant or proved beyond a reasonable doubt to a jury can be used to calculate a sentence, whether the defendant has pleaded guilty or

41

been convicted at trial. The maximum sentence a judge may impose is a sentence based upon the facts admitted by the defendant or proved to a jury beyond a reasonable doubt.

In a split-majority ruling, the Court struck down the provision of the federal sentencing statute that required federal district judges to impose a sentence within the Federal Guidelines range, along with the provision that deprived federal appeals courts of the power to review sentences imposed outside the Guidelines range. The Court instructed federal district judges to impose a sentence with reference to a wider range of sentencing factors set forth in the federal sentencing statute, and directed federal appeals courts to review criminal sentences for "reasonableness," which the Court left undefined. Id.

This ruling was the direct consequence of the Court's ruling six months earlier in *Blakely v. Washington*, 542 U.S. 296 (2004), in which the Court had imposed the same requirement on a guidelines sentencing scheme employed in the State of Washington. The *Blakely* decision arose out of *Apprendi v. New Jersey* in which the Court held that, except for the fact of a prior conviction, any fact that increases the defendant's punishment above the statutory maximum punishment had to be submitted to a jury and proved beyond a reasonable doubt.

The Appellant would demonstrate that this case involved a maximum

sentence where the facts and information used, especially via the Pre-Sentence Report, were not held to a trial standard as well as proven to any standard of the law. At a minimum, a sentencing hearing may have addressed any relevant conduct concerns had the Trial Court refused to hear the concerns or objections.

In United States v. Puma, 937 F.2d 151, 160 (5th Cir. 1991), cert. denied, 112 S. Ct. 1165, 117 L. Ed. 2d 412 (1992) this Court remanded for resentencing because the district court had failed to make an express finding that the conspiratorial activity at issue was reasonably foreseeable as required by former U.S.S.G. § 2D1.4 of the Guidelines -- the same type of finding as required by U.S.S.G. § 1B1.3 (a)(1)(B). Moreover, Rule 32 of the Federal Rules of Criminal Procedure mandates that the sentencing court make findings regarding any controverted facts in the PSR, or state that those facts will not be taken into account in sentencing. See FED. R. CRIM. P. 32(C)(3)(D).

In *United States v. Aderholt*, 87 F.3d 740 (5th Cir. 1996), it was error to sentence the defendant under guidelines applicable to conspiracy to commit murder where the defendant was convicted under conspiracy to commit mail fraud even though murder was allegedly involved in the mail fraud scheme. In this case, to determine Defendant's base offense level, the district court grouped the four counts in the indictment, and pursuant to U.S.S.G. §§3D1.2 and 3D1.3, purported

43

to choose the offense level for the most serious offense. The district court chose the offense level for murder because, relying on U.S.S.G §3D1.2 application note 8, §1B1.2(d) and §1B1.2 application note 5, it concluded that murder was an object of the conspiracy.

Appellant would show that plain error has been shown since the district court sentenced Appellant to a term of imprisonment which far exceeded the statutory maximum if sentencing were carried out pursuant to the federal sentencing guidelines. In determining whether the error made by the district court affected Appellant 's substantial rights, this Court has previously found plain error where the incorrect application of sentencing guidelines resulted in a "dramatic increase" in the recommended imprisonment range and the actual term of imprisonment imposed. See, e.g., *United States v. Gracia-Cantu*, 302 F.3d 308, 313 (5th Cir. 2002); *United States v. Alarcon*, 261 F.3d 416, 423 (5th Cir. 2001); *United States v. Aderholt,* 87 F.3d 740, 744 (5th Cir. 1996). Here, such as showing has been made. Because he was assessed a life sentence, Appellant has demonstrated that the district court's sentencing error resulted in a "dramatic increase" to his sentence. For this reason, Appellant's sentence should be vacated and set aside and his case remanded back to the district court for re-sentencing.

## CONCLUSION

Based on the foregoing errors, Appellant respectfully prays that his convictions be vacated and set aside on the points of review he has asserted in this brief. Alternatively, Appellant requests that he be granted a new sentencing hearing on the *Apprendi* and *Booker* violations he has briefed in the third point for review he has submitted. Appellant would also pray for all other relief, legal and equitable, be granted pursuant to law.

Respectfully submitted.

JOE A. SPENCER, JR.

*Attorney for Defendant-Appellant*
1009 Montana
El Paso, Texas 79901
Tel.: (915) 532-5562
Fax: (915) 532-7535

_____
*Attorney for Defendant-Appellant*

45

## CERTIFICATE OF SERVICE

I served two copies of the foregoing Brief of Appellant and diskette containing the brief on Johnny Sutton, U.S. Attorney for the Western District of Texas (Attn: Assistant U.S. Attorney Joseph H. Gay Jr.), by mailing them to his office at 601 N.W. Loop 410, Suite 600, San Antonio, Texas 78216-5512, on January 28, 2010. I also served a copy on Said Francisco Herrera, prisoner number 10145280 Unit 4B, by mailing him a copy to USP McCreary, U.S. Penitentary, PO Box 3000, Pine Knot, KY 42635 in compliance with Fifth Circuit Rule 31.1.

JOE A. SPENCER, JR.
*Attorney for Defendant-Appellant*

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)
Certificate of Compliance with Type-Volume Limitation,
Typeface Requirements, and Type Style Requirements

1.    This brief complies with the type-volume limitation of FED. R. APP. P. 32(a)(7)(B) because this brief contains Seven Thousand Two Hundred Two Words (7,202) words, excluding the parts of the brief exempted by Fed. R. APP. P. 32(a)(7)(B)(iii);

2.    This brief complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type style requirements of FED. R. APP. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2003 in Times New Roman with a 14 point font.

> Respectfully submitted.
>
> JOE A. SPENCER, JR.
>
> *Attorney for Defendant-Appellant*
> 1009 Montana
> El Paso, Texas 79901
> Tel.: (915) 532-5562
> Fax: (915) 532-7535
>
> _____
> *Attorney for Defendant-Appellant*

47