# No. 09-50323

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

**UNITED STATES OF AMERICA,**

**Plaintiff-Appellee,**

**v.**

**SAID FRANCISCO HERRERA, a/k/a Shorty; ARTURO ENRIQUEZ,
a/k/a Tury; MANUEL CARDOZA, a/k/a Tolon; CARLOS PEREA, a/k/a
Shotgun;  EUGENE MONA, a/k/a Gino; and BENJAMIN ALVAREZ,
a/k/a T-Top,**

**Defendants-Appellant.**

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS**

_____

**CONSOLIDATED BRIEF FOR THE UNITED STATES OF AMERICA**

_____

**JOHN E. MURPHY**
**United States Attorney**

**TRIAL ATTORNEY**
**JOSE LUIS ACOSTA**
**Assistant United States**
  **Attorney**

**ELIZABETH BERENGUER**
**Assistant United States Attorney**
**Western District of Texas**
**601 N.W. Loop 410, Suite 600**
**San Antonio, Texas 78216**
**(210) 384-7090 / FAX (210) 384-7031**
**ATTORNEYS FOR APPELLEE**

## <u>RECOMMENDATION ON ORAL ARGUMENT</u>

The United States of America suggests oral argument would not significantly aid the decisional process in this case. The issue(s) raised on this appeal can be determined upon the briefs that adequately present the record and legal arguments relevant to this appeal. *See* Fed. R. App. P. 34(a)(2)(C).

# TABLE OF CONTENTS

**Pages**

RECOMMENDATION ON ORAL ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . ii

TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . vi

JURISDICTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE ISSUES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF THE CASE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

      A.    Course of Proceedings and Disposition in the Court Below. . . . . . . 4
      B.    Statement of Facts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

SUMMARY OF THE ARGUMENTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

ARGUMENTS AND AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

    I.  THERE WAS SUFFICIENT EVIDENCE FOR ANY RATIONAL
    JURY TO FIND CARDOZA, ALVAREZ, MONA, AND HERRERA
    GUILTY OF THE RICO CONSPIRACY, IN VIOLATION OF 18
    U.S.C. § 1962(d) (COUNT 2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

    II.  THERE WAS SUFFICIENT EVIDENCE FOR ANY RATIONAL
    JURY TO FIND CARDOZA, ALVAREZ, AND HERRERA GUILTY
    OF THE SUBSTANTIVE RICO STATUTE, 18 U.S.C. § 1962(c)
    COUNT 1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

    III.  THERE WAS SUFFICIENT EVIDENCE FOR ANY RATIONAL
    JURY TO FIND HERRERA AND ENRIQUEZ GUILTY OF
    CONSPIRING TO INTERFERE WITH COMMERCE BY THREATS
    OR VIOLENCE, IN VIOLATION OF 18 U.S.C. § 1951 (COUNT 3). . . . 67

# TABLE OF CONTENTS CONTINUED

**Pages**

IV.  THERE WAS SUFFICIENT EVIDENCE FOR ANY RATIONAL
JURY TO FIND CARDOZA AND ALVAREZ GUILTY OF
ONSPIRACY TO LAUNDER MONETARY INSTRUMENTS
(COUNT 4). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

V.  THE DISTRICT COURT'S ADMISSION OF ALVAREZ'S
PRISON BANK RECORDS AND A SUMMARY OF THOSE RECORDS
DID NOT VIOLATE THE CONFRONTATION CLAUSE. . . . . . . . . . . 79

VI.  HERRERA FAILED TO ADEQUATELY BRIEF, AND
tHEREFORE WAIVED, ANY CHALLENGE RELATING TO THE
ADMISSION OF UNSPECIFIED EXHIBITS. . . . . . . . . . . . . . . . . . . . . . 88

VII .  THE DISTRICT COURT PROPERLY DENIED ENRIQUEZ'S
MOTION TO SUPPRESS HIS PRE-ARREST STATEMENTS
AFTER FINDING THAT ENRIQUEZ WAS NOT IN CUSTODY
WHEN QUESTIONED AND THAT HIS STATEMENT TO
DETECTIVES WAS VOLUNTARILY MADE. . . . . . . . . . . . . . . . . . . . . 92

VIII.  THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION
WHEN IT DENIED ENRIQUEZ'S MOTION FOR SEVERANCE
PURSUANT TO FEDERAL RULE OF CRIMINAL PROCEDURE 14.  104

IX.  THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION
BY IMPLEMENTING SEVERAL JUROR ANONYMITY MEASURES,
INCLUDING WITHHOLDING SOME IDENTIFYING JUROR
INFORMATION AND ORDERING THE U.S. MARSHALS TO
PROVIDE SECURE OFF-SITE JUROR PARKING AND
TRANSPORTATION TO THE JURORS BETWEEN THE
OFFSITE PARKING AND THE COURTHOUSE. . . . . . . . . . . . . . . . . . 112

# <u>TABLE OF CONTENTS CONTINUED</u>

<u>Pages</u>

X.  THE DISTRICT COURT PROPERLY DECLINED TO GRANT PEREA'S AND CARDOZA'S REQUEST FOR A NEW TRIAL AFTER DETERMINING THAT NO *BRADY* VIOLATION OCCURRED. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 123

XI.  THE DISTRICT COURT DID NOT PLAINLY ERR IN IMPOSING LIFE SENTENCES FOR CARDOZA AND HERRERA FOR THEIR RICO CONSPIRACY CONVICTIONS (COUNT 2); HOWEVER, THE GOVERNMENT DOES NOT OPPOSE REMAND FOR RESENTENCING FOR MONA ON THE BASIS OF HIS *APPRENDI* CLAIM. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 135

XII.  THE DISTRICT COURT DID NOT CLEARLY ERR IN RELYING   ON UNCONTROVERTED FACTS CONTAINED THE PRESENTENCE REPORT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 139

XIII.  THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION WHEN IT DECLINED PEREA'S REQUEST FOR AN EVIDENTIARY SENTENCING HEARING.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 143

XIV.  THE DISTRICT COURT DID NOT PLAINLY OR OTHERWISE ERR WHEN IT SENTENCED CARDOZA AND ALVAREZ TO A TERM OF IMPRISONMENT THAT FELL WITHIN THE ADVISORY GUIDELINE RANGE.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 150

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 154

CERTIFICATE OF SERVICE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 154

CERTIFICATE OF COMPLIANCE.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 155

# TABLE OF AUTHORITIES

**Cases**                                                                 **Pages**

*Anderson v. Sch. Board of Madison County*, 517 F.3d 292 (5th Cir. 2008). . . . . 93

*Apprendi v. New Jersey*, 530 U.S. 466 (2000). . . . . . . . . . . . . . . . . . . . . . . . . . 136

*Brady v. Maryland*, 373 U.S. 83 (1963). . . . . . . . . . . . . . . . . . . . . . . . . . 123, 131

*Bruton v. United States*, 391 U.S. 123 (1968).. . . . . . . . . . . . . . . . . . . . . . . . 111

*Colorado v. Connelly*, 479 U.S. 157 (1986). . . . . . . . . . . . . . . . . . . . . . . . . . . 103

*Crawford v. Washington*, 541 U.S. 36 (2004). . . . . . . . . . . . . . . . . . . . . 83, 84, 86

*Gall v. United States,* 552 U.S. 38 (2007).. . . . . . . . . . . . . . . . . . . . . . . . . . . . 151

*Jackson v. Virginia*, 443 U.S. 307 (1979). . . . . . . . . . . . . . . . . . . . . 29, 53, 67, 73

*Melendez-Diaz v. Massachusetts*, 129 S. Ct. 2527 (2009). . . . . . . . . . . . . . . 84, 85

*Miranda v. Arizona,* 384 U.S. 436 (1966). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 99

*Nenno v. Quarterman*, 489 F.3d 214 (5th Cir. 2007). . . . . . . . . . . . . . . . . . . . . 102

*Oregon v. Mathiason,* 429 U.S. 492 (1977). . . . . . . . . . . . . . . . . . . . . . . . . . . . 101

*Richardson v. Marsh*, 481 U.S. 200 (1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . 111

*Rita v. United States*, 551 U.S. 338 (2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . 151

*Schneckloth v. Bustamonte,* 412 U.S. 218 (1973). . . . . . . . . . . . . . . . . . . . . . . 102

*Stansbury v. California*, 511 U.S. 318 (1994). . . . . . . . . . . . . . . . . . . . . . . . . . . 99

*Strickler v. Greene,* 527 U.S. 263 (1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 132

# TABLE OF AUTHORITIES CONTINUED

**Cases**                                                                          **Pages**

*United States v. Adefehinti*, 510 F.3d 319 (D.C. Cir. 2007). . . . . . . . . . . . . . . . . 85

*United States v. Alonzo*, 435 F.3d 552 (5th Cir. 2006). . . . . . . . . . . . . . . . . . . . 150

*United States v. Alonzo,* 681 F.2d 997 (5th Cir. 1982). . . . . . . . . . . . . . . . . . . . 29

*United States v. Asibor*, 109 F.3d 1023 (5th Cir.1997). . . . . . . . . . . . . . . . . . . . 55

*United States v. Avants,* 367 F.3d 433 (5th Cir. 2004). . . . . . . . . . . . . . . . . . . . 90

*United States v. Ayala*, 887 F.2d 62 (5th Cir. 1989). . . . . . . . . . . . . . . . . . . . . . 29

*United States v. Bermea,* 30 F.3d 1539 (5th Cir. 1994). . . . . . . . . . . . . . . 107, 110

*United States v. Box,* 50 F.3d 345 (5th Cir. 1995). . . . . . . . . . . . . . . . . . . . 33, 34

*United States v. Branch*, 91 F.3d 699 (5th Cir. 1996). . . . . . . . . . . . 118, 120, 121

*United States v. Broussard,* 80 F.3d 1025 (5th Cir. 1996). . . . . . . . . . . . . . . . . 102

*United States v. Bryan*t, 770 F.2d 1283 (5th Cir. 1985). . . . . . . . . . . . . . . . . . . . 30

*United States v. Burns,* 162 F.3d 840 (5th Cir. 1998).. . . . . . . . . . . . . . . . . . . . . 88

*United States v. Cabrera*, 288 F.3d 163 (5th Cir. 2002). . . . . . . . . . . . . . . . . . . 143

*United States v. Cardenas Alvarado,* 806 F.2d 566 (5th Cir. 1986). . . . . . . . . . . 88

*United States v. Carson,* 455 F.3d 336 (D.C. Cir. 2006). . . . . . . . . . . . . . . . . . . 122

*United States v. Cauble,* 706 F.2d 1322 (5th Cir. 1983). . . . . . . . . . . 31, 55, 59, 64

*United States v. Charles,* 469 F.3d 402 (5th Cir. 2006). . . . . . . . . . . . . . . . . . . . 93

## TABLE OF AUTHORITIES CONTINUED

**Cases**                                                                                    **Pages**

*United States v. Collins,* 972 F.2d 1385 (5th Cir. 1992). . . . . . . . . . . . . . . . . 101

*United States v. Cooper*, 274 F.3d 230 (5th Cir. 2001). . . . . . . . . . . . . . . . . . 143

*United States v. Cortinas*, 142 F.3d 242 (5th Cir. 1998). . . . . . . . . . . . . . . . . 109

*United States v. Cotton*, 535 U.S. 625 (2002). . . . . . . . . . . . . . . 135, 136, 139, 150

*United States v. Cox,* 942 F.2d 1282 (8th Cir. 1991). . . . . . . . . . . . . . . . . . . . . 35

*United States v. Darden,* 70 F.3d 1507 (8th Cir. 1995). . . . . . . . . . . . 118, 122, 123

*United States v. Delgado,* 401 F.3d 290 (5th Cir. 2005). . . . . . . . . . 32, 35, 60, 66

*United States v. Edwards,* 303 F.3d 606 (5th Cir. 2002). .   112, 117, 118, 120, 121

*United States v. Elliott*, 571 F.2d 880 (5th Cir. 1978). . . . . . . . . . . . . . . . . 31, 53

*United States v. Ellis*, 460 F.3d 920 (7th Cir. 2006). . . . . . . . . . . . . . . . . . . . . . 85

*United States v. Erwin,* 793 F.2d 656 (5th Cir. 1986). . . . . . . . . . . . . . . . . . . . 54

*United States v. Fernandez,* 388 F.3d 1199 (9th Cir. 2004). . . . . . . . 41, 45, 56, 139

*United States v. Fernandez,* 559 F.3d 303 (5th Cir. 2009). . . . . . . . . . . . . . . . . 110

*United States v. Friedman*, 854 F.2d 535 (2d Cir. 1988). . . . . . . . . . . . . . . . . . 108

*United States v. Garcia-Flores*, 246 F.3d 451 (5th Cir. 2001). . . . . . . . . . . . . . . 88

*United States v. Garza*, 42 F.3d 251 (5th Cir. 1994). . . . . . . . . . . . . . . . . . 74, 79

*United States v. Gonzales*, 79 F.3d 413 (5th Cir. 1996). . . . . . . . . . . . . . . . . . . 39

# TABLE OF AUTHORITIES CONTINUED

**Cases**                                                                    **Pages**

*United States v. Gonzalez*, 250 F.3d 923 (5th Cir. 2001). . . . . . . . . . . . . . . . . . . 153

*United States v. Gotti*, 459 F.3d 296 (2d Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . 78

*United States v. Green*, 293 F.3d 886 (5th Cir. 2002). . . . . . . . . . . . . . . . . . . . 136

*United States v. Green*, 599 F.3d 360 (4th Cir. 2010). . . . . . . . . . . . . . . . . . . . . 74

*United States v. Greenwood,* 974 F.2d  1449 (5th Cir. 1992). . . . . . . . . . . . . . . 55

*United States v. Henderson,* 19 F.3d 917 (5th Cir. 1994). . . . . . . . . . . . . . . . . 143

*United States v. Hickman,* 179 F.3d 230 (5th Cir. 1999). . . . . . . . . . . . . . . . . . 34

*United States v. Hughes*, 230 F.3d 815 (5th Cir. 2000). . . . . . . . . . . . . . . . 124, 134

*United States v. Izaguirre-Losoya,* 219 F.3d 437 (5th Cir. 2000). . . . . . . . . . . . 152

*United States v. Jackson,* 625 F.3d 875 (5th Cir. 2010). . . . . . . . . . . . . . . . . . . . 85

*United States v. Jimenez*, 513 F.3d 62 (3d Cir. 2008). . . . . . . . . . . . . . . . . . . . . 87

*United States v. Krout,* 66 F.3d 1420 (5th Cir. 1995). . . . .    112, 117, 119, 120, 122

*United States v. Lance*, 853 F.2d 1177 (5th Cir. 1988). . . . . . . . . . . . . . . . . . . . 91

*United States v. Lee*, 217 F.3d 284 (5th Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . 29

*United States v. Maldonado-Rivera*, 922 F.2d 934 (2d Cir.1990). . . . . . . . . . . . 122

*United States v. Maltos,* 985 F.2d 743 (5th Cir.1992). . . . . . . . . . . . . . . . . . . . . 30

*United States v. Mares,* 402 F.3d 511 (5th Cir. 2005). . . . . . . . . . . . . . . . . . . . 151

## TABLE OF AUTHORITIES CONTINUED

**Cases**                                                                      **Pages**

*United States v. Marrero*, 299 F.3d 653 (7th Cir. 2002)                          35

*United States v.  Martin*, 431 F.3d 846 (5th Cir. 2005). . . . . . . . . . . . . . . . . . 123

*United States v. Martinez*, 151 F.3d 384 (5th Cir. 1998). . . . . . . . . . . . . . . . 29, 67

*United States v. Maurer,* 226 F.3d 150 (2d Cir. 2000). . . . . . . . . . . . . . . . . . . . 148

*United States v. McGuire*, 608 F.2d 1028 (5th Cir. 1979). . . . . . . . . . . . . . . . . 107

*United States v. Miller*, 520 F.3d 504 (5th Cir. 2008),
        *quoting United States v. Sipe*, 388 F.3d 471 (5th Cir. 2004). . . 124, 133, 134

*United States v. Mondragon-Santiago*, 564 F.3d 357 (5th Cir. 2009). . . . . 150, 151

*United States v. Morgan,* 505 F.3d 332 (5th Cir. 2007). . . . . . . . . . . . . . . . . 79, 83

*United States v. Nava*, 624 F.3d 226 (5th Cir. 2010). . . . . . . . . . . . . . . . . . . . . 142

*United States v. Neal,* 27 F.3d at 1045, *quoting United States v. Harrelson,*
        754 F.2d 1153 (5th Cir. 1985). . . . . . . . . . . . . . . . . . . . . 106, 108, 109, 110

*United States v. Ness*, 466 F.3d 79 (2d Cir. 2006), *vacated on other grounds*
        *by Regalado Cuellar v. United States*, 553 U.S. 550 (2008). . . . . . . . . . . . 78

*United States v. Nguyen,* 493 F.3d 613 (5th Cir. 2007). . . . . . . . . . . . . . . . . . . 108

*United States v. Nicholson,* 846 F.3d 277 (5th Cir. 1988). . . . . . . . . . . . . . . . . 112

*United States v. Olano*, 507 U.S. 725 (1993). . . . . . . . . . . . . . . . . . . . . . . . . . 150

*United States v. Paccione*, 949 F.2d 1183 (2d Cir. 1991). . . . . . . . . . . . . . . . . 123

x

# TABLE OF AUTHORITIES CONTINUED

**Cases**                                                                **Pages**

*United States v. Peterson*, 244 F.3d 285 (5th Cir. 2001). . . . . . . . . . . . . . . . . . 107

*United States v. Pofahl,* 990 F.2d 1456 (5th Cir. 1993). . . . . . . . . . . . . . . 109, 110

*United States v. Posada-Rios*, 158 F.3d at 857,
   *citing United States v. Fernandez-Roque,* 703 F.2d 808
   (5th Cir. 1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30, 46, 47, 78

*United States v. Prieto-Tejas*, 779 F.2d 1098 (5th Cir. 1986). . . . . . . . . . . . . . . 46

*United States v. Restrepo*, 994 F.2d 173 (5th Cir. 1993). . . . . . . . . . . . . . . . . . 104

*United States v. Rivera*, 295 F.3d 461 (5th Cir. 2002),
   *citing United States v. Ismoila,* 100 F.3d 380 (5th Cir. 1996). . . . . . . . . . . 74

*United States v. Robertson,* 110 F.3d 1113 (5th Cir. 1997). . . . . . . . . . . . . . . . 123

*United States v. Rodriguez*, 360 F.3d 949 (9th Cir. 2004). . . . . . . . . . . . . . . . . . 35

*United States v. Rodriguez*, 602 F.3d 346 (5th Cir. 2010). . . . . . . . . . . . . . . . . 141

*United States v. Runyan*, 290 F.3d 223 (5th Cir. 2002). . . . . . . . . . . . . . . 131, 132

*United States v. Sanchez,* 74 F.3d 562 (5th Cir. 1996). . . . . . . . . . . . . . . . . . . . 117

*United States v. Santiago*, 410 F.3d 193 (5th Cir. 2005). . . . . . . . . . . . . . . . . . . 93

*United States v. Schwartz,* No. 05-2770, 2009 WL 532796
   (3d Cir. Mar. 4, 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 85

*United States v. Simmons,* 374 F.3d 313 (5th Cir. 2004). . . . . . . . . . . . . . . . . . 106

*United States v. Simmons*, 568 F.3d 564 (5th Cir. 2009). . . . . . . . . . . . . . . . . . 150

## TABLE OF AUTHORITIES CONTINUED

**Cases**                                                                        **Pages**

*United States v. Smith*, 440 F.3d 704 (5th Cir. 2006). . . . . . . . . . . . . . . . . . . . . . 151

*United States v. Snyder,* 930 F.2d 1090 (5th Cir. 1991). . . . . . . . . . . . . . . . . . 33, 69

*United States v. Solis*, 299 F.3d 420 (5th Cir. 2002). . . . . . . . . . . . . . . . . . . . . . 140

*United States v. Sparks*, 2 F.3d 574 (5th Cir. 1993). . . . . . . . . . . . . . . . . . . . . . 108

*United States v. Stephens,* 964 F.2d 424 (5th Cir. 1992),
    *citing United States v. Villarreal*, 764 F.2d 1048 (5th Cir. 1985). . . . . 33, 68

*United States v. Thomas,* 12 F.3d 1350 (5th Cir. 1994). . . . . . . . . . . . . . . . . . . . 56

*United States v. Tomblin,* 46 F.3d 1369 (5th Cir.1995). . . . . . . . . . . . . . . . . . . . 33

*United States v. Toro,* 840 F.2d 1221 (5th Cir. 1988). . . . . . . . . . . . . . . . . . . . . 104

*United States v. Trujillo*, 502 F.3d 353 (5th Cir. 2007). . . . . . . . . . . . . . . 139, 141

*United States v. Valdez,* 453 F.3d 252 (5th Cir. 2006). . . . . . . . . . . . . . . . . . . . 141

*United States v. Vasquez*, 216 F.3d 456 (5th Cir. 2000). . . . . . . . . . . . . . . . . . . 135

*United States v. Villafranca*, 260 F.3d 374 (5th Cir. 2001). . . . . . . . . . . . . . . . . 34

*United States v. Warneke,* 310 F.3d 542 (7th Cir. 2002). . . . . . . . . . . 136, 137, 138

*United States v. Weiland,* 420 F.3d 1062 (9th Cir. 2005). . . . . . . . . . . . . . . . . . . 85

*United States v. West,* 58 F.3d 133 (5th Cir.1995). . . . . . . . . . . . . . . . . . . . . . . 142

*United States v. Wright*, 797 F.2d 245 (5th Cir.1986). . . . . . . . . . . . . . . . . . 34, 68

# TABLE OF AUTHORITIES CONTINUED

**Cases**                                                                      **Pages**

*United States v. Wyly*, 193 F.3d 289 (5th Cir. 1999). . . . . . . . . . . . . . . . 36, 56, 75

*United States v. Yanez -Sosa*, 513 F.3d 194 (5th Cir. 2008). . . . . . . . . . . . . . . . 88

*United States v. Yeley-Davis,* No. 10-8000, 2011 WL 167249
    (10th Cir. Jan. 20, 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 85

*Yohey v. Collins*, 985 F.2d 222 (5th Cir.1993). . . . . . . . . . . . . . . . . . . . . 64, 89, 140

*Zafiro v. United States*, 506 U.S. 534 (1993). . . . . . . . . . . . . . . 106, 107, 108, 109

## Statutes

18 U.S.C. § 1951. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30, 32, 38, 54, 68, 142

18 U.S.C. § 1956. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30, 36, 54, 73, 74

18 U.S.C. § 1961. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31, 36

18 U.S.C. § 1962. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 30, 53

21 U.S.C. § 841. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38, 54, 55, 137, 138

21 U.S.C. § 846. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

## Rules

Fed. R. App. P. 28. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

Fed. R. Crim. P. 14. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 106

Fed. R. Evid. 901. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 90, 92

## TABLE OF AUTHORITIES CONTINUED

**State Cases**                                                                 **Pages**

Tex. Penal Code Ann. § 19.02(b) (Vernon 2008). . . . . . . . . . . . . . . . . . . . . . . . . 42

**Miscellaneous**

U.S. Const. amend. VI. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83

**No. 09-50323**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

————————————

### UNITED STATES OF AMERICA,

**Plaintiff-Appellee,**

v.

### SAID FRANCISCO HERRERA, a/k/a Shorty; ARTURO ENRIQUEZ, a/k/a Tury; MANUEL CARDOZA, a/k/a Tolon; CARLOS PEREA, a/k/a Shotgun;  EUGENE MONA, a/k/a Gino; and BENJAMIN ALVAREZ, a/k/a T-Top,

**Defendants-Appellants.**

————————————

## ON APPEAL FROM THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS

————————————

## BRIEF FOR THE UNITED STATES OF AMERICA

————————————

## <u>JURISDICTION</u>

This is an appeal from a final judgment of the district court in a criminal case.

The jurisdiction of this Court is invoked pursuant to 18 U.S.C. § 3742 and 28 U.S.C. § 1291.

## **STATEMENT OF THE ISSUES**

I.    Whether there was sufficient evidence for any rational jury to find Cardoza, Alvarez, Mona, and Herrera guilty of the RICO conspiracy, in violation of 18 U.S.C. § 1962(d) (Count 2). (Cardoza Issue 3, Op. Br. at 20-35; Alvarez Issue II, Op. Br. at 33-35; Mona Issues 1 & 2, Op. Br. at 31-49; Herrera's Issue 1, Op. Br. at 17-26)

II.    Whether there was sufficient evidence for any rational jury to find Cardoza, Alvarez, and Herrera guilty of the substantive RICO statute, 18 U.S.C. § 1962(c) (Count 1). (Cardoza Issues 2 & 5, Op. Br. at 20-35, 39-40; Alvarez Issues I & IV, Op. Br. at 29-33, 37-38; Herrera Issue 1, Op. Br. at 17-26)

III.    Whether there was sufficient evidence for any rational jury to find Herrera and Enriquez guilty of conspiring to interfere with commerce by threats or violence, in violation of 18 U.S.C. § 1951 (Count 3). (Herrera Issue 1, Op. Br. at 17-26; Enriquez Issue 1, Op. Br. at 16-23)

IV.    Whether there was sufficient evidence for any rational jury to find Cardoza and Alvarez guilty of conspiracy to launder monetary instruments, in violation of 18 U.S.C. § 1956 (Count 4). (Cardoza Issue 4, Op. Br. at 35-39; Alvarez Issue III, Op. Br. at 35-37).

V.     Whether the district court's admission of Alvarez's prison bank records and a summary of those records violated the Confrontation Clause. (Alvarez Issue VII, Op. Br. at 45-47)

VI.     Whether Herrera failed to adequately brief, and therefore waived, any challenge relating to the admission of unspecified exhibits. (Herrera Issue 2, Op. Br. at 26-35)

VII.     Whether the district court properly denied Enriquez's motion to suppress his pre-arrest statements after finding that Enriquez was not in custody when questioned and that his statement to detectives was voluntarily made. (Enriquez Issue 2, Op. Br. at 24-33)

VIII.     Whether the district court abused its discretion when it denied Enriquez's motion for severance pursuant to Federal Rule of Criminal Procedure 14. (Enriquez Issue 3, Op. Br. at 34-39)

IX.     Whether the district court abused its discretion by implementing several juror anonymity measures, including withholding some identifying juror information and ordering the U.S. marshals to provide secure off-site juror parking and transportation to the jurors between the offsite parking and the courthouse. (Perea's Issue 2, Op. Br. at 11-16; Cardoza Issue 1, Op. Br. at 15-20; Alvarez Issue V, Op. Br. at 39-43)

X.    Whether the district court properly declined to grant Perea's and Cardoza's request for a new trial after determining that no *Brady* violation occurred. (Perea Issue 1, Op. Br. at 6-11; Cardoza Issue 6, Op. Br. at 40-44)

XI.    Whether the district court plainly erred in imposing life sentences for Cardoza, Mona, and Herrera on the basis of their RICO conspiracy convictions. (Cardoza Issue 7b, Op. Br. at 46-47; Herrera Issue 3, Op. Br. at 40-41; Mona Issue 3, Op. Br. at 49-52)

XII.    Whether the district court clearly erred in relying on uncontroverted facts contained the presentence report. (Herrera Issue 3, Op. Br. at 35-37; Enriquez Issue 4, Op. Br. at 39-46)

XIII.    Whether the district court abused its discretion when it declined Perea's request for an evidentiary sentencing hearing. (Perea Issue 3, Op. Br. at 16-18)

XIV.    Whether the district court plainly or otherwise erred when it sentenced Cardoza and Alvarez to a term of imprisonment that fell within the advisory guideline range. (Cardoza Issue 7a, Op. Br. at 45-46; Alvarez Issue VI, Op. Br. at 43-45)

## STATEMENT OF THE CASE

### A.    Course of Proceedings and Disposition in the Court Below

By grand jury indictment filed on January 9, 2008, in the Western District of Texas, El Paso Division, six co-defendants were charged in an 11-count indictment

4

for various criminal offenses relating to their involvement with the Barrio Azteca, an established prison gang operating in El Paso, Texas (1 PR. 28-52; *see also* 1 PR. 347-94).[1] Defendants-Appellants Carlos Perea ("Perea"), Manuel Cardoza ("Cardoza"), and Benjamin Alvarez ("Alvarez") were each charged with one count of engaging in the affairs of an enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c) (Count 1); one count of conspiracy to conduct the affairs of an enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(d) (Count 2); one count of conspiracy to launder monetary instruments, in violation of 18 U.S.C. § 1956(a)(1)(A)(i)(B)(i) & (h) (Count 4); and one count of conspiracy to possess heroin, cocaine, and marijuana with intent to distribute, in violation of 21 U.S.C. §§ 841(a), 846 (Count 5) (*see* 1 PR. 347-94). Co-Defendant-Appellant Eugene Mona ("Mona") was charged with one count of conspiracy to conduct the affairs of an enterprise through a pattern of racketeering

---

[1] References to the Record on Appeal are generally designated by the number of the record volume followed by "R" and the pertinent page number(s) assigned by the Clerk of Court. However, because only an electronic record was provided, "Volume 1" will include all court documents filed in each particular defendant's case and will be designated by "1" followed by the first letter of the relevant defendant's last name, "R," and the pertinent page number(s). For example, the indictment filed in Perea's case will be cited as "1 PR. 28-52." All joint transcripts have been assigned a successive volume number in chronological order, beginning with the Status Conference on October 31, 2008 (hereinafter "2 R.," followed by the pertinent page number), and ending with the Sentencing Hearing on April 13, 2009 (hereinafter "17 R.," followed by the pertinent page number). The suppression hearing for Defendant Enriquez on September 9, 2008, has been designated as Volume 18 (18 R.). References to the Presentence Investigation Report are designated "PSR" followed by the relevant paragraph number(s).

activity, in violation of 18 U.S.C. § 1962(d) (Count 2) (1 MR. 29-53).

Co-Defendant-Appellant Said Francisco Herrera ("Herrera") was charged with one count of engaging in the affairs of an enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c) (Count 1); one count of conspiracy to conduct the affairs of an enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(d) (Count 2); one count of conspiracy to interfere with commerce by threats or violence, in violation of 18 U.S.C. § 1951 (Count 3); one count of conspiracy to possess heroin, cocaine, and marijuana with intent to distribute, in violation of 21 U.S.C. §§ 841(a), (846) (Count 5); and one count of committing violent crimes in aid of racketeering activity, in violation of 18 U.S.C. § 22, 1959(a)(3) (Count 10) (*see* 1 HR. 39-67). Co-Defendant-Appellant Arturo Enriquez ("Enriquez") was charged with one count of conspiracy to interfere with commerce by threats or violence, in violation of 18 U.S.C. § 1951 (Count 3); one count of conspiracy to possess heroin, cocaine, and marijuana with intent to distribute, in violation of 21 U.S.C. §§ 841(a), 846 (Count 5); and one count of murder in aid of racketeering activity, in violation of 18 U.S.C. § 1959(a)(1) (Count 11) (1 ER. 36-60).

During the month-long federal jury trial, the court granted Enriquez's motion for judgment of acquittal on Count 5 (12 R. 173; 13 R. 4, 210). On December 2, 2008,

the jury returned guilty verdicts for Perea, Cardoza, and Alvarez on all four charged counts: Counts 1, 2, 4, and 5 (1 PR. 439-55; 16 R. 11-16). Mona was convicted of Count 2 (*see* 1 PR. 446; 16 R. 14-15). Herrera was convicted of Counts 1, 2, 3, and 5, but the jury was unable to reach a unanimous verdict on Count 10 (*see* 1 PR. 439-55; 16 R. 13-16). Enriquez was convicted of Count 3, but acquitted of Count 11 (1 PR. 448, 455; 16 R. 15, 16-17). Upon the government's motion, the district court declared a mistrial as to Count 10 for Herrera (16 R. 18).

On April 14, 2009, the district court sentenced Perea, Cardoza, and Alvarez to three concurrent terms of life imprisonment on Counts 1, 2, and 5, and a concurrent term of imprisonment of 240 months on Count 4, all terms to be served consecutively with the sentence previously imposed in a separate federal criminal case (1 PR. 1607-1612; 1 AR. 1561-66; 17 R. 16, 22, 37).[2] All defendants filed timely notices of appeal (*see* 1 PR. 1627; 1 CR. 1690, 6875; 1 AR. 1627; 1 MR. 1720; 1 HR. 1648, 6837; 1 ER. 1753, 6555).[3]

---

[2] Although all six defendants were sentenced at the same time, Perea's Judgment and Commitment was not entered until April 15, 2009 (*see* 1 PR. 1607).

[3] Defendants Perea, Cardoza, Mona, Herrera, and Enriquez filed their notices of appeal within 14 days after the entry of judgment, as required by Federal Rule of Appellate Procedure 4(b)(1)(A). Defendant Alvarez filed his notice of appeal on June 17, 2009, within 14 days of the district court's order denying his motion for a new trial on June 8, 2009, as permitted by Federal Rule of Appellate Procedure 4(b)(3)(A).

**B.    Statement of Facts**

1.    <u>The Organization of the Barrio Azteca Criminal Enterprise</u>[4]

In 1985, a group of inmates in the Texas Department of Corrections prison system formed the Barrio Azteca gang in order to unite inmates from El Paso and other West Texas areas.[5] Over the next two decades, the BA expanded its sphere of influence beyond the Texas Department of Corrections to federal Bureau of Prisons correctional facilities, various West Texas cities, and Ciudad Juarez, Chihuahua, Mexico.[6] The BA also formed a symbiotic alliance with the Vincente Carrillo-Fuentes drug trafficking organization ("*La Linea*"), a drug cartel in Juarez, Mexico.[7]

The original members created a charter, which set forth a command structure, hierarchy of ranks, and strict rules of order.[8] Prospective members must be sponsored by a current BA member and, before their acceptance, must pass a background investigation conducted by the BA leadership to ensure their lack of affiliation to

---

[4] Due to the length of the trial and corresponding immensity of the record, the government will place the citations to the record in footnotes in this factual summary section.

[5] 8 R. 93-95.

[6] 7 R. 182; 12 R. 83.

[7] 4 R. 34; 5 R. 231; 7 R. 50; 10 R. 89-90, 156-57;11 R. 48.

[8] 3 R. 162; 4 R. 110, 138-39; 5 R. 175-76; 7 R. 182-83.

other gangs or prior cooperation with law enforcement.[9] Members are then provided with the BA rules and required to follow the BA chain of command or face discipline.[10]

Once initiated, BA membership is for life.[11] As such, BA members who are released from prison are expected to continue their membership in the BA enterprise in the "free world." Specifically, upon their release, members are required to immediately report to the BA"free world" leadership, attend membership meetings to discuss BA business, and work to further the goals of the organization.[12] This "free world" leadership is directly appointed by the BA prison leadership.[13]

2.    The Defendants' Involvement in the BA's Racketeering Activities

From 2003 until 2008, the BA conducted an extortion scheme in order to surreptitiously funnel money to their members incarcerated within various state correctional institutions and federal prisons.[14] Specifically, throughout this period, the

---

[9] 3 R. 142-45, 158-60; 4 R. 276-81; 5 R. 174-75; 6 R. 255, 256-57; 7 R. 183-84, 191.

[10] 3 R. 160-62; 4 R. 138-39, 164; 5 R. 175-76; 6 R. 255-56; 7 R. 187-88.

[11] 3 R. 162; 13 R. 156-64 .

[12] 3 R. 201-04, 206-07; 4 R. 149, 151-52, 287-93; 5 R. 177, 178-80; 6 R. 150-51, 276-79, 280-81; 7 R. 57-58, 189.

[13] *See* 6 R. 22; 7 R. 29-30; 10 R. 80-81; 12 R. 16, 31.

[14] *See, e.g.*, 8 R. 38-39.

BA charged drug traffickers (known as "*tienda*s" or "stores") a portion or tax of their weekly drug proceeds ("*cuota*") for running their illegal drug businesses in the BA's territory.[15] In exchange for their *cuota* payments, the BA promised the *tienda*s protection, provided an additional source of illegal drugs, and would perform "enforcement" actions for the *tienda*s, such as assaults or murders.[16] The non-incarcerated BA members then sent this aggregate collection of *cuota* money to the higher-ranking BA members' prison commissary accounts, usually in the form of money orders through the U.S. Postal Service.[17]

The BA command structure was paramilitary in nature.[18] As such, well-connected or well-performing BA members moved up through the ranks from prospective BA member ("*esquina*") to soldier ("*soldados*") to sergeant to lieutenant to captain ("*capo*").[19] The *capo*s issued orders through the higher-ranking members to maintain order and to continue the BA's provision of illegally-derived *cuota* funds

---

[15] 3 R. 175-76, 209, 228-31; 4 R. 132, 162, 293; 5 R. 180, 193-96; 6 R. 280-83; 7 R. 180, 182; 10 R. 53-54, 55.

[16] 3 R. 227; 4 R. 132, 140, 163-64, 165-68, 240-49; 6 R. 309-10, 316-17; 7 R. 23-29, 30-31, 39, 189-90; 10 R. 48-49.

[17] 3 R. 168, 177, 206; 4 R. 32-33, 161-62; 5 R. 128, 130, 186, 197-201, 203-07, 212, 233, 251-52, 292-95; 6 R. 168-75, 181, 284-86; 7 R. 185-86, 191-92; 10 R. 47-48, 49-51.

[18] 4 R. 110, 139, 191-92.

[19] 3 R. 162, 211; 4 R. 110; 7 R. 182-83, 188-89; 10 R. 28, 29.

to its incarcerated members.[20] Non-compliant BA members (or ones that were harming the organization) could face severe discipline issued through a "green light."[21] Such punishment ranged from a physical assault ("*calentada*") to death.[22] Communication between members ("*carnales*") about BA matters occurred primarily through heavily-coded letters known as "*whilas*" or "*estucas*."[23]

The BA also disciplined El Paso drug dealers who either refused to pay the *cuota* or failed to come up with the weekly *cuota* payment.[24] Generally, this discipline was escalating in degree.[25] For instance, if a prospective or established *tienda* did not pay its *cuota*, the BA members would continue to return to the *tienda* for collection, invariably issuing escalating demands or threats, committing assaults or robberies, or even, on occasion, murdering the recalcitrant drug dealer.[26] Additionally, the BA

---

[20]  3 R. 204; 10 R. 28.

[21]  3 R. 177-78, 206-08; 5 R. 208-09; 6 R. 259; 7 R. 187-88; 10 R. 30.

[22]  3 R. 165-66,178, 206-08; 4 R. 64, 145-46, 164, 192; 5 R. 209; 6 R. 32-22, 259; 10 R. 30-31.

[23]  3 R. 144-46, 163-65, 166-72, 179-81, 233; 4 R. 150-52, 282-87, 292, 295; 5 R. 179, 188-91, 210; 6 R. 182, 267-75, 286; 7 R. 52, 82, 103, 184-85; 9 R. 71-72; 10 R. 37-38, 45; Ex. 47.

[24]  4 R. 138, 145.

[25]  12 R. 95, 97.

[26]  3 R. 177; 4 R. 39, 145; 5 R. 215; 7 R. 37; 9 R. 86, 94-99, 153-55; 10 R. 44, 105.

served as the "enforcer" for the *La Linea* drug cartel in Juarez.[27] In addition to importing and transporting substantial amounts of drugs for the cartel, BA members would commit assaults or murders on the cartel's behalf in exchange for money and discounted drugs for their own drug trafficking activities.[28]

The six co-defendants in this case were all BA members,[29] charged with varying offenses relating to their BA involvement.[30] Perea, Cardoza, and Alvarez were BA *capo*s, who directed BA affairs from their respective correctional facilities.[31] As such, all three men communicated orders to other members to carry out BA activities,[32] promoted and demoted members,[33] pronounced disciplinary measures,[34]

---

[27] 4 R. 34; 5 R. 196; 7 R. 193.

[28] 4 R. 158-59, 168-69, 227; 5 R. 212-13, 230-31; 6 R. 47-60, 263, 264; 7 R. 193; 8 R. 50-58; 10 R. 82-85, 87-88, 89, 90-95; 12 R. 30, 31.

[29] 3 R. 146-49, 150, 152; 5 R. 184; 7 R. 200, 203; 8 R. 259-61, 274-76; 9 R. 69, 70-71, 72, 77; 9 R. 109; 10 R. 22-23.

[30] 3 R. 181; 4 R. 152-53, 295-96, 297-304, 314, 326, 327, 328; 5 R. 294; 6 R. 101, 275; 7 R. 97-98, 107-08, 7 R. 211-22; 225-241, 243, 246-53; 8 R. 23-37, 205-08; 10 R. 35-37, 76, 78, 86-87, 241-42, 249; Exs. 39, 40, 43, 197, 212, 249, 331.

[31] 4 R. 152, 314, 328; 6 R. 218, 289-90, 292; 7 R. 84-90, 151; 8 R. 48-50, 208, 221-23, 251-52; 12 R. 33; Ex. 41, 62.

[32] 4 R. 152, 314, 328; 6 R. 218, 289-90, 292; 7 R. 84-90, 151; 8 R. 48-50, 208, 221-23, 251-52; 12 R. 33; Ex. 41, 62.

[33] 4 R. 36; 5 R. 237-38, 269; 6 R. 221, 292, 307; 7 R. 29-30, 93-98, 122; 8 R. 39-43; 10 R. 39, 46, 74-75, 78-79, 81, 80-81; Exs. 49, 50.

[34] 4 R. 35; 7 R. 93-97, 122, 109-10, 135-36.

and directed how the *cuota* money would be distributed among the BA members within various prison facilities.[35] All three men also received a substantial amount of *cuota* money into their own prison commissary accounts throughout the course of the conspiracy.[36]

Mona, a BA lieutenant, served as the "bridge" or communication link between *Capo* Cardoza and other BA members.[37] Mona would communicate with Cardoza through heavily-coded letters (or "*whilas*") under Mona's alias "Sally Cardoza," telephone calls, and prison visits and then direct Cardoza's orders to other BA members.[38] Mona also served as a point of access for *Capo* David Merez, the former leader of the El Paso "streets" or "free world."[39] In this capacity, Mona collected the weekly *cuota* money from another high-ranking BA member, and then gave that *cuota* money to Merez, who was suppose to send the money to prisons.[40]

---

[35] 4 R. 297-04; 7 R. 89, 118-20; 8 R. 203-04, 205-08, 209-12; Ex. 60, 209.

[36] 4 R. 33; 5 R. 186-87, 233; 6 R. 99-100, 172-74; 7 R. 118-20; 11 R. 15-17, 26, 28-30, 36, 75, 90; 12 R. 99-103; Exs. 352-54.

[37] 3 R. 171-72; 4 R. 131, 154, 199, 202, 223, 241-42; 10 R. 38-39, 60.

[38] 4 R. 48-58; 5 R. 190-91, 223, 41; 6 R. 153-58, 170, 180-81, 218-22; 8 R. 10-23; 10 R. 38-39; 58-59, 73-74, 193-94; Exs. 61, 62, 79-84, 259.

[39] 4 R. 33, 46, 48-58, 155, 201; 5 R. 202; 7 R. 57-58; 10 R. 60, 185-87, 207-08, 243, 263-64.

[40] 7 R. 37-38, 57-58, 61; 10 R. 58, 260, 264-65, 276.

Herrera, a BA sergeant, collected *cuota* money from *tienda*s, opened new *tienda*s, and enforced BA rules and policies.[41] He also committed several assaults on the BA's behalf.[42] Eventually, Herrera was placed in charge of the East Side of El Paso and even assumed the role of the right-hand man of the El Paso BA leadership.[43]

Enriquez was a BA foot soldier.[44] In December of 2006, Enriquez and two other BA members went to collect *cuota* from a *tienda* on Frutas Street in El Paso, which had not paid their *cuota* on at least two prior BA visits.[45] After the three men discussed the plan of robbing the *tienda* and assaulting them if they were unable to pay their *cuota* again, Enriquez and the two other BA members donned gloves and drove over to the apartment on Frutas Street.[46] While Enriquez waited outside as a lookout, the two other BA members went inside the apartment, demanded the *cuota*, and, when that proved unsuccessful, fatally shot one of the drug dealers, Jose Luis

---

[41] 4 R. 142-43, 144, 146-47, 155; 9 R. 79; 10 R. 57, 62, 63-64, 102.

[42] 9 R. 80-81.

[43] 4 R. 147; 5 R. 230; 9 R. 110; 10 R. 52-53, 57.

[44] 9 R. 164, 208-09, 263.

[45] 6 R. 105-06, 111-12; 9 R. 85-86, 87-90, 177-78, 181-82.

[46] 9 R. 91-94, 107, 210-11; Ex. 305 at 16.

Oviedo.[47] The three men then fled the scene.[48] After initially lying to police, Enriquez later admitted his involvement in the murder.[49]

On January 9, 2008, following a five-year federal investigation, the six co-defendants, along with ten other BA members,[50] were charged in an 11-count indictment for various criminal offenses relating to their involvement with the BA. Perea, Cardoza, and Alvarez were charged with a substantive RICO count (Count1), a RICO conspiracy (Count 2), a money laundering conspiracy count (Count 4), and a drug trafficking conspiracy count (Count 5).[51] Mona was also charged with the RICO conspiracy count (Count 2).[52] Herrera was charged with both RICO counts (Counts 1 and 2), a Hobbs Act violation (Count 3), the drug trafficking conspiracy count (Count 5), and one count of committing violent crimes in aid of racketeering

---

[47] 9 R. 94-99, 153-55.

[48] 9 R. 99-100.

[49] 9 R. 199, 208-09, 210-11, 212, 214, 215, 232, 247-48, 253-54; Exs. 204, 205.

[50] Of those ten remaining co-defendants, five pleaded guilty and testified against the defendants at trial (Gustavo "Tavo" Gallardo, Jose Martin "Spider" Garcia, Roberto "Niteowl" Duran, Johnny "Conejo" Michelletti, and Eric "Flaco" Saucedo); four pleaded guilty and did not testify (Miguel Angel "Angelillo" Esqueda, Danny Tarin, Adam "Serio" Munoz, and Sandy Valles New); and one remains a fugitive (Eduardo "Tablas" Ravelo).

[51] 1 PR. 347-94.

[52] 1 MR. 29-53.

15

activity (Count 10).[53] Finally, Enriquez was charged with a Hobbs Act violation (Count 3), the drug trafficking conspiracy count (Count 5), and one count of murder in aid of racketeering activity (Count 11).[54]

### 3.    The Trial and Sentencing

The case proceeded to a joint trial of all defendants.[55] During the month-long trial, the government presented the testimony of ten former BA members, including five co-defendants who had already pled guilty to various counts in the same indictment. It also presented the expert testimony of El Paso police officer Andres Sanchez, a gang investigations specialist, who is familiar with the BA gang and who interpreted many of the coded letters and recorded phone conversations for the jury.[56] FBI Special Agent Samantha Mikeska, the case agent, among other testimony, presented evidence that money orders sent by BA members were deposited into Perea's, Cardoza's, and Alvarez's prison commissary accounts.[57][58] Additionally, the

---

[53] 1 HR. 39-67.

[54] 1 ER. 36-60.

[55] Facts relating to Defendant Enriquez's suppression and severance issues will be discussed separately under Issues VII and VIII, *infra*, respectively.

[56] 7 R. 168-253; 8 R. 9-253.

[57] The admission of Exhibit 352 (Perea's and Alvarez's federal prison commissary account bank records), Exhibit 353 (Cardoza's and a fourth unindicted *capo*'s Texas Department of Corrections prison commissary account bank records), and Exhibit 354 (Agent Mikeska's
(continued...)

government produced the testimony of a plethora of local and federal law enforcement officers,[59] victims,[60] and provided a wealth of documentary, photographic, and recorded evidence.

Following the government's presentation of evidence, the district court granted Enriquez's motion for judgment of acquittal on Count 5, the drug trafficking conspiracy count.[61] However, it denied all other motions for judgment of acquittal.[62] Both Mona and Herrera elected to testify on their own behalf, during which they both

---

[57] (...continued)
    summary document of those account records) will be discussed more fully under Issue V, *infra*.

[58] 5 R. 118-25, 130 (from testimony of FBI Special Agent Amy Fryberger); *see also* 10 R. 64-65, 66-68 (from testimony of Josue Aguirre); 10 R. 294-95; 11 R. 5-6, 9-10, 15-17; Exs. 353-54 (from testimony of Special Agent Mikeska).

[59] *See* 4 R. 104-122, 239-55 (testimony of FBI Special Agent Enrique Corral); 5 R. 112-25 (testimony of Special Agent Fryberger); 8 R. 255-63 (testimony of El Paso Police Officer Deborah Zalokar); 8 R. 272-78 (testimony of El Paso County Deputy Sheriff Saul Ambriz); 9 R. 164-74 (testimony of El Paso Police Officer Christopher Mears); 9 R. 175-82 (testimony of El Paso Police Officer Lance Lanahan); 9 R. 184-92 (testimony of El Paso Police Detective Michael Aman); 9 R. 193-242 (testimony of El Paso Police Detective Yvette Nevarez); 9 R. 244-64 (testimony of El Paso Police Detective Ramon Sanchez); 10 R. 5-17 (testimony of Socorro Police Officer Jesus Ramirez); 10 R. 293-99; 11 R. 3-56; 12 R. 5-151 (testimony of Special Agent Mikeska); 12 R. 3-4 (testimony of FBI Special Agent Jesus Nieto).

[60] *See, e.g.*, 9 R. 3-55.

[61] 12 R. 172; 13 R. 4.

[62] *See* 13 R. 210.

denied that they belonged to the BA during the course of the conspiracy and essentially denied their guilt of the charges.[63]

On December 12, 2008, the jury returned its verdict. It found Perea, Cardoza, and Alvarez guilty of both RICO counts (Counts 1 and 2), the money laundering count (Count 4), and the drug trafficking conspiracy count (Count 5).[64] It further found Mona guilty of the RICO conspiracy count (Count 2).[65] It also found Herrera guilty of both RICO counts (Counts 1 and 2), the Hobbs Act count (Count 3), the drug trafficking conspiracy count (Count 5), but was unable to reach a unanimous verdict on the crime of violence in aid of racketeering count (Count 10).[66] Finally, it acquitted Enriquez of the murder in aid of racketeering count (Count 11), but convicted him of the Hobbs Act count (Count 5).[67] Upon the government's motion, the court declared a mistrial for Hernandez as to Count 10.[68]

On April 14, 2009, the district court sentenced Perea, Cardoza, and Alvarez to three concurrent terms of life imprisonment on Counts 1, 2, and 5, and a concurrent

---

[63] *See* 12 R. 216-97; 13 R. 10-74 (testimony of Mona); 13 R. 112-84 (testimony of Herrera).

[64] 16 R. 11-16.

[65] 16 R. 14-15.

[66] 16 R. 13-16.

[67] 16 R. 15, 16-17.

[68] 16 R. 18.

term of imprisonment of 240 months on Count 4, all terms to be served consecutively with the sentence previously imposed in a separate federal criminal case.[69] [70] On the same date, the court sentenced Mona to a term of life imprisonment on Count 2.[71] Next, the court sentenced Herrera to four concurrent terms of life imprisonment on Counts 1, 2, 3, and 5.[72] Finally, the court sentenced Enriquez to a term of imprisonment of 180 months on Count 3.[73]

Following the sentencing, Perea, Cardoza, Alvarez, Mona, and Herrera filed a motion for new trial, to which the government filed a response.[74] Essentially, the defendants requested a new trial on the grounds that the information contained in the presentence reports concerning the activities of other co-defendants was never disclosed to the defendants in discovery, and that this information would have diminished their own guilt at trial.[75] The defendants also contended that the manner in which the jury was transported to and from the courthouse during the trial was

---

[69] Facts relating to sentencing issues will be discussed separately under Issues XI through XIV, *infra*.

[70] 1 PR. 1607-1612; 1 AR. 1561-66; 17 R. 16, 22, 37.

[71] 1 MR. 1698-1703; 17 R. 40.

[72] 17 R. 46-47.

[73] 17 R. 56.

[74] *See* 1 AR. 1570-81.

[75] *See* 1 AR. 1606-07. Both issues will be more fully discussed under Issues IX and X, *infra*.

19

unduly prejudicial.[76] The court denied the motion on both grounds in a lengthy written order.[77]

This appeal followed.

## SUMMARY OF THE ARGUMENTS

I.    There was sufficient evidence for any rational jury to find Cardoza, Alvarez, Mona, and Herrera guilty of the RICO conspiracy, in violation of 18 U.S.C. § 1962(d) (Count 2). First, the evidence presented at trial showed that the BA had many members who frequently met or otherwise communicated to discuss the interests of their organization and plan its activities, including extortion, money laundering, drug trafficking, and murder, as prohibited by RICO. Second, as the district court found, there was "thorough and extensive" evidence that Cardoza, Alvarez, Mona, and Herrera all knew of and agreed to the overall objective of the conspiracy. Accordingly, the jury could reasonably infer that all four defendants knowingly participated in the overall objective of the conspiracy and the evidence was sufficient to sustain their RICO conspiracy convictions.

II.    There was sufficient evidence for any rational jury to find Cardoza, Alvarez, and Herrera guilty of the substantive RICO statute, 18 U.S.C. § 1962(c)

---

[76] 1 AR. 1607.

[77] 1 AR. 1606-22.

(Count 1). The evidence at trial showed that all three men participated in the conduct of the BA's affairs through a pattern of racketeering activity. For instance, the evidence demonstrated that Cardoza and Alvarez were BA *capo*s, who directed BA affairs from their respective correctional facilities. Both men communicated orders to other members to carry out BA activities, promoted and demoted members, pronounced disciplinary measures, and directed how the *cuota* money would be distributed among the BA members within various prison facilities. They also received a substantial amount of *cuota* money into their own prison commissary accounts throughout the course of the conspiracy.

The evidence further showed that Herrera, a BA sergeant, collected *cuota* money from *tienda*s, opened new *tienda*s, and enforced BA rules and policies. He also committed several assaults on the BA's behalf. Eventually, Herrera was placed in charge of the East Side of El Paso and even assumed the role of the right-hand man of the El Paso BA leadership. Accordingly, there was sufficient evidence for the jury to reasonably conclude that Cardoza, Alvarez, and Herrera, through their leadership positions in the BA, knowingly participated in the BA's affairs through a pattern of racketeering activity.

III.    There was sufficient evidence for any rational jury to find Herrera and Enriquez guilty of conspiring to interfere with commerce by threats or violence, in

violation of 18 U.S.C. § 1951 (Count 3). With respect to Herrera, the government sufficiently established that, in the scope of his leadership duties with the BA, he conspired to extort local drug dealers of money by threat or violence. Specifically, the testimony at trial established that Herrera was a ranking member of the BA, responsible for collecting *cuota* money from *tienda*s, opening new *tienda*s, and enforcing BA rules and policies, including the use of force against those who refused to pay a *cuota*. With respect to Enriquez, the evidence demonstrated that, while collecting *cuota* on December 6, 2006, he and two other BA members murdered a drug dealer who refused to pay the *cuota*. Accordingly, there was sufficient evidence for the jury to reasonably conclude that Herrera and Enriquez participated in the conspiracy to collect *cuota* through extortion.

IV.    There was sufficient evidence for any rational jury to find Cardoza and Alvarez guilty of conspiracy to launder monetary instruments, in violation of 18 U.S.C. § 1956 (Count 4). Specifically, there was ample evidence from which the jury could infer that Cardoza and Alvarez, as leaders of the BA criminal enterprise, knew that the substantial funds deposited into their prison commissary accounts by BA members were derived from *cuota* collections obtained through the BA's extortion scheme. Accordingly, the evidence sufficiently demonstrated that Cardoza and Alvarez knowingly participated in a conspiracy to launder illegally-obtained funds.

22

V.    The district court's admission of Alvarez's prison bank records and a summary of those records did not violate the Confrontation Clause. Rather, it properly admitted the bank records and its accompanying self-authenticating affidavit as non-testimonial statements not subject to the Confrontation Clause. Moreover, even if this Court were to find that the admission of the affidavit was erroneous, any error was harmless because Alvarez does not contest the specific facts contained in the custodian's certification.

VI.    Herrera failed to adequately brief, and therefore waived, any challenge relating to the admission of unspecified exhibits. Alternatively, he has not demonstrated that the admission of any audio recordings or English-language translations of BA-coded and Spanish-language letters and recordings was an abuse of the court's discretion or plainly erroneous.

VII.    The district court properly denied Enriquez's motion to suppress his pre-arrest statements after finding that Enriquez was not in custody when questioned and that his statement to detectives was voluntarily made. The record demonstrates that Enriquez willingly agreed to accompany the plainclothes detectives to police headquarters to answer questions. He was informed on several occasions that he was not under arrest, but that he was a witness to the murder investigation. Enriquez was not handcuffed or searched, nor was his property inventoried. The detectives did not

threaten or physically restrain his freedom of movement in any way. Enriquez met with the detectives for a combined total of less than one hour and fifty minutes, including travel time, split between two separate meetings, "a time span that could hardly lead a reasonable person to believe he was under arrest," and was read his *Miranda* rights four times in that time period. During his second interview, Enriquez agreed to make his recorded statement only 10 to 15 minutes after his conversation with detectives began. Accordingly, the suppression motion was properly denied and the Court should reject Enriquez's argument on this point.

VIII.   The district court did not abuse its discretion when it denied Enriquez's motion for severance pursuant to Federal Rule of Criminal Procedure 14. Enriquez failed to meet his burden of proving that any potential prejudice outweighed the strong interest in a joint trial. Accordingly, he failed to demonstrate that the district court abused its discretion in refusing to order that he be separately tried and this Court should reject his argument on this ground.

IX.   The district court did not abuse its discretion by implementing several juror anonymity measures, including withholding some identifying juror information and ordering the U.S. marshals to provide secure off-site juror parking and transportation to the jurors between the offsite parking and the courthouse.   As the district court found, the circumstances surrounding the case supported the

24

implementation of juror anonymity provisions. Perea, Cardoza, and Alvarez were the highest-ranking members of a violent prison gang that engaged in organized crime This highly-structured, paramilitary-structured organization has an estimated 3,500 members in the El Paso/Juarez area alone, most of whom have prior criminal convictions. The gang also has extensive ties with a Juarez drug cartel. All three defendants faced (and received) life sentences, and the facts at trial showed that Perea directly ordered at least one murder from his prison cell. The BA has made past attempts to interfere with the judicial process and witnesses, and the record reflects the media's substantial interest in the case. Finally, the court's carefully-tailored anonymity measures struck a reasonable balance between the defendants' rights and the protection of the jurors. Accordingly, the court did not abuse its discretion in implementing these procedures, and the defendants' arguments on this point should be rejected.

X.    The district court properly declined to grant Perea's and Cardoza's request for a new trial after determining that no *Brady* violation occurred. First, the district court did not clearly err when it determined that the government had not suppressed evidence. Moreover, even if the government had suppressed the evidence, the district court did not clearly err in finding that the evidence was immaterial to Perea's and Cardoza's guilt and punishment. Accordingly, because the evidence was

neither suppressed nor material, the district court properly denied Perea's and Alvarez's motion for a new trial on this basis.

XI.   The district court did not plainly err in imposing life sentences for Cardoza and Herrera for their RICO conspiracy convictions. Specifically, they cannot demonstrate that the court plainly erred by imposing a life sentence on Count 2 because, by virtue of its special verdicts finding both men committed Racketeering Act 2 in Count 1,  the jury explicitly found beyond a reasonable doubt that both men participated in the conduct of the BA's affairs through a pattern of racketeering activity for which the maximum penalty included life imprisonment. Accordingly, neither Cardoza nor Herrera can demonstrate reversible error with respect to this same determination under Count 2 on plain error review. With respect to Mona, in light of the circumstances of the case, the government does not oppose remand for re-sentencing on the basis of his *Apprendi* claim.

XII.   The district court did not clearly err in relying on uncontroverted facts contained the presentence report at sentencing. The record demonstrates that the pertinent information in the report was obtained from trial testimony, FBI investigative reports, statements provided by confidential sources and witnesses, and Enriquez's own statements to law enforcement. Furthermore, neither Enriquez nor Herrera provided any testimony or evidence that these sources of information were

26

unreliable. Accordingly, the district court did not clearly err in adopting the PSR's factual findings and this Court should reject Herrera's and Enriquez's claim on this point.

XIII.  The district court did not abuse its discretion when it declined Perea's request for an evidentiary sentencing hearing. In this case, Perea received a copy of the presentence report before the hearing and filed extensive objections. He was also provided with an opportunity to present these objections to the district court during the sentencing hearing. Although Perea challenged the reliability of the information in the report, he never provided the district court with any contrary evidence. Moreover, as the district court reasonably found, there was no dispute of material fact regarding the total amount of laundered proceeds or drug proceeds; these particular findings were immaterial to the defendant's sentence; and the trial evidence sufficiently established that the defendant should be held accountable for a foreseeable act of murder. Accordingly, the district court did not abuse its discretion by denying Perea's motion.

XIV.  The district court did not plainly or otherwise err when it sentenced Cardoza and Alvarez to a term of imprisonment that fell within the advisory guideline range. The district court implicitly considered the statutory sentencing factors in § 3553(a). Moreover, the court–which had presided over the entire month-long trial of

the defendants—imposed sentences within the properly-calculated advisory guideline ranges. In doing so, the court indicated its awareness of the contents of the presentence report, and its familiarity with the defendants' objections to that report. Moreover, the court indicated its awareness of both the advisory guideline ranges, and its discretion to impose a sentence outside those ranges. In light of this record and the presumption that courts know the applicable law and apply it correctly, Cardoza and Alvarez have failed to establish that the district court committed any procedural error in imposing their within-guidelines sentences, much less plainly so. Accordingly, this Court should reject their challenge to the procedural reasonableness of their sentences. The judgments and sentences should be affirmed.

## ARGUMENTS AND AUTHORITIES

## I. THERE WAS SUFFICIENT EVIDENCE FOR ANY RATIONAL JURY TO FIND CARDOZA, ALVAREZ, MONA, AND HERRERA GUILTY OF THE RICO CONSPIRACY, IN VIOLATION OF 18 U.S.C. § 1962(d) (COUNT 2).

(Cardoza Issue 3, Op. Br. at 20-35; Alvarez Issue II, Op. Br. at 33-35; Mona Issues 1 & 2, Op. Br. at 31-49; Herrera's Issue 1, Op. Br. at 17-26).

## A.    Standard of Review

In reviewing the sufficiency of the evidence supporting a conviction, this Court will affirm a conviction if a rational trier of fact could have found that the evidence established the essential elements of guilt beyond a reasonable doubt. *See United States v. Martinez*, 151 F.3d 384, 388 (5th Cir. 1998); *see also Jackson v. Virginia*, 443 U.S. 307, 319 (1979). All reasonable inferences must be drawn in favor of the government, and any conflicts in the evidence must be resolved in favor of the jury's verdict. *United States v. Lee*, 217 F.3d 284, 288 (5th Cir. 2000); *see also Jackson*, 443 U.S. at 319 (facts are viewed "in the light most favorable to the prosecution"). In weighing the evidence, fact finders may properly "use their common sense" and "evaluate the facts in light of their knowledge of the natural tendencies and inclinations of human beings." *United States v. Ayala*, 887 F.2d 62, 67 (5th Cir. 1989) (citation omitted). The jury is free to choose among any reasonable construction of the evidence. *United States v. Alonzo*, 681 F. 2d 997, 1002 (5th Cir. 1982). The

29

standard of review is the same whether the evidence is direct or circumstantial. *United States v. Bryant*, 770 F.2d 1283, 1288 (5th Cir. 1985).

## B.     Legal Argument

On appeal, Cardoza, Alvarez, Mona, and Herrera challenge the sufficiency of evidence in support of their RICO conspiracy convictions under 18 U.S.C. § 1962(d). Their claims are meritless. The evidence was sufficient to support their convictions.

In this case, all four men were charged with conspiring to engage in the affairs of an enterprise through a pattern of racketeering activity, in violation of § 1962(d).[78] "To prove a RICO conspiracy, the government must establish (1) that two or more people agreed to commit a substantive RICO offense and (2) that the defendant knew of and agreed to the overall objective of the RICO offense." *United States v. Posada-Rios*, 158 F.3d 832, 857-58 (5th Cir. 1998). These elements may be established by circumstantial evidence. *Id.*; *see also United States v. Maltos,* 985 F.2d 743, 746 (5th Cir.1992) ("The agreement, a defendant's guilty knowledge and a defendant's

---

[78] The RICO Act criminalizes a conspiracy to violate any of its substantive provisions. *See* 18 U.S.C. § 1962(d). Count 2 alleged that Perea, Cardoza, Alvarez, Mona, and Herrera conspired to violate § 1962(c), prohibiting the participation in the conduct of the affairs of certain enterprises through a pattern of racketeering activity (*see* 1 PR. 361-62). It further alleged that the "pattern of racketeering activity" included violations of 18 U.S.C. § 1951 (extortion and conspiracy to commit extortion); 18 U.S.C. § 1956 (money laundering and conspiracy to commit money laundering); 21 U.S.C. §§ 846 and 841(a) (narcotics trafficking and conspiracy to commit narcotics trafficking, including heroin, cocaine, and marijuana); and Texas Penal Code 19.02(b) (first-degree murder) (1 PR. 361-86).

30

participation in the conspiracy all may be inferred from the development and

collocation of circumstances."). In this case, both requirements were met.

1.    The Agreement to Engage in a "Pattern of Racketeering Activity"
       Prohibited by § 1962(c)

First, there was sufficient evidence for a reasonable jury to have found that two

or more people agreed to violate § 1962(c), which criminalizes participation in the

conduct of an enterprise's affairs through a pattern of racketeering activity.[79] On

appeal, Mona argues that the government failed to sufficiently prove that BA

members agreed to engage in the affairs of the BA through a "pattern of racketeering

activity" (Mona Op. Br. at 31-44).[80] However, as discussed below, the evidence

---

[79] The RICO statute contains an exhaustive list of federal and state criminal offenses that constitute "racketeering activity." *See* 18 U.S.C. § 1961(1). A "pattern of racketeering activity requires at least two acts of racketeering activity" in the past ten years. *Id.* § 1961(5).

[80] Mona also argues that the government failed to establish that the pattern of the racketeering activity was related to the conduct of the enterprises' affairs because the illegal acts undertaken by BA members "was for their own purpose and benefit" (Mona Op. Br. at 45-49). Thus, citing cases requiring a nexus between the racketeering acts of defendants and their participation in the affairs of otherwise lawful enterprises, Mona essentially challenges the sufficiency of evidence demonstrating that the parties "conduct[ed] or participate[d] in the affairs of an enterprise through a pattern of racketeering activity and not merely [committed] each of the predicate crimes necessary to demonstrate a pattern of racketeering activity." *United States v. Elliott*, 571 F.2d 880, 902 (5th Cir. 1978); *see also United States v. Cauble*, 706 F.2d 1322, 1331-32 (5th Cir. 1983) ("RICO criminalizes the conduct of an enterprise through a pattern of racketeering activity and not merely the defendant's engaging in racketeering activity. Therefore, there must be a nexus between the enterprise, the defendant, and the pattern of racketeering activity."). Here, however, the evidence at trial demonstrated that the BA is an *unlawful* enterprise that's sole purpose is to enrich its members and associates and maintain its power through a pattern of racketeering activity (*see, e.g.*, 1 PR. 349; 7 R. 180, 182, 185-93; 12 R. 93-97). Thus, by demonstrating the

(continued...)

31

presented at trial showed that the BA had many members—including Cardoza, Alvarez, Mona and Herrera—who frequently met or otherwise communicated to discuss the interests of their organization and plan its activities, including extortion, money laundering, drug trafficking, and murder, as prohibited by RICO. Such evidence supports the jury's determination that two or more people agreed to violate § 1962(c). *See United States v. Delgado*, 401 F.3d 290, 296 (5th Cir. 2005).

### a.    The Agreement to Commit Extortion

First, the government established that RICO conspiracy alleged in Count 2 included an agreement by two or more people to commit extortion (and conspire to do so) by the wrongful use of actual and threatened force, violence, and fear under the Hobbs Act, 18 U.S.C. § 1951(a).[81] To convict a defendant for criminal conspiracy

---

[80] (...continued)
enterprise's illegal purpose and the BA member' participation in racketeering activity that furthered that illegal purpose, the government sufficiently established the required nexus for purposes of § 1326(d). In any event, this issue will be more fully discussed *infra* under Issue II of the government's Answering Brief, addressing the element of the substantive RICO statute that required the government to prove that the defendants participated in the affairs of the enterprise *through* a pattern of racketeering activity.

[81] Section 1951 states: "Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined under this title or imprisoned not more than twenty years, or both." § 1951(a). The statute defines "extortion" as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." *Id.* § 1951(b)(2).

32

under the Hobbs Act the jury must find an agreement between two or more persons to commit a crime, and an overt act by one of the conspirators to further the conspiracy. *See United States v. Stephens*, 964 F.2d 424, 427-28 (5th Cir. 1992), *citing United States v. Villarreal,* 764 F.2d 1048, 1051 (5th Cir. 1985). To then establish a substantive offense under the Hobbs Act, the government must prove beyond a reasonable doubt: (1) that a defendant induced a person to part with property; (2) that the defendant acted knowingly and willfully by means of extortion; and (3) that the extortionate transaction delayed, interrupted, or adversely affected interstate commerce. *See United States v. Snyder*, 930 F.2d 1090, 1093 (5th Cir. 1991).

On appeal, Mona essentially argues that the government failed to prove any agreement to commit extortion because there was an insufficient nexus to interstate commerce to establish a violation of the Hobbs Act (Mona Op. Br. at 33-36; *see also* Herrera Op. Br. at 25-26; Enriquez Op. Br. at 23).[82] This claim is without merit. The effect of the defendants' activities on interstate commerce need only be slight. *United States v. Box*, 50 F.3d 345, 352 (5th Cir. 1995); *United States v. Tomblin,* 46 F.3d 1369, 1382 (5th Cir.1995); *Collins,* 40 F.3d at 99. For instance, this Court has held

---

[82] Both Herrera and Enriquez challenge the sufficiency of the interstate nexus of § 1951 as applied to their activities in their challenges to the sufficiency of their convictions under Count 3, the predicate Hobbs Act count.

33

that "[c]riminal acts directed toward individuals may violate section 1951(a) when . . . the number of individuals victimized or the sum at stake is so large that there will be some 'cumulative effect on interstate commerce.'" *Collins,* 40 F.3d at 100. The determination whether interstate commerce has been affected is made on a case-by-case basis. *Wright*, 797 F.2d at 248.

In this case, the government established that the BA required drug dealers to pay a *cuota* or portion of their weekly drug proceeds in exchange for running their illegal drug businesses in BA territory (*see* 3 R. 175-76, 209, 228-31; 4 R. 132, 162, 293; 5 R. 180, 193-96; 6 R. 280-83; 7 R. 180, 182; 10 R. 53-54, 55). If the drug dealers refused to pay, the BA members, such as Herrera and Enriquez, would continue to return to the *tienda* for collection, invariably issuing escalating demands or threats, committing assaults or robberies, or even, on occasion, murdering the recalcitrant drug dealer (*see* 3 R. 177; 4 R. 39, 145; 5 R. 215; 7 R. 37; 9 R. 86, 94-99, 153-55; 10 R. 44, 105). This Court has held that such illegal interference with narcotics trafficking is sufficient to create an effect on interstate commerce, since drugs are traded on an interstate market. *See United States v. Villafranca*, 260 F.3d 374, 377-78 (5th Cir. 2001); *Box*, 50 F.3d at 353; *see also United States v. Hickman,* 179 F.3d 230, 231 (5th Cir. 1999) (en banc) (Higginbotham, J., dissenting from affirmance by equally divided court) (noting the reach of the Hobbs Act to interstate

travel and economic markets such as illegal drugs); *United States v. Cox,* 942 F.2d 1282, 1286 (8th Cir. 1991) (interference with a drug dealer's business violates the Hobbs Act because of the interstate character of drug dealing); *United States v. Rodriguez*, 360 F.3d 949, 956 (9th Cir. 2004) ("conspiracy to steal cocaine alone suffices to establish a connection to foreign commerce"); *United States v. Marrero*, 299 F.3d 653, 655 (7th Cir. 2002) (holding same because "all cocaine originates overseas"). Additionally, the evidence demonstrated that, as a benefit in exchange for the *cuota*, the BA provided drugs to its *tiendas*, which it obtained from the Juarez-based *La Linea* drug cartel. *See United States v. Delgado*, 401 F.3d 290, 297 (5th Cir. 2005) (RICO enterprise that distributed and acquired drugs produced in Columbia and arrived in the United States via Mexico is engaged in interstate commerce). Finally, the evidence presented at trial showed that BA members used cell phones and the U.S. Postal Service to transfer money and communicate with each other in furtherance of the BA's criminal purposes. *Id.* (evidence that RICO enterprise used Western Union, telephones, the U.S. Postal Service, and pagers in furtherance of their criminal purposes affected interstate commerce). Consequently, the evidence was sufficient to support the jury's finding that the conspiratorial agreement included extortion affecting interstate commerce.

b.    *The Agreement to Commit Money Laundering*

The government also established that the RICO conspiracy alleged in Count 2 included an agreement to commit money laundering (and conspiracy to do so) in violation of 18 U.S.C. § 1956.[83] To obtain a conviction for money laundering, the government must prove that the defendant: 1) conducted or attempted to conduct a financial transaction; 2) which the defendant knew involved the proceeds of a specified unlawful activity; 3) with the intent either to promote or further specified unlawful activity or to conceal or disguise the nature, location, source, ownership, or control of the proceeds of unlawful activity. *United States v. Wyly*, 193 F.3d 289, 295 (5th Cir. 1999). The term "specified unlawful activity" includes nearly all of the "racketeering activity" defined in 18 U.S.C. § 1961(1). *See* 18 U.S.C. § 1956(c)(7)(A).

In this case, the government established that, during the course of the conspiracy, the BA conducted an extortion scheme in order to surreptitiously funnel

---

[83] Section 1951 states: "Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity . . . with the intent to promote the carrying on of specified unlawful activity; or . . . knowing that the transaction is designed in whole or in part . . . to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity . . . shall be sentenced to a fine of not more than $500,000 or twice the value of the property involved in the transaction, whichever is greater, or imprisonment for not more than twenty years, or both." 18 U.S.C. § 1956(a)(1)(A)(i), (B)(i).

36

money to their members incarcerated within various state correctional institutions and federal prisons (*see, e.g.*, 8 R. 38-39). Specifically, the BA charged its *tiendas* a weekly *cuota* for the privilege of running their illegal drug businesses in the BA's territory (3 R. 175-76, 209, 228-31; 4 R. 132, 162, 293; 5 R. 180, 193-96; 6 R. 280-83; 7 R. 180, 182; 10 R. 53-54, 55.). For those drug dealers who either refused to pay the *cuota* or failed to come up with the weekly *cuota* payment, the BA members would continue to return to the *tienda* for collection, invariably issuing escalating demands or threats, committing assaults or robberies, or even, on occasion, murdering the recalcitrant drug dealer (3 R. 177; 4 R. 39, 145; 5 R. 215; 7 R. 37; 9 R. 86, 94-99, 153-55; 10 R. 44, 105). The non-incarcerated BA members then sent this aggregate collection of *cuota* money to the higher-ranking BA members' prison commissary accounts, usually in the form of money orders through the U.S. Postal Service (*see* 3 R. 168, 177, 206; 4 R. 32-33, 161-62; 5 R. 128, 130, 186, 197-201, 203-07, 212, 233, 251-52, 292-95; 6 R. 168-75, 181, 284-86; 7 R. 185-86, 191-92; 10 R. 47-51). These money orders would bear fictitious names and addresses in order to disguise the senders' true identities and true source of the funds (5 R. 204; 7 R. 185-86; 8 R. 38-39; 8 R. 88; 10 R. 51; 11 R. 9-10; 12 R. 7-9). In light of this evidence, the government sufficiently demonstrated an agreement to launder illegally-obtained funds.

For the first time on appeal, Mona argues that there was insufficient evidence that two or more people agreed to violate § 1956 because the BA's extortion scheme does not constitute "specified unlawful activity" under § 1961 (Mona Op. Br. at 38). This argument is meritless. As more fully detailed above, the BA's extortion of local drug dealers constituted a violation of the Hobbs Act under 18 U.S.C. § 1951(a). Section 1951 is enumerated "racketeering activity" under § 1961 and, thus, constitutes "specified unlawful activity" for purposes of the money laundering statute. *See* § 1956(c)(7)(A). Accordingly, the evidence was sufficient to support the jury's finding that the conspiratorial agreement included money laundering in violation of § 1956.

### c. *The Agreement to Traffic Narcotics*

Third, the government established that the RICO conspiracy alleged in Count 2 included an agreement among BA members to conspire to engage in narcotics trafficking in violation of 21 U.S.C. §§ 841(a) and 846.[84] To establish a drug conspiracy under §§ 841(a)(1) and 846, the government must prove: 1) the existence of an agreement between two or more persons to violate federal narcotics laws; 2) the

---

[84] Section 841(a)(1) makes it unlawful for any person to knowingly or intentionally "manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance." 21 U.S.C. § 841(a)(1). Section 846 states that "[a]ny person who attempts or conspires to commit any offense defined in this subchapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy."

defendant's knowledge of the agreement; and 3) the defendant's voluntary participation in the agreement. *See United States v. Gonzales*, 79 F.3d 413, 423 (5th Cir. 1996). Correspondingly, to establish possession of narcotics with intent to distribute under § 841(a)(1), the government must prove beyond a reasonable doubt that the defendant (1) knowingly (2) possessed a controlled substance (3) with intent to distribute it. *Id.*

On appeal, Mona argues that there was insufficient evidence of an agreement to conspire to traffic narcotics (Mona Op. Br. at 39-40). On the contrary, the government provided sufficient evidence demonstrating that BA members conspired with each other, with their *tiendas*, and with the *La Linea* drug cartel to import and distribute substantial amounts of heroin, cocaine, and marijuana. For instance, the government offered evidence of the symbiotic relationship between the BA and the *La Linea* drug cartel in Juarez, Mexico (4 R. 34; 5 R. 196; 7 R. 193). In addition to importing and transporting drugs for the cartel, BA members would commit assaults or murders on the cartel's behalf in exchange for money and discounted drugs for their own drug trafficking activities (4 R. 158-59, 168-69, 227; 5 R. 212-13, 230-31, 266; 6 R. 47-60, 263, 264; 7 R. 193; 8 R. 50-58; 10 R. 82-85, 87-88, 89, 90-95; 12 R. 30, 31). Indeed, in November of 2006, the government seized 100 kilograms of cocaine from BA member Gustavo "Tavo" Gallardo, who was ordered to transport

the cocaine sourced by BA member Eduardo "Tablas" Ravelo, the primary connection between the BA and *La Linea* (5 R. 212-135, 246-48; 6 R. 102-03; Exs. 354-57).

As further evidence of the relationship between the BA and *La Linea*, the government introduced an August 25, 2004 recorded conversation between BA Sergeant Josue "Casper" Aguirre, BA member Jose Martin "Spider" Garcia, and "Shooter," a member of *La Linea*, during which Shooter confirmed to Aguirre and Garcia that he fronted more than 600 pounds of marijuana to BA members Robert Valles and Mike "Chato" Flores (10 R. 69, 89, 91; 10 R. 91-94; Exs. 222-23).[85] Shooter complained to Aguirre that Flores had failed to pay his drug debt, and further warned that he would not front any more drugs to BA members until the dispute was settled (10 R. 91-94; Exs. 222-23; *see also* 12 R. 30, 31). Following unsuccessful attempts to resolve the dispute, "Chato" Flores was later kidnaped by cartel members and BA members Eduardo Ravelo and Gustavo Gallardo, taken to Juarez, and is now presumed dead (6 R. 47-60; 7 R. 51; 10 R. 94-95, 156-57).

In April of 2005, Juarez BA leader Eduardo "Tablas" Ravelo ordered El Paso BA leader Miguel Angel "Angelillo" Esqueda to murder the owner of a company named Truck Town for a drug debt owed to *La Linea* (8 R. 50-58; 10 R. 82-85, 87,

---

[85] Several BA members testified that BA members were fronted drugs by La Linea on account of their BA membership (7 R. 150; 10 R. 89-90).

157, 244-45; 12 R. 31). Although the murder was ultimately thwarted by a cooperator's tip to the FBI, Esqueda ordered several lower-ranking members of the BA to assist him in the "hit," including one *esquina* who would actually shoot the Truck Town owner in the hopes of being accepted for BA membership (8 R. 192, 194; 10 R. 82-83, 87, 196-99; 11 R. 12-13; 12 R. 53-54, 93-94, 95).

In addition to its agreement with *La Linea*, the BA also conspired with its *tiendas* and each other to traffic narcotics. In addition to providing protection, drugs, and prison connections for its *tiendas*, the BA members also had the privilege of trafficking drugs without having to pay a *cuota* and purchasing their drugs at cheaper prices (4 R. 135, 147, 170-72, 214-15, 245; 6 R. 298-99, 312; 7 R. 21-27, 39; 10 R. 62-64, 96-99; Ex. 251). *See United States v. Fernandez*, 388 F.3d 1199, 1227 (9th Cir. 2004) ("evidence of a generalized, coherent and consistent scheme for the reception and distribution of narcotics and division of profits from sale" by Mexican Mafia members demonstrates sufficient evidence of single drug trafficking conspiracy). BA members also operated their own *tiendas*, in which only BA members were allowed to sell drugs (*see* 4 R. 141-42, 148, 179). Moreover, in the Spring of 2007, one of the BA's largest *tiendas*, Marco Lujan, sought the BA's assistance to kill a federal prisoner who was arrested transporting Lujan's drugs and whom Lujan believed was cooperating with law enforcement (4 R. 168-69; 6 R.

309-11, 316-17; 7 R. 19-29, 30-31, 78; 7 R. 33; 10 R. 105-06; Ex. 325-26). One BA

member explained that such prison "hits" to silence cooperators were one of the

benefits the *tiendas* received in exchange for *cuota* payments (7 R. 24-25).

Additionally, the government proffered evidence that Ravelo and El Paso BA leader

David Merez offered to sell BA member Johnny Michelletti a kilogram of cocaine on

account of his good performance of his BA duties (3 R. 184-86). Accordingly, the

evidence was sufficient to support the jury's finding that the conspiratorial agreement

included a conspiracy to traffic drugs.

### d.    The Agreement to Commit Murder

Fourth, the government established that the RICO conspiracy alleged in Count

2 included an agreement among BA members to commit murder in violation of Texas

law.[86] On appeal, Mona argues that there was insufficient evidence of an agreement

to murder (Mona Op. Br. at 39-40). On the contrary, the government provided a

wealth of evidence demonstrating that BA members agreed to commit murder.

---

[86] Section 19.02 of the Texas Penal Code states that a person commits the first degree felony of Murder "if he: (1) intentionally or knowingly causes the death of an individual; (2) intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual; or (3) commits or attempts to commit a felony, other than manslaughter, and in the course of and in furtherance of the commission or attempt, or in immediate flight from the commission or attempt, he commits or attempts to commit an act clearly dangerous to human life that causes the death of an individual." Tex. Penal Code Ann. § 19.02(b) (Vernon 2008).

42

i.     The Murder of Mike "Chato" Flores

First, the government produced sufficient evidence that BA members participated with *La Linea* to murder Mike "Chato" Flores as a result of Flores' alleged drug theft from *La Linea*. In August of 2004, BA Sergeant Josue Aguirre was approached by a man from the cartel, informing Aguirre that *La Linea* suspected that Flores and his drug trafficking partner Robert Valles had stolen millions of dollars worth of drugs from them and inquiring about their whereabouts (*see* Exs. 222, 223; *see also* 10 R. 91-93). The cartel affiliate also warned Aguirre that he would not sell drugs to other BA members unless Flores repaid the debt (*id.*). After Aguirre warned Chato Flores and tried to resolve the matter, he was approached by Eduardo "Tablas" Ravelo, the leader of the BA in Juarez and primary connection between the BA and *La Linea* (10 R. 94-95). Ravelo told Aguirre that Flores' repayment was unsuccessful, and instructed Aguirre to find Flores (10 R. 95).

One year later after *La Linea*'s initial communication with Aguirre, and upon *Capo* David Merez's orders, Ravelo and another BA member approached BA Lieutenant Gustavo "Tavo" Gallardo at his tattoo shop in El Paso and instructed him to pick up Flores and Valles because of "the heat on them in Juarez" and pressure from *La Linea* to "do something about it" (6 R. 48-49; 7 R. 51). Various BA members helped Ravelo find Flores (6 R. 49). Ravelo, Gallardo, other BA members, and cartel

43

members then kidnapped Flores and delivered him to Juarez to "talk to *La Linea*" about the theft (6 R. 50-57). Chato Flores disappeared on that date and is presumed dead (6 R. 60; 10 R. 94-95).

ii.     The Murder of Jose Luis Oviedo

Additionally, the government produced sufficient evidence that BA members conspired to murder Jose Luis Oviedo in the course of their extortion scheme. As noted above, if a *tienda* refused or was unable to pay its *cuota*, the BA would continue to attempt to collect the *cuota*, applying escalating levels of "discipline" (*see* 3 R. 177; 4 R. 39, 145; 5 R. 215; 7 R. 37; 9 R. 86, 94-99, 153-55; 10 R. 44, 105). On the evening of December 6, 2006, three BA members went to collect *cuota* from a *tienda* on Frutas Street in El Paso, which had not paid their *cuota* on at least two prior BA visits (6 R. 105-06, 111-12; 9 R. 85-86, 87-90, 177-78, 181-82). After the three men discussed the plan of robbing the *tienda* and "beat[ing] them up" if they were unable to pay their *cuota* again, the BA members donned gloves and drove over to the apartment on Frutas Street (9 R. 91-94, 107, 210-11; Ex. 305 at 16). While one of the BA members waited outside as a lookout, the other two went inside the apartment, demanded the *cuota*, and, when that proved unsuccessful, fatally shot one of the drug dealers, Jose Luis Oviedo (9 R. 94-99, 153-55). Accordingly, the evidence sufficiently demonstrated that BA members agreed to murder Jose Luis Oviedo.

44

iii.    The Attempted Murder of the Owner of Truck Town

Finally, the government produced evidence that BA members agreed to murder the owner of an El Paso business on account of the victim's drug debt to *La Linea*. As described above, in April of 2005, Eduardo "Tablas" Ravelo ordered El Paso BA leader Miguel Angel "Angelillo" Esqueda to murder the owner of Truck Town for a drug debt owed to *La Linea* (8 R. 50-58; 10 R. 82-85, 87, 157, 244-45; 12 R. 31). Although the murder was ultimately thwarted only by Aguirre's tip to the FBI, Esqueda ordered several lower-ranking members of the BA, including Aguirre, to assist him in the "hit," including one *esquina* who planned to shoot the Truck Town owner in the hopes of being accepted for BA membership (8 R. 192, 194; 10 R. 82-83, 87, 196-99; 11 R. 12-13; 12 R. 53-54, 93-94, 95). *See United States v. Fernandez*, 388 F.3d 1199, 1259 (9th Cir. 2004) (citing cases holding that a "§ 1962(d) conviction does not require a substantive violation under § 1962(c) to have been established, in that the prosecution need not prove that the necessary predicate acts have been successfully completed"). Accordingly, the evidence sufficiently demonstrated that BA members agreed to murder the Truck Town owner.

2.    The Defendants' Knowledge and Agreement to the Conspiracy's Overall Objective

Second, as the district court found, there was "thorough and extensive" evidence that Cardoza, Alvarez, Mona, and Herrera all knew of and agreed to the overall objective of the conspiracy, that is, to conduct the BA's affairs through a pattern of racketeering activity (*see* 1 AR. 1617). In order to establish this element, the government must only provide some evidence "from which the jury could reasonably infer that the defendant[s] knowingly participated in some manner in the overall objective of the conspiracy." *See Posada-Rios*, 158 F.3d at 857, *citing United States v. Fernandez-Roque*, 703 F.2d 808, 814-15 (5th Cir. 1983). The government is not, however, required to prove that the conspirator agreed to commit or facilitate each and every part of the substantive offense. *See Posada-Rios*, 158 F.3d at 857. Rather, a defendant may be convicted of a conspiracy if the evidence shows that he only participated at one level of the conspiracy charged in the indictment, and only played a minor role in the conspiracy. *See United States v. Prieto-Tejas*, 779 F.2d 1098, 1103 (5th Cir. 1986). Additionally, the government is not required to prove "that the defendant knew all of the details of the unlawful enterprise or the number or identities of all of the co-conspirators." *Posada-Rios*, 158 F.3d at 857

### a.     Cardoza

On appeal, Cardoza challenges the sufficiency of the evidence establishing his knowledge of and agreement with the overall objectives of the conspiracy (*see* Cardoza Op. Br. at 28). On the contrary, the evidence at trial established that Cardoza was a BA *capo*, the highest-ranking leader of the BA organization (3 R. 181; 4 R. 152; 5 R. 251; 6 R. 99-100, 275; 7 R. 108; 10 R. 35-37, 76, 78). In this capacity, he oversaw and directed other members to carry out BA activities (*see, e.g.*, 6 R. 101, 179, 262-63, 291-92; 10 R. 39, 41, 73-74, 193-94; Ex. 61); promoted and demoted members (*see, e.g.*, 7 R. 29-30; 10 R. 39, 41, 46, 80-81; 8 R. 45-50; Ex. 61, 62); pronounced disciplinary measures (*see, e.g.*, 6 R. 292-93; 7 R. 132); and expressly directed how the *cuota* money would be distributed among the BA members within various prison facilities (*see, e.g.*, 8 R. 177-78, 205-09, 210-11; Ex. 60 at 11; Ex. 259 at 42, 50). From his longstanding leadership over the BA, the jury could presume that Cardoza knew what the act of collecting *cuota* would entail. *Cf. Posado-Rios*, 158 F.3d at 858 (jury could infer from defendant's longstanding association with the drug trade and with enterprise that he knew that the prospective act of supplying cocaine would entail numerous violations of the law). In addition, at his direction, Cardoza received a substantial amount of *cuota* money into his prison commissary account throughout the course of the conspiracy (5 R. 251; 6 R. 99-100, 285; 7 R. 246-47;

47

Exs. 212, 352-54). From this evidence, the jury could reasonably infer that Cardoza

knowingly participated in the overall objective of the conspiracy and the evidence

was sufficient to sustain his RICO conspiracy conviction.

  b.  *Alvarez*

Alvarez also challenges the sufficiency of the evidence establishing that he

knew of and agreed to the conspiracy (*see* Op. Br. at 33-35). However, the evidence

at trial sufficiently established this element. Like Cardoza, the jury heard evidence

that Alvarez was a BA *capo*, the highest-ranking leader of the BA organization (*see*

3 R. 181; 5 R. 294; 6 R. 99-100, 275; 7 R. 108; 8 R. 210; 10 R. 76, 78; 12 R. 16-17).

As such, Alvarez oversaw and directed other members to carry out BA activities,

promoted and disciplined members, and directed the *cuota* distribution (5 R 300-03;

6 R. 45-46, 101-02, 308; 7 R. 50, 182-83, 191; 8 R. 98-99; 10 R. 28, 81-82; 12 R. 16,

29-31). Specifically, the government provided evidence that Alvarez received

information about BA business and issued directives through Sandy New, a co-

indicted BA associate who acted as Alvarez's "bridge" (Exs. 39, 45, 47, 65, 196, 197,

330, 331; *see also* 7 R. 209-22; 8 R. 23-27, 31). He also received letters from the

leader of the El Paso BA, discussing the power struggle to control the El Paso BA,

and a heavily-coded letter from Perea, discussing BA business (Ex. 40, 43, 49; *see*

*also* 8 R. 40-41). In addition, Alvarez sent a letter to a BA member, ordering him to

48

contact BA leadership on his behalf and send money to him (*see* 4 R. 295-98, 5 R. 55; Ex. 41). His order—which demonstrated his knowledge of how to get in contact with BA leadership—was followed (4 R. 299-304). The government also introduced a letter Alvarez sent to Cardoza, in which he discussed BA business and Cardoza's "bridge" address (Ex. 51; 8 R. 213-16). Finally, like Cardoza, Alvarez received a substantial amount of *cuota* money throughout the course of the conspiracy (5 R. 251; 6 R. 99-100, 285; 7 R. 246-47; 10 R. 252-53; 11 R. 16-17, 90; Exs. 212, 352-54). Accordingly, the jury could reasonably infer that Alvarez knowingly participated in the overall objective of the conspiracy and the evidence was sufficient to sustain his RICO conspiracy conviction.

> c.    Mona

Mona also challenges the sufficiency of the evidence establishing that he knew of and agreed to the conspiracy (*see* Op. Br. at 40-41, 43-44). However, the evidence at trial sufficiently also established this element with respect to him.

Below, the government offered evidence that Mona, a BA lieutenant, served as the "bridge" or communication link between *Capo* Cardoza and other BA members (3 R. 171-72; 4 R. 131, 154, 199, 202, 223, 241-42; 10 R. 38-39, 60). Mona would communicate with Cardoza through heavily-coded letters (or "*whilas*") under Mona's alias "Sally Cardoza," telephone calls, and prison visits and then direct Cardoza's

orders to other BA members (4 R. 48-58; 5 R. 190-91, 223, 41; 6 R. 153-58, 170, 180-81, 218-22; 8 R. 10-23; 10 R. 38-39; 58-59, 73-74, 193-94; Exs. 36, 61, 62, 79-84, 259). Mona also served as a point of access for *Capo* David Merez, the former leader of the El Paso "streets" or "free world" (4 R. 33, 46, 48-58, 155, 201; 5 R. 202; 7 R. 57-58; 10 R. 60, 185-87, 207-08, 243, 263-64). In this capacity, Mona collected the weekly *cuota* money from another high-ranking BA member, and then gave that *cuota* money to Merez, who was suppose to send the money to prisons (7 R. 37-38, 57-58, 61; 10 R. 58, 260, 264-65, 276). The jury could infer from Mona's high level of participation in the upper echelons of the BA and his role of delivering information between Cardoza and other high-ranking BA members that Mona knew the overall objectives of the conspiracy. For instance, there was overwhelming evidence from which the jury could infer Mona's knowledge, as a high-ranking BA member, that the BA would kill those who did not pay their *cuota*, those who cooperated with law enforcement, and those who thwarted the BA's criminal enterprise (*see, e.g.*, 3 R. 177; 4 R. 35, 39, 145; 5 R. 215; 7 R. 37; 8 R. 227; 9 R. 86, 94-99, 153-55, 160; 10 R. 44, 105; 11 R. 12-13). There was also overwhelming evidence from which the jury could infer Mona, as a BA member, knew that the BA rules instructed its members that those who tried to leave the BA would be killed (*see, e.g.*, 3 R. 162; 10 R. 30-31, 178). Additionally, the jury could readily infer from Mona's high level of

50

involvement in the BA's *cuota* scheme (*see, e.g.*, 7 R. 37-38, 57-58, 61; 10 R. 58, 200) that he knew the *cuota* was collected through force and acts of violence, such as what occurred when Adam Munoz, Eric Saucedo, and Enriquez murdered drug dealer Jose Luis Oviedo (10 R. 206). Indeed, there was evidence that, following Oviedo's murder, Mona actually discussed the murder with several BA members and conveyed the information he learned to BA leader David Merez (5 R. 224-25; 6 R. 44-45, 111-12; 9 R. 107-08, 150-51; 12 R. 109-11; 12 R. 135-36).

Moreover, in addition to testimony that he intentionally altered his handwriting sample to disguise his handwriting (5 R. 41-42, 96), Mona elected to testify at trial, providing incredulous and conflicting testimony concerning the scope of his relationship with Cardoza and affiliation with the BA (*compare* 12 R. 262, 273-77, 279-81, 287-88, 290, 291-305; 13 R. 11, 12, 14-16, 22-42 *with* Ex. 259 at 3, 5, 8, 12, 15-16, 20, 22, 23, 29-30, 47, 50). From this evidence, the jury could readily infer his lack of credibility in denying his knowledge and agreement of the conspiracy. Accordingly, the jury could reasonably infer that Mona knowingly participated in the overall objective of the conspiracy and the evidence was sufficient to sustain his RICO conspiracy conviction.

### d.    *Herrera*

On appeal, Herrera also challenges the sufficiency of evidence establishing his knowledge of and agreement with the overall objectives of the conspiracy (*see* Op. Br. at 28). However, the testimony at trial established that Herrera was a ranking member of the BA, responsible for collecting *cuota* money from *tiendas*, opening new *tiendas*, and enforcing BA rules and policies (4 R. 142-43, 144, 146-47, 155; 5 R. 52; 6 R. 169-70; 8 R. 259-61; 9 R. 79; 10 R. 54, 57, 62, 63-64, 102). Herrera was eventually placed in charge of the East Side of El Paso and even assumed the role of the right-hand man of the El Paso BA leadership (4 R. 147; 5 R. 230; 9 R. 110; 10 R. 52-53, 57). In this capacity, Herrera would receive the entire *cuota* collection from BA members in his area and then give this money to his superiors to send to the BA members in prison (4 R. 143-44; 6 R. 169-70). Moreover, in addition to overseeing the BA members who collected *cuota* in his area, Herrera would also personally collect *cuota* from certain *tiendas* (4 R. 147; 10 R. 57, 62-64). On January 26, 2006, Herrera violently attacked a man he suspected of dealing cocaine in BA territory, but who had thus far refused to pay a *cuota*, claiming he was not selling drugs (8 R. 294-303; 9 R. 14-20, 48-50; 10 R. 1-2-03). Herrera also committed other assaults on the BA's behalf (9 R. 80-81). "Where, as here, the evidence establishes that [the] defendant, over a period of years, committed several acts of racketeering activity in

furtherance of the enterprise's affairs, the inference of an agreement to do so is unmistakable." *Elliott*, 571 F.2d at 903. Accordingly, the jury could reasonably infer that Herrera knowingly participated in the overall objective of the conspiracy and the evidence was sufficient to sustain his RICO conspiracy conviction.

## II. THERE WAS SUFFICIENT EVIDENCE FOR ANY RATIONAL JURY TO FIND CARDOZA, ALVAREZ, AND HERRERA GUILTY OF THE SUBSTANTIVE RICO STATUTE, 18 U.S.C. § 1962(c) (COUNT 1).

(Cardoza Issues 2 & 5, Op. Br. at 20-35, 39-40; Alvarez Issues I & IV, Op. Br. at 29-33, 37-38; Herrera Issue 1, Op. Br. at 17-26).

### A.    Standard of Review

As stated above, when reviewing the sufficiency of the evidence supporting a conviction, this Court will affirm a conviction if a rational trier of fact could have found that the evidence established the essential elements of guilt beyond a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

### B.    Legal Argument

On appeal, Cardoza, Alvarez, and Herrera challenge the sufficiency of evidence in support of their substantive RICO convictions under 18 U.S.C. § 1962(c). Their claims are meritless. The evidence was sufficient to support their convictions.

In this case, all three men were charged with engaging in the affairs of an enterprise through a pattern of racketeering activity, in violation of 18 U.S.C.

§ 1962(c).[87] [88] To establish a violation of § 1962(c) the government must prove (1) the existence of an enterprise that affects interstate or foreign commerce, (2) that the defendant was "employed by" or "associated with" the enterprise, (3) that the defendant participated in the conduct of the enterprise's affairs, and (4) that the participation was "through a pattern of racketeering activity." *United States v. Erwin*, 793 F.2d 656, 670 (5th Cir. 1986). All three defendants appear to challenge only the third and fourth elements, the sufficiency of the evidence demonstrating that they participated in the conduct of the BA's affairs through a pattern of racketeering activity (*see* Cardoza Op. Br. at 22; Alvarez Op. Br. at 30; Herrera Op. Br. at 24-25). In order to establish that a defendant "conducted" or "participated in the conduct of an enterprise's affairs," the government must establish that (1) the defendant has in fact committed the racketeering acts as alleged, (2) the defendant's position in the enterprise facilitated his commission of the racketeering acts, and (3) the predicate

---

[87] Section 1962(c) prohibits "any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."

[88] The indictment alleged that the "pattern of racketeering activity" consisted of three racketeering acts. First, it alleged that Herrera had conspired to interfere with commerce by extortion, in violation of the Hobbs Act in 18 U.S.C. § 1951 ("Racketeering Act 1") (1 PR. 358). Second, it alleged that Perea, Cardoza, Alvarez, and Herrera had conspired to traffic narcotics, in violation of 21 U.S.C. §§ 841(a), 846 ("Racketeering Act 2") (1 PR. 359). Finally, it alleged that Perea, Cardoza, and Alvarez had conspired to launder monetary instruments, in violation of 18 U.S.C. § 1956(a)(1)(A)(i)(B)(i) & (h) ("Racketeering Act 3") (1 PR. 360).

acts had some direct or indirect effect on the enterprise. *United States v. Cauble*, 706 F.2d 1322, 1332-33 & n.24 (5th Cir. 1983). However, in proving that the racketeering acts has some "effect" on the enterprise," the government need not establish that the racketeering exclusively "benefitted" or "advanced the affairs of" the enterprise; instead the government must only prove "that the predicate offenses and the affairs of the enterprise are related" *United States v. Dozier*, 672 F.2d 531, 544 (5th Cir. 1982); *see also Cauble*, 706 F.2d at 1333 n.24 ("The prosecution need prove only that the racketeering acts affected the enterprise in some fashion.").

1.    Cardoza[89]

The government sufficiently demonstrated that Cardoza participated in the conduct of the BA's affairs through a pattern of racketeering activity, that is, through conspiring to traffic narcotics (Racketeering Act 2) and conspiring to launder monetary instruments (Racketeering Act 3).[90] As noted above under Issue I, *supra*,

---

[89] Due to the similarity of arguments raised by Cardoza in his challenge to the sufficiency of the evidence relating to his predicate conviction under Count 5 for conspiracy to possess with intent to distribute heroin, cocaine, and marijuana (*see* Cardoza Issue 5, Op. Br. at 39-40), this subsection also responds to that argument.

[90] A noted above under Issue I, *supra*, in order to convict a defendant of conspiracy under 21 U.S.C. § 841(a)(1) and 846, the government had to prove that: (1) an agreement existed between two or more persons to violate narcotics laws; (2) the defendant knew of the conspiracy; and (3) the defendant participated in the conspiracy. *United States v. Asibor*, 109 F.3d 1023, 1030 (5th Cir.1997). A person may be guilty as a co-conspirator even if he plays only a minor role, but mere association with other persons involved in a criminal enterprise is insufficient to prove participation in a conspiracy. *United States v. Greenwood*, 974 F.2d (continued...)

the evidence at trial established that Cardoza was a BA *capo*, the highest-ranking leader of the BA organization (3 R. 181; 4 R. 152; 5 R. 251; 6 R. 99-100, 275; 7 R. 108; 10 R. 35-37, 76, 78). In this capacity, he oversaw and directed other members to carry out BA affairs, including promoting and demoting members, pronouncing disciplinary measures, and directing how the *cuota* money would be distributed among the BA members within various prison facilities (*see, e.g.*, 6 R. 101, 179, 262-63, 291-93; 7 R. 29-30, 132; 8 R. 177-78, 205-09, 210-11; 10 R. 39, 41, 46, 73-74, 80-81, 193-94; Ex. 60 at 11; Ex. 259 at 42, 50). Additionally, Cardoza, as *capo*, determined and directed the BA leadership in El Paso and Juarez (4 R. 35, 36; 5 R. 183, 237-38, 300-01, 303; 6 R. 101, 221; 7 R. 50; 8 R. 98-99; 12 R. 31). These personnel decisions facilitated the drug trafficking activities of BA leaders Eduardo Ravelo (*see* 3 R. 182-86; 4 R. 34; 5 R. 183, 221, 229, 230, 246-48; 6 R. 68); Angel Esqueda (4 R. 216; 5 R. 221; 10 R. 89); Gustavo Gallardo (5 R. 212-13, 246-48; 6 R. 183); and David Merez (3 R. 181-85; 7 R. 127; 10 R. 90). *See United States v.*

---

[90] (...continued)

1449, 1457 (5th Cir. 1992). Proof of the existence of the predicate agreement, however, may be tacit and inferred from circumstantial evidence. *United States v. Thomas*, 12 F.3d 1350, 1356-57 (5th Cir. 1994). To obtain a conviction for money laundering, the government must prove that the defendant: 1) conducted or attempted to conduct a financial transaction; 2) which the defendant knew involved the proceeds of a specified unlawful activity; 3) with the intent either to promote or further specified unlawful activity or to conceal or disguise the nature, location, source, ownership, or control of the proceeds of unlawful activity. *United States v. Wyly*, 193 F.3d 289, 295 (5th Cir. 1999).

*Fernandez*, 388 F.3d 1199, 1227 (9th Cir. 2004) ("evidence of a generalized, coherent and consistent scheme for the reception and distribution of narcotics and division of profits from sale" by Mexican Mafia members demonstrates sufficient evidence of drug trafficking conspiracy). Additionally, the jury could reasonably infer that Cardoza's orchestration and direction of *cuota* collection necessarily required his participation in the symbiotic BA conspiracy to traffic narcotics, as discussed above under Issue I, *supra*.

Specifically, the government offered evidence that Cardoza sent letters to "Sally Cardoza," a pseudonym for Mona, a BA lieutenant who served as the "bridge" or communication link between Cardoza and other BA members (6 R. 154-57, 218-19, 221; 8 R. 17-19; 10 R. 38-39; Exs. 58, 59, 61, 62, 63, 67, 69). In these heavily-coded letters, Cardoza discussed BA affairs and gave specific instructions to BA leadership (*see, e.g.*, Ex. 62; 8 R. 48-50). In several letters introduced at trial, Cardoza directed that money be sent to the prison accounts of specific BA members, listing those members' names and inmate numbers (Ex. 60; *see also* Ex. 59; 8 R. 209-12). Mona then dispensed Cardoza's instructions to BA leadership or otherwise complied with Cardoza's instructions (6 R. 218, 221; 8 R. 221-22; 10 R. 73-74, 193-94).

In addition, Cardoza would also visit with Mona at Cardoza's correctional facility on a semi-regular basis (6 R. 180; 8 R. 10-12; 10 R. 73-74, 243; Exs. 79-84).

During these visits, Cardoza and Mona would discuss BA affairs, including their "bridge" address; various BA members, including those BA members who should be sent *cuota* money and those recently released from prison to whom the BA should stop sending *cuota* money; and various problems with BA leadership in El Paso (*see, e.g.*, Exs. 258, 259; 8 R. 17-19, 20, 22-23, 174-76, 177-78; 8 R. 205-08). After these visits, Mona would bring back messages from Cardoza to the BA leadership in El Paso (10 R. 73-74, 193-94).

By letter, Cardoza issued orders to other BA members concerning BA affairs. For instance, Cardoza directed BA members in the "free world" to investigate when money was not arriving at the prisons as instructed (6 R. 289-92; 7 R. 80). After the appointed BA member, Gerardo "Little Man" Hernandez, informed Cardoza that the *cuota* money had been collected, but was not arriving at the prisons because *Capo* David Merez was not sending it, Cardoza sent a letter to BA leadership stripping Merez of his duties ("putting [Merez] on ice") (6 R. 292-93). Additionally, the government introduced evidence that Cardoza communicated other orders to BA members (Ex. 42; 6 R. 179; 10 R. 11-12, 39, 41, 45-46, 107-10, 207), and directed the BA leadership in both El Paso and Juarez (6 R. 101, 221; 7 R. 29-30; 8 R. 208). Finally, at his direction, the BA sent Cardoza a substantial amount of *cuota* money into his prison commissary accounts throughout the course of the conspiracy (5 R.

58

251; 6 R. 99-100, 285; 7 R. 246-47; Exs. 212, 352-54). In light of this evidence the jury could reasonably find that Cardoza, through his position as *capo*, directed and orchestrated the BA's drug trafficking conspiracy and the laundering of *cuota* money to himself and other imprisoned BA members.

Finally, in addition to demonstrating that Cardoza conspired to traffic narcotics and launder *cuota* money and that his position as *capo* facilitated his commission of the racketeering acts, the government also established that his racketeering activity affected the BA. *See Cauble*, 706 F.2d at 1331-32 ("RICO criminalizes the conduct of an enterprise through a pattern of racketeering activity and not merely the defendant's engaging in racketeering activity. Therefore, there must be a nexus between the enterprise, the defendant, and the pattern of racketeering activity."). Here, the government established that the BA was a criminal prison gang that conducted its affairs through the various BA members' racketeering acts. Specifically, the BA's purposes included: 1) the enrichment of BA members and associates through murder, assault, extortion, money laundering, and the distribution of narcotics; 2) preserving and protecting the power, territory, and profits of the BA through the use of intimidation, violence, threats of violence, assaults, and murder; 3) promoting enhancing the BA and its members' and associates' activities; and 4) keeping victims in fear of the BA and in fear of its members and associates through

violence and threats of violence (*see, e.g.,* 3 R. 168, 177, 206; 4 R. 32-34, 161-62; 5 R. 128, 130, 186, 197-201, 203-07, 212, 231, 233 251-52, 292-95; 6 R. 168-75, 181, 284-86; 7 R. 50, 185-86, 191-92; 8 R. 38-39, 93-95; 10 R. 47-48, 49-51, 89-90, 156-57; 11 R. 48; *see also* 1 PR. 349). Thus, the jury could reasonably find that Cardoza, through his leadership position as *capo* and control over the enterprise, committed his racketeering activity in order to further the BA's very purposes. *See United States v. Delagado*, 401 F.3d 290, 298 (5th Cir. 2005) (holding nexus established where "[t]he racketeering acts listed in the indictment are related in that they were all shown to be committed in the furtherance of [Texas Mexican Mafia] business. The predicate acts served to intimidate members of rival gangs, intimidate individuals who posed problems for TMM members, collect drug debts owed to TMM members, and raise revenue for TMM members); *Dozier*, 672 F.2d at 544 (holding that government had "clear[ly]" established the required nexus between the defendant's pattern of racketeering activity and his participation in the conduct of the enterprise's affairs where "only [his] position in the [enterprise] and his control over its affairs enabled him to hawk its services for personal gain").[91] Accordingly, the government sufficiently established the required nexus and sufficiently established that Cardoza

---

[91] The same reasoning applies to Mona's "nexus" challenge to the sufficiency of his RICO conspiracy conviction. *See supra* note 80.

participated in the conduct of the BA's affairs through a pattern of racketeering activity.

2.     Alvarez[92]

The government also sufficiently demonstrated that Alvarez participated in the conduct of the BA's affairs through a pattern of conspiring to traffic narcotics (Racketeering Act 2) and conspiring to launder monetary instruments (Racketeering Act 3). Like Cardoza, the jury heard evidence that Alvarez was a BA capo, the highest-ranking leader of the BA organization (see 3 R. 181; 5 R. 294; 6 R. 99-100, 275; 7 R. 108; 8 R. 210; 10 R. 76, 78; 12 R. 16-17). As such, Alvarez oversaw and directed other members to carry out BA activities, promoted and disciplined members, and directed the *cuota* distribution (5 R 300-03; 6 R. 45-46, 101-02, 308; 7 R. 50, 182-83, 191; 8 R. 98-99; 10 R. 28, 81-82; 12 R. 16, 29-31). As with Cardoza, Alvarez's personnel decisions facilitated the drug trafficking activities of BA leadership in the "free world" and his actions in orchestrating and directing *cuota* collection necessarily required his participation in the symbiotic BA conspiracy to traffic narcotics.

---

[92] As with Cardoza, due to the similarity of arguments raised by Alvarez in his challenge to the sufficiency of the evidence relating to his predicate conviction under Count 5 for conspiracy to possess with intent to distribute heroin, cocaine, and marijuana (*see* Alvarez Issue IV, Op. Br. at 37-38), this subsection also responds to that argument.

61

Specifically, the government established that Alvarez issued directives through Sandy New, a BA associate and co-defendant. As a "bridge" for Alvarez, New would read heavily-coded letters to Alvarez over the phone (Exs. 196, 197, 330, 331; 7 R. 212). During these conversations, New would report BA business and issues, advise Alvarez of BA personnel changes, and inform him about the specific source of the money he received in his prison accounts (*id.*; *see also* 7 R. 209-22; 8 R. 23-27, 31). New also sent Alvarez heavily-coded letters containing information about BA affairs (*see, e.g.*, Ex. 45, 65; 5 R. 58). Correspondingly, Alvarez would send letters to New at her post office box in El Paso, which were intended for other BA members (*see, e.g.*, Ex. 39, 47, 52, 68; 8 R. 31, 32-33; 212-13). These letters contained directives about BA affairs, including a new prison commissary address to which the BA should direct his future *cuota* payments (*see* Ex. 47 at 9; 8 R. 39).

Angel Esqueda, the episodic leader of El Paso BA, would also send letters to Alvarez, informing him about the power struggle between him and David Merez to lead the El Paso streets and the status of BA funds (Ex 49; 8 R. 40-41). Under a fictitious name, Perea also wrote Alvarez to discuss BA matters (Ex. 40; 7 R. 213, 8 R. 34-36; 8 R. 97-98)

In October of 2003, Alvarez sent a letter to BA Member Roberto Duran, instructing him to contact *Capo* David Merez on Alvarez's behalf and directing

Duran to send money to Alvarez (4 R. 295-98, 5 R. 55; Ex. 41). As a result, Duran

contacted BA leadership about the letter, met with David Merez, and received $100

cash from Merez to send to Alvarez (4 R. 299-304). Duran converted the cash into a

money order and sent it to Alvarez's commissary account (4 R. 304). From this

evidence, the jury could infer that Alvarez knew how to contact the BA leadership in

El Paso, and that those leaders followed his orders. In addition, at his direction, the

BA sent Cardoza a substantial amount of *cuota* money into his prison commissary

accounts throughout the course of the conspiracy (5 R. 251; 6 R. 99-100, 285; 7 R.

246-47; Exs. 212, 352-54). From this evidence, the jury could reasonably find that

Alvarez, through his position as *capo*, both directed and facilitated the BA's drug

trafficking conspiracy and the laundering of *cuota* money to himself and other

imprisoned BA members. Moreover, as with Cardoza described above, the

government also established that Alvarez's racketeering activity affected the BA,

supplying the requisite nexus between his pattern of racketeering activity and his

participation in the conduct of the BA's affairs. Correspondingly, the government

sufficiently established that Alvarez participated in the conduct of the BA's affairs

through a pattern of racketeering activity.

3.     <u>Herrera</u>

Finally, the government also sufficiently demonstrated that Herrera participated in the conduct of the BA's affairs through a pattern of racketeering activity, that is, through conspiring to interfere with commerce by threats or violence in violation of the Hobbs Act (Racketeering Act 1) and conspiring to traffic narcotics (Racketeering Act 2).[93] The testimony at trial established that Herrera was a ranking member of the BA, responsible for collecting *cuota* money from *tiendas*, opening new *tiendas*, and enforcing BA rules and policies (4 R. 142-43, 144, 146-47, 155; 5 R. 52; 6 R. 169-70; 8 R. 259-61; 9 R. 79; 10 R. 54, 57, 62, 63-64, 102; Ex. 335). Herrera was eventually placed in charge of the East Side of El Paso and even assumed the role of the right-hand man of the El Paso BA leadership (4 R. 147, 230, 238; 5 R. 230; 9 R. 110; 10 R. 52-53, 57). As discussed above, the *tiendas* from whom the BA collected were

---

[93] Unlike Cardoza and Alvarez, Herrera does not appear to challenge the sufficiency of the evidence supporting his predicate conviction under Count 5 for conspiracy to possess with intent to distribute heroin, cocaine, and marijuana. Instead, he only challenges the sufficiency of the evidence supporting his substantive RICO conviction, his RICO conspiracy conviction, and his predicate conviction under the Hobbs Act, 18 U.S.C. § 1951 (*see* Herrera Op. Br. at 17-26). Herrera has, thus, waived any challenge to the sufficiency of his drug trafficking conspiracy conviction in Count 5. *See* Fed. R. App. P. 28(a)(9)(A); *Yohey v. Collins*, 985 F.2d 222, 224 (5th Cir.1993) (failure to specifically brief issue results in its abandonment). However, in order to establish the sufficiency of his substantive RICO conviction under Racketeering Act 2, the government still must establish that the jury reasonably concluded that Herrera did, in fact, commit the racketeering acts as alleged under Racketeering Act 2, conspiracy to possess with intent to distribute a controlled substance (1 PR. 359). *See Cauble*, 706 F.2d at 1332-33.

induced to pay the *cuota* by extortion (see 3 R. 177; 4 R. 39, 145; 5 R. 215; 7 R. 37;

9 R. 86, 94-99, 153-55; 10 R. 44, 105).

In the scope of his duties, Herrera conspired with other BA members to extort

money from the *tiendas* or potential *tiendas*. BA member Jose "Spider" Garcia

testified that he would collect the *cuota* from tiendas and hand it over to Herrera, who

was his direct superior (4 R. 143-44). Herrera, in turn, would then give this *cuota*

money to his superiors to send to the BA members in prison (6 R. 169-70). Garcia

also testified that, during this time, if a *tienda* did not pay its *cuota*, it would receive

a *calentada* (4 R. 145). On January 26, 2006, Herrera violently attacked a man he

suspected of dealing cocaine in BA territory, but who had thus far refused to pay a

*cuota,* claiming he was not selling drugs (8 R. 294-303; 9 R. 14-20, 48-50; 10 R.

1-2-03). Herrera also committed other assaults on the BA's behalf (9 R. 80-81).

Moreover, in addition to overseeing the BA members who collected *cuota* in

his area, Herrera would personally collect *cuota* from *tiendas* (10 R. 57). He also

operated his own *tiendas*, at which he allowed only other BA members to sell drugs

(4 R. 147, 243. 10 R. 62-64). Finally, during his testimony, Herrera expressly denied

that he extorted *tiendas* by threats or intimidation or distributed drugs (13 R. 127-39),

and the jury was entitled to disbelieve his testimony. Accordingly, there was

sufficient evidence for the jury to reasonably conclude that Herrera, through his

leadership position in the BA, knowingly participated in the BA's drug trafficking conspiracy and extorted *cuota* funds in violation of the Hobbs Act.

Finally, the government also established that Herrera's racketeering activity affected the BA. Here, the jury could reasonably find that Herrera, through his leadership position and control over the East Side of El Paso, committed his racketeering activity in order to further the BA's purposes of enriching its members through extortion; preserving and protecting the power, territory, and profits of the BA through the use of intimidation, violence, threats of violence, assaults, and murder; and keeping victims in fear of the BA and in fear of its members and associates through violence and threats of violence. *See Delagado*, 401 F.3d 290, 298 (5th Cir. 2005) (nexus established where racketeering acts "were all shown to be committed in the furtherance of [Texas Mexican Mafia] business[,] serv[ing] to intimidate members of rival gangs, intimidate individuals who posed problems for TMM members, collect drug debts owed to TMM members, and raise revenue for TMM members"). For instance, immediately before attacking Jose Acuna, whom Herrera suspected of refusing to pay a *cuota* to the BA (10 R. 102-03, 204-05), Herrera loudly shouted "Big Bad 21," a code term for the BA, in earshot of the crowded parking lot (8 R. 295-96). Moreover, Herrera did not keep the *cuota* he collected from East Side *tiendas* for himself (6 R. 169-70); instead, he forwarded the

funds to his superiors to send to BA members in prison. With respect to the drug trafficking conspiracy, the government demonstrated that Herrera, as a privilege of his BA membership, did not have to pay a *cuota,* purchased his drugs at cheaper prices, and was permitted to operate his own *tiendas* in exclusive venues (4 R. 135, 141-42, 147, 148, 170-72, 179, 214-15, 245; 6 R. 298-99, 312; 7 R. 21-27, 39; 10 R. 62-64, 96-99; Ex. 251). Accordingly, the government sufficiently established that Herrera's racketeering acts affected the BA. His sufficiency argument on this point, as with Cardoza's and Alvarez's, should be rejected by this Court.

## III. THERE WAS SUFFICIENT EVIDENCE FOR ANY RATIONAL JURY TO FIND HERRERA AND ENRIQUEZ GUILTY OF CONSPIRING TO INTERFERE WITH COMMERCE BY THREATS OR VIOLENCE, IN VIOLATION OF 18 U.S.C. § 1951 (COUNT 3)

(Herrera Issue 1, Op. Br. at 17-26; Enriquez Issue 1, Op. Br. at 16-23)

### A.    Standard of Review

As noted above, in reviewing the sufficiency of the evidence supporting a conviction, this Court will affirm a conviction if a rational trier of fact could have found that the evidence established the essential elements of guilt beyond a reasonable doubt. *See United States v. Martinez*, 151 F.3d 384, 388 (5th Cir. 1998); *see also Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

**B.    Legal Argument**

On appeal, Herrera and Enriquez challenge the sufficiency of evidence in support of their convictions for conspiracy to commit extortion under the Hobbs Act, 18 U.S.C. § 1951.[94] Their claims are meritless. The evidence was sufficient to support both Herrera and Enriquez's conviction of the charge.

In this case, both men were charged with conspiracy to commit extortion by the wrongful use of actual and threatened force, violence, and fear under the Hobbs Act, 18 U.S.C. § 1951(a).[95] To convict a defendant for criminal conspiracy under the Hobbs Act the jury must find an agreement between two or more persons to commit a crime, and an overt act by one of the conspirators to further the conspiracy. *See United States v. Stephens*, 964 F.2d 424, 427-28 (5th Cir. 1992), *citing United States v. Villarreal,* 764 F.2d 1048, 1051 (5th Cir. 1985). "Proof of a conspiracy does not require direct evidence of an actual agreement between the co-conspirators, but may be inferred from circumstantial evidence." *United States v. Wright,* 797 F.2d 245, 253

---

[94] It appears that Herrera and Enriquez filed identical arguments on the Count 3 sufficiency issue.

[95] Section 1951 states: "Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined under this title or imprisoned not more than twenty years, or both." § 1951(a). The statute defines "extortion" as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." *Id.* § 1951(b)(2).

(5th Cir.1986). To then establish a substantive offense under the Hobbs Act, the government must prove beyond a reasonable doubt: (1) that a defendant induced a person to part with property; (2) that the defendant acted knowingly and willfully by means of extortion; and (3) that the extortionate transaction delayed, interrupted, or adversely affected interstate commerce. *See United States v. Snyder*, 930 F.2d 1090, 1093 (5th Cir. 1991).

    1.    <u>Evidence of Herrera's Participation in the BA's Extortion Conspiracy.</u>

On appeal, Herrera challenges the sufficiency of evidence demonstrating his participation in the extortion scheme.[96] The government sufficiently established that he conspired to extort local drug dealers of money by threat or violence. Below, the testimony at trial established that Herrera was a ranking member of the BA, responsible for collecting *cuota* money from *tienda*s, opening new *tienda*s, and enforcing BA rules and policies (4 R. 142-43, 144, 146-47, 155; 5 R. 52; 6 R. 169-70; 8 R. 259-61; 9 R. 79; 10 R. 54, 57, 62, 63-64, 102). Herrera was eventually placed in charge of the East Side of El Paso and even assumed the role of the right-hand man

---

[96] Herrera and Enriquez also argue there was an insufficient nexus to interstate commerce to establish a violation of the Hobbs Act (*See* Herrera Op. Br. at 25-26; Enriquez Op. Br. at 23). This argument was addressed under Issue I, *supra*, in response to Mona's argument that the BA's extortion scheme did not affect interstate commerce, and should be rejected by this Court in its evaluation of the sufficiency of Herrera's and Enriquez's conviction in Count 3 for the same reasons advanced above.

of the El Paso BA leadership (4 R. 147; 5 R. 230; 9 R. 110; 10 R. 52-53, 57). As discussed above, the *tiendas* from whom the BA collected were induced to pay the *cuota* by force or threats of force, violence, and fear (*see* 3 R. 177; 4 R. 39, 145; 5 R. 215; 7 R. 37; 9 R. 86, 94-99, 153-55; 10 R. 44, 105).

In the scope of his duties, Herrera conspired with other BA members to extort money from the *tiendas* or potential *tiendas*. BA member Jose "Spider" Garcia testified that he would collect the *cuota* from *tiendas* and hand it over to Herrera, who was his direct superior (4 R. 143-44). Herrera, in turn, would then give this money to his superiors to send to the BA members in prison (6 R. 169-70). Garcia also testified that, during this time, if a *tienda* did not pay its *cuota*, it would receive a *calentada* (4 R. 145). Moreover, in addition to overseeing the BA members who collected *cuota* in his area, Herrera would also personally collect *cuota* from *tiendas* (10 R. 57). He also operated his own *tiendas*, at which only BA members could sell drugs (4 R. 147, 243. 10 R. 62-64). On January 26, 2006, Herrera violently attacked a man he suspected of dealing cocaine in BA territory, but who had thus far refused to pay a *cuota*, claiming he was not selling drugs (8 R. 294-303; 9 R. 14-20, 48-50; 10 R. 1-2-03).[97] Herrera also committed other assaults on the BA's behalf (9 R. 80-81). Finally,

---

[97] On appeal, Herrera claims that his assault of Jose Acuna was "never directly linked to [BA] membership" (Herrera Op. Br. at 19). On the contrary, Ramon Arce testified that (continued...)

Herrera expressly denied that he extorted *tiendas* by threats or intimidation (13 R. 127-39), and the jury was entitled to disbelieve his testimony. Accordingly, there was sufficient evidence for the jury to reasonably conclude Herrera participated in the conspiracy to collect *cuota* through extortion.

2.     Evidence of Enriquez's Involvement in the BA's *Cuota* Collection Conspiracy.

The government also sufficiently established that Enriquez conspired to extort local drug dealers of money by threat or violence in violation of the Hobbs Act. First, contrary to Enriquez's claims on appeal, the evidence at trial sufficiently demonstrated that Enriquez was a BA member. Most significantly, Enriquez admitted to El Paso police detectives that he collected *cuota* for the BA (*see* Ex. 305 at 3, 8, 15-16, 27), and witnesses testified that only BA members collected *cuota*, particularly from *tienda* that had not paid in the past (*see* 9 R. 136; 10 R. 104-05). In addition, Eric Saucedo testified that Enriquez was a "*carnal*," the name by which BA members identified themselves (9 R. 91-100, 107, 164), and there was evidence that Enriquez

---

[97] (...continued)

Herrera loudly shouted "Big Bad 21," a code term for the BA, immediately before attacking Acuna (8 R. 295-96). Moreover, cooperator Josue "Casper" Aguirre testified that, before the assault, Herrera had pointed out Acuna's rim shop as the address of a person who was selling drugs, but who had refused to pay the *cuota* on the several occasions he was approached (10 R. 102-03, 204-05). In fact, Herrera discussed Acuna's rim shop at two different BA meetings and finally approached *Capo* David Merez for advice about the situation (10 R. 102-03). Merez then advised Herrera that if Herrera was sure Acuna was selling drugs, "then to do what he had to do" (*id.*).

followed the orders of higher-ranking BA members (9 R. 99-100, 155; Ex. 305 at 3, 25).[98]

Enriquez's participation in the Hobbs Act conspiracy was further evidenced by his actions on the evening of December 6, 2006, when he and two other BA members went to collect *cuota* from a *tienda* on Frutas Street in El Paso, which had not paid their *cuota* on at least two prior BA visits (6 R. 105-06, 111-12; 9 R. 85-86, 87-90, 177-78, 181-82). After the three men discussed the plan of robbing the *tienda* and "beat[ing] them up" if they were unable to pay their *cuota* again, Enriquez and the two other BA members donned gloves and drove over to the apartment on Frutas Street (9 R. 91-94, 107, 210-11; Ex. 305 at 16). While Enriquez waited outside as a lookout, the two other BA members went inside the apartment, demanded the *cuota*, and, when that proved unsuccessful, fatally shot one of the drug dealers, Jose Luis Oviedo (9 R. 94-99, 153-55). The three men then fled the scene (9 R. 99-100). After initially lying to police, Enriquez later admitted that he was collecting *cuota* with Munoz when Munoz shot Oviedo (9 R. 199, 208-09, 210-11, 212, 214, 215, 232, 247-48, 253-54; Exs. 204, 205). Phone records confirm calls between Munoz's cell phone

---

[98] Saucedo continually referred to Enriquez as a "*carnal*" throughout his testimony (*see, e.g.*, 9 R. 91-100, 107, 153-55, 163). Saucedo explained that only *carnals* collect *cuota* (9 R. 136). He further explained that Adam Munoz told Saucedo that Enriquez was a *carnal*, and that Enriquez gave him a head gesture indicating he was a *carnal* when Saucedo first got into Munoz's car on the evening of the murder (9 R. 164).

and Enriquez on the day of the murder (9 R. 246-47; Ex. 289). Accordingly, the evidence sufficiently demonstrated that Enriquez participated in a conspiracy to collect *cuota* through extortion. The district court properly denied his and Herrera's motions for judgment of acquittal on Count 3.

## IV. THERE WAS SUFFICIENT EVIDENCE FOR ANY RATIONAL JURY TO FIND CARDOZA AND ALVAREZ GUILTY OF CONSPIRACY TO LAUNDER MONETARY INSTRUMENTS (COUNT 4).

(Cardoza Issue 4, Op. Br. at 35-39; Alvarez Issue III, Op. Br. at 35-37)

### A.    Standard of Review

As stated above, when reviewing the sufficiency of the evidence supporting a conviction, this Court will affirm a conviction if a rational trier of fact could have found that the evidence established the essential elements of guilt beyond a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

### B.    Legal Argument

On appeal, Cardoza and Alvarez challenge the sufficiency of evidence in support of their money laundering conspiracy convictions. Their claims are meritless. The evidence was sufficient to support their convictions.

In this case, Cardoza and Alvarez were charged with conspiracy to launder monetary instruments in violation of 18 U.S.C. § 1956(a)(1)(A)(i), (B)(i) and (h) (1

PR. 388).[99] In order to convict a defendant for conspiracy to launder monetary instruments under § 1956(h), the government must prove (1) the existence of an agreement between two or more persons to commit a money laundering offense proscribed under § 1956(a); (2) that the defendant knew that the money laundering proceeds had been derived from an illegal activity; and (3) the defendant knowingly and voluntarily became part of the conspiracy. *United States v. Green*, 599 F.3d 360, 371 (4th Cir. 2010); *see also United States v. Rivera*, 295 F.3d 461, 467-68 (5th Cir. 2002), *citing United States v. Ismoila*, 100 F.3d 380, 387 (5th Cir. 1996); *see also United States v. Garza,* 42 F.3d 251, 253 (5th Cir. 1994). In order to obtain a conviction for money laundering under § 1956(a)(1)(A)(i) and (B)(i), the government must prove that the defendant: 1) conducted or attempted to conduct a financial transaction; 2) which the defendant knew involved the proceeds of a specified unlawful activity; 3) with the intent either to promote or further specified unlawful activity or to conceal or disguise the nature, location, source, ownership, or control

---

[99] Section 1951 states: "Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity . . . with the intent to promote the carrying on of specified unlawful activity; or . . . knowing that the transaction is designed in whole or in part . . . to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity . . . shall be sentenced to a fine of not more than $500,000 or twice the value of the property involved in the transaction, whichever is greater, or imprisonment for not more than twenty years, or both." 18 U.S.C. § 1956(a)(1)(A)(i), (B)(i).

of the proceeds of unlawful activity. *United States v. Wyly*, 193 F.3d 289, 295 (5th Cir. 1999).

Below, the government established that, during the course of the conspiracy, the BA conducted an extortion scheme in order to surreptitiously funnel money to their members incarcerated within various state correctional institutions and federal prisons (*see, e.g.*, 8 R. 38-39). Specifically, the BA charged its *tiendas* a weekly *cuota* for the privilege of running their illegal drug businesses in the BA's territory (3 R. 175-76, 209, 228-31; 4 R. 132, 162, 293; 5 R. 180, 193-96; 6 R. 280-83; 7 R. 180, 182; 10 R. 53-54, 55.). For those drug dealers who either refused to pay the *cuota* or failed to come up with the weekly *cuota* payment, the BA members would continue to return to the *tienda* for collection, invariably issuing escalating demands or threats, committing assaults or robberies, or even, on occasion, murdering the recalcitrant drug dealer (3 R. 177; 4 R. 39, 145; 5 R. 215; 7 R. 37; 9 R. 86, 94-99, 153-55; 10 R. 44, 105.). The non-incarcerated BA members then sent this aggregate collection of *cuota* money to the higher-ranking BA members' prison commissary accounts, generally in the form of money orders through the U.S. Postal Service (*see* 3 R. 168, 177, 206; 4 R. 32-33, 161-62; 5 R. 128, 130, 186, 197-201, 203-07, 212, 233, 251-52, 292-95; 6 R. 168-75, 181, 284-86; 7 R. 185-86, 191-92; 10 R. 47-51). These money orders would bear fictitious names and addresses in order to disguise the senders' true

identities and true source of the funds (5 R. 204; 7 R. 185-86; 8 R. 38-39; 8 R. 88; 10 R. 51; 11 R. 9-10; 12 R. 7-9). Both Cardoza and Alvarez directed the distribution of *cuota* funds and received substantial amounts of *cuota* money into their own prison commissary accounts (*see, e.g.*, 5 R. 251; 6 R. 99-100; 7 R. 245-47; 8 R. 98-99, 177-78, 205-12; 10 R. 81-82; 12 R. 16-17; Ex. 44; Ex. 60 at 11; Ex. 212; Ex. 259 at 42, 50; Exs. 352-54). In light of this evidence, the government sufficiently demonstrated that both men conspired to launder illegally-obtained funds in violation of § 1956(a)(1)(A)(i), (B)(i) and (h).

On appeal, while Cardoza and Alvarez appear to concede that they received money in their commissary accounts from the BA (*see* Cardoza Op. Br. at 36; Alvarez Op. Br. at 36), they argue that the evidence insufficiently established their knowledge that the money involved the proceeds derived from an illegal activity (Cardoza Op. Br. at 36, 39; Alvarez Op. Br. at 36-37). This argument is meritless. There was ample evidence that Cardoza and Alvarez, as leaders of the BA criminal enterprise, knew that the funds deposited into their prison commissary accounts were derived from *cuota* collections obtained through the BA's extortion scheme. First, Cardoza and Alvarez personally and specifically directed the distribution of BA funds to themselves and other BA members in various state and federal correctional facilities (*see, e.g.*, 8 R. 177-78, 205-09, 210-11; Ex. 60 at 11; Ex. 259 at 42, 50). Indeed, the

government introduced several heavily-coded letters at trial in which Cardoza directed that money be sent to the prison accounts of specific BA members, listing those members' names and inmate numbers (Ex. 60; *see also* Ex. 59; 8 R. 209-12). It also introduced conversations between Cardoza and his "bridge," during which Cardoza discussed BA members who should be sent *cuota* money and those recently released from prison to whom the BA should stop sending *cuota* money (*see, e.g.*, Exs. 258, 259; 8 R. 17-19, 20, 22-23, 174-76, 177-78; 8 R. 205-08). With respect to Alvarez, the government offered evidence that Alvarez sent a heavily-coded letter through his "bridge" to BA leadership, informing them of a new address to which they should direct his funds (*see* Ex. 47 at 9; 8 R. 39). In another letter, Alvarez ordered a BA member to send money to his prison commissary account (*see* 4 R. 295-98, 5 R. 55; Ex. 41). Additionally, in their *capo* capacity, Cardoza and Alvarez removed El Paso BA leader David Merez from power after he failed to send the collection of *cuota* to BA members in prison as required (*see* 6 R. 22, 289-92; 7 R. 29-30, 93-97, 122, 124, 127; 10 R. 74-75, 78-81; 12 R. 16, 31). Indeed, in one conversation with his "bridge" following Merez's temporary removal, Alvarez was informed that the money he received came from the "new ones" or new BA leadership (Ex. 197; 7 R. 210). From this evidence, and Cardoza and Alvarez's long-standing leadership positions in the BA, the jury could reasonably infer that both men knew

how these *cuota* funds were derived. *See Posado-Rios*, 158 F.3d at 858 (jury could infer from defendant's longstanding association with the drug trade and with enterprise that he knew that the prospective act of supplying cocaine would entail numerous violations of the law).

Moreover, other evidence supported the jury's conclusion that Cardoza and Alvarez knew that the money involved the proceeds of illegal activity. For instance, the jury could reasonably infer Cardoza and Alvarez's knowledge of the illegal character of the funds based on their high level of secrecy (such as the use of "bridges," aliases, and three-way calling) and scrupulous use of nonsensical coded language in letters and phone conversations. *Compare United States v. Ness*, 466 F.3d 79, 80-81 (2d Cir. 2006) (holding that jury could reasonably find that level of secrecy, use of coded language, and the scrupulous avoidance of a paper trail were designed, at least in part, to conceal the identity of the funds), *vacated on other grounds by Regalado Cuellar v. United States*, 553 U.S. 550 (2008); *United States v. Gotti*, 459 F.3d 296, 337 (2d Cir. 2006) (noting that the "highly complex and surreptitious" process through which the funds were transferred—involving coded language, the use of intermediaries, secretive handoffs, and cash transactions—sufficed to permit the inference that the deliveries "had been designed in a way that would conceal the source of the moneys" ). Additionally, while neither Cardoza nor Alvarez had any

78

other apparent source of income, they both received substantial deposits into their prison commissary accounts at regular intervals throughout the course of the conspiracy. In fact, based on correlating deposits of equivalent amounts deposited into all four *capos* prison commissary accounts and money order receipts provided to the FBI by cooperating BA members, the jury could reasonably find that Cardoza received at least $12,175 in *cuota* funds and that Alvarez received at least $10,942 in *cuota* funds from 2003 until 2008. From this evidence, the jury could reasonably conclude that Cardoza and Alvarez knew their substantial income stream was illegitimate. *See Garza*, 42 F.3d at 253. Accordingly, the evidence sufficiently demonstrated that Cardoza and Alvarez knowingly participated in a conspiracy to launder illegally-obtained funds. The district court properly denied their motions for judgment of acquittal on Count 4.

## V. <u>THE DISTRICT COURT'S ADMISSION OF ALVAREZ'S PRISON BANK RECORDS AND A SUMMARY OF THOSE RECORDS DID NOT VIOLATE THE CONFRONTATION CLAUSE.</u>

(Alvarez Issue VII, Op. Br. at 45-47)

**A.    Standard of Review**

This Court reviews an alleged Confrontation Clause violation de novo, subject to harmless-error analysis. *United States v. Morgan*, 505 F.3d 332, 338 (5th Cir. 2007).

**B.     Facts Relevant to the Admission of Exhibits 353 and 354**

At trial, FBI Special Agent Samantha Mikeska presented evidence that *cuota* money was deposited into Perea's, Cardoza's, and Alvarez's prison commissary accounts via money orders sent by BA members. Specifically, over Alvarez's Confrontation objection, the court admitted Exhibit 353, which contained a self-proving affidavit from Joe Guadian, a custodian of records for the Bureau of Prisons,[100] and the corresponding banking histories for Perea's and Alvarez's federal prison commissary accounts from January 1, 2003, through November 10, 2008 (10 R. 297-300).[101] These banking histories consisted of a computer printout detailing each deposit into Alvarez's and Perea's accounts, including the transaction dates, amounts, and the senders' last names and/or zip codes (*see* Ex. 353 at 1-5; 10 R. 294-95; 12 R. 99-100).

Moreover, over the Confrontation objection of Alvarez, the court also admitted Exhibit 354, a one-page document summarizing the deposits into *Capos* Perea's,

---

[100] The affidavit attested that the attached "financial reports" were made and kept by the Bureau of Prisons in the regular course of business, recorded by an employee or representative with personal knowledge, and made at or near the time it occurred (Ex. 353). The records were proffered pursuant to Rule 902(11) of the Federal Rules of Evidence, which governs the self-authentication of business records (*see* 1 PR. 146-47 (written notice pursuant to Rule 902(11)(C))).

[101] Correspondingly, Exhibit 352 contained the Texas Department of Corrections prison commissary account banking histories for Cardoza and a fourth unindicted *capo*, Manuel Torres (10 R. 295; Ex. 352).

Alvarez's, Cardoza's, and Torres' accounts during the course of the conspiracy (*see* Ex. 354; 11 R. 16-18).[102] Special Agent Mikeska compiled this summary document using the bank records described above; records of specific money orders deposited into Perea's, Alvarez's, Cardoza's, and Torres' accounts;[103] and corresponding money order receipts provided to the FBI by BA members Josue Aguirre and Eduardo Ruiz.[104] This summary document consisted of a spreadsheet showing the jury the dates and amounts of each deposit into the four accounts in order to make the various bank records "easier to read and show a pattern" (11 R. 16). The green highlighted portions of the summary document denoted where Mikeska had actually traced the source of the funds from money orders receipts provided to the FBI by BA members (11 R. 16-17, 26, 32).[105] The yellow highlighted portion of the summary document

---

[102] Because *cuota* payments were typically made in denominations of $50, $100, $150, or $200, Agent Mikeska only included deposits of those denominations in her summary unless some further explanation justified the deposits' inclusion (*see* 11 R. 16).

[103] The money orders—retained by the Bureau of Prisons Deposit Fund Branch and Texas Department of Corrections—were admitted at trial, without objection (*see* Exs. 85, 86, 92, 94, 96, 98-105, 107-120, 122-29, 131-33, 135-38, 141-43, 146-48, 150, 151, 153, 155-64, 169, 171, 173-75, 179-95; *see also* 5 R. 118-20; 11 R. 25).

[104] All of the money order receipts were admitted at trial (*see* Ex. 90, 91, 93, 95, 97, 101, 106, 121, 130, 134, 139, 140, 144, 145, 149, 152, 154, 165-70, 172, 176-78; *see also* 10 R. 64-65, 66-68 (from testimony of Josue Aguirre); 11 R. 25, 32 (from testimony of Special Agent Mikeska)).

[105] Agent Mikeska testified that, by comparing the unique numeric identifier on the money order receipts she received from Aguirre and Ruiz with the money orders she received from the Bureau of Prisons and Texas Department of Corrections, she individually traced each

(continued...)

denoted a correlation of deposit activity from which the jury could reasonably infer that   the funds came from the same source, such as two *capos* receiving the exact same amount on the same day or receiving funds from money orders that bore sequential numbers (11 R. 17; *see also* 12 R. 99-103). The document then provided a "total" at the bottom of each column, which tabulated the total of yellow and green deposits into each account (Ex. 354; 11 R. 105). For instance, Alvarez's column showed that he received $10,942 in *cuota* money into his prison commissary account over the course of the conspiracy (Ex. 354).

## C.    Legal Argument

On appeal, Alvarez claims that district court erroneously admitted his prison bank records and a summary of those records (Exhibits 353 and 354) in violation of his Sixth Amendment rights under the Confrontation Clause.[106] Essentially, he claims that the district court violated the Confrontation Clause when it allowed the Government to use the self-proving affidavit of the Bureau of Prisons custodian of

---

[105] (...continued)
money order receipt to funds deposited directly into Torres', Cardoza's, Perea's, and Alvarez's individual commissary accounts (11 R. 16-17, 29-30, 72-74; *see also* 5 R. 118-25, 130 (from testimony of FBI Special Agent Amy Fryberger)).

[106] Below, and apparently on appeal, Alvarez's objection to the admission of Exhibit 354 was based solely on its summary of evidence derived from Exhibit 352, and not on any other independent Confrontation grounds (*see* 11 R. 17-18; Alvarez Op. Br. at 46-47). As mentioned above, Agent Mikeska, the creator of Exhibit 354, was subject to extensive cross-examination about the exhibit (*see, e.g.*, 11 R. 29-43, 52-54, 72-76, 78-79, 84-90, 101-06; 12 R. 7-9, 62-63, 125-27).

records—rather than the custodian's live testimony—to authenticate Alvarez's prison bank records (*see* Alvarez Op. Br. at 46 (claiming he had no opportunity to confront the creator of the records concerning "how the information [in the documents] was compiled, where the deposits came from[,] or where and when the money was received from," in violation of his Confrontation rights); *see also id.* at 47 ("Had Defendant been able to cross-examine the maker of Government Exhibit 353, he may have been able to develop when and from where the deposits made into Defendant's account came from, and been able to refute the conclusions that Special Agent Mikeska was making with respect to the deposits into [his] account."). His argument is meritless. The district court properly admitted these documents as non-testimonial statements not subject to the Confrontation Clause.

The Sixth Amendment guarantees a criminal defendant the right "to be confronted with the witnesses against him." U.S. Const. amend. VI. In *Crawford v. Washington,* 541 U.S. 36, 53-54 (2004), the Supreme Court held that this right is violated where the prosecution introduces "testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." However, the Court also observed that some statements, "by their nature," are not "testimonial" and, thus, do not fall within the ambit of the Sixth Amendment protections. *Id.* at 56. For example, the Court

explained that "business record or statements in furtherance of a conspiracy" are not, by their nature, testimonial. *Id.* After the Supreme Court recently held that even routine business records can be considered testimonial when "made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial," *Melendez-Diaz v. Massachusetts*, 129 S. Ct. 2527, 2532 (2009), this Court distinguished between "[business] records that are kept in the ordinary course of business," which are non-testimonial, and those records "that are specifically produced for use at trial, which "are 'testimonial' and are at the heart of statements triggering the Confrontation Clause." *United States v. Martinez-Rios*, 595 F.3d 581, 586 (5th Cir. 2010). Accordingly, only those business records "not routinely produced in the course of government business but instead are exclusively generated for use at trial," are testimonial statements within the ambit of the Confrontation Clause. *Id.*

In this case, the district court properly admitted the bank records and corresponding summary document. The defendant does not appear to challenge that the bank records themselves—which were "made and kept by the Bureau in the regular course of business" in order to record deposit activity in individual inmate accounts "at or near the time" of the activity—were non-testimonial business records not invoking the protections of the Confrontation Clause. *See Crawford,* 541 U.S. at

56 (business records admitted pursuant to a hearsay exception are not "testimonial" and therefore do not implicate the Confrontation Clause). Moreover, the self-proving affidavit attesting to the authenticity of the business records was also not testimonial. *See United States v. Morgan*, 505 F.3d 332, 338-39 (5th Cir. 2007) (holding "that *Crawford* does not apply to the foundational evidence authenticating business records in preliminary determinations of the admissibility of evidence"); *United States v. Jackson*, 625 F.3d 875, 881 n.6 (5th Cir. 2010) (reaffirming *Morgan* post-*Melendez-Diaz*); *United States v. Yeley-Davis*, No. 10-8000, 2011 WL 167249, at *4 (10th Cir. Jan. 20, 2011) (agreeing with all other Circuits that "certificates of authenticity presented under Rule 902(11) are not testimonial"); *United States v. Ellis*, 460 F.3d 920, 927 (7th Cir. 2006) ("Given the records themselves do not fall within the constitutional guarantee provided by the Confrontation Clause, it would be odd to hold that the foundational evidence authenticating the records do."); *United States v. Adefehinti*, 510 F.3d 319, 328 (D.C. Cir. 2007) (same); *United States v. Weiland*, 420 F.3d 1062, 1077 (9th Cir. 2005) ("a routine certification by the custodian of a domestic public record . . . and a routine attestation to authority and signature, such as that provided by the Secretary of State in this case, are not testimonial in nature"); *United States v. Schwartz*, No. 05-2770, 2009 WL 532796, at *3 (3d Cir. Mar. 4, 2009) (unpublished) (agreeing with reasoning of *Ellis*); *see also Melendez-Diaz*, 129

S. Ct. at 2532 n.1 ("Contrary to the dissent's suggestion, . . . we do not hold, and it is not the case, that anyone whose testimony may be relevant in establishing the . . . authenticity of the sample . . . . must appear in person as part of the prosecution's case."); *Crawford,* 541 U.S. at 76 (Rehnquist, C.J., concurring in the judgment) (requiring the records custodians and other officials from the various states and municipalities to make themselves available for cross-examination in the countless criminal cases heard each day in United States would present a serious logistical challenge "without any apparent gain in the truth-seeking process"). Indeed, three months before trial, the government provided written notice of its intent to introduce the business records by self-authentication as required by Federal Rule of Evidence 903(11)(C), and the court did not thwart any effort by Alvarez to call the certifying custodian to testify during trial, if desired. Accordingly, the district court did not violate Alvarez's Confrontation rights by permitting the government to use the self-proving affidavit to authenticate the bank records.

In any event, even if this Court were to find that the admission of the documents was erroneous, any error was harmless. On appeal, Alvarez claims that, had the court required the live testimony of the records custodian to authenticate the records, he "may have been able to develop when and from where the deposits made into Defendant's account came from" (Op. Br. at 47; *see also* Op. Br. at 46). He does

not, however, contest the veracity of the custodian's certification itself. Thus, because Alvarez does not contest the specific facts contained in the certification—that the attached financial reports were the records of the Bureau of Prisons—any error in admitting the certification had no effect on the jury's verdict and was harmless beyond a reasonable doubt. *See United States v. Jimenez*, 513 F.3d 62, 80 (3d Cir. 2008) (even if sworn declarations of bank employees were testimonial and subject to Confrontation Clause, admission of such declarations to lay foundation for bank records, which were introduced as business records, was harmless in bank fraud prosecution where defendants did not contest validity of statements in declarations, declarations merely stated bank statements were made at or near time of occurrence of matters contained in statements, that statements were kept in course of regularly conducted activity of bank, and that duplicates were accurate copies). Moreover, Agent Mikeska acknowledged during her own testimony that the bank records did not establish the true identity of the sender or the source of the funds, but merely recorded any available information provided by the sender on the money order itself (10 R. 297-98; 11 R. 88, 105-07; 12 R. 7-9). Thus, even if the custodian had personal knowledge of the facts Alvarez intended to elicit, any testimony the custodian might provide regarding the source of the deposits would be cumulative and would have no effect on the jury's verdict. Accordingly, as the admission of the documents did not

87

violate the Confrontation Clause and, even if it did, any resulting error was harmless, the district court did not err in admitting the bank records and summary document based on the affidavit. This Court should reject Alvarez's claim on this point.

## VI. HERRERA FAILED TO ADEQUATELY BRIEF, AND THEREFORE WAIVED, ANY CHALLENGE RELATING TO THE ADMISSION OF UNSPECIFIED EXHIBITS.

(Herrera Issue 2, Op. Br. at 26-35)

### A.    Standard of Review

Generally, this Court reviews a district court's evidentiary ruling for abuse of discretion. *United States v. Burns*, 162 F.3d 840, 852 (5th Cir. 1998). "A trial court abuses its discretion when its ruling is based on an erroneous view of the law or a clearly erroneous assessment of the evidence." *United States v. Yanez -Sosa*, 513 F.3d 194, 200 (5th Cir. 2008) (internal quotation marks omitted). However, where a defendant fails to object to the admission of evidence in the district court, his claim is reviewed for plain error only. *United States v. Garcia-Flores*, 246 F.3d 451, 457 (5th Cir. 2001); *United States v. Cardenas Alvarado*, 806 F.2d 566, 573 (5th Cir. 1986).

### B.    Relevant Facts

On appeal, Herrera challenges the district court's admission of unspecified "numerous and voluminous evidence," including unidentified audio recordings and

letters admitted at trial (Op. Br. at 27). Although he does not cite any specific infirmities with the admission of these unspecified exhibits, he generally claims that they were all admitted "based on improper foundation," or "without proper language translation" (*id.*). However, because his argument has been inadequately briefed, the government is unable to respond to his allegations. Accordingly, Herrera has waived any challenge to the admission of these unspecified exhibits on appeal.

Where a defendant makes conclusory allegations of unspecified error, this Court will consider his brief inadequate and his arguments abandoned. *See Yohey v. Collins,* 985 F.2d 222, 224-25 (5th Cir. 1993). In this case, the district court admitted more than 300 exhibits in Herrera's month-long trial, many of which constitute audio recordings or translated documents. On appeal, Herrera makes a general claim that "many of" these documents were admitted "based on improper foundation," or "without proper language translation" (*id.*; *see also* Op. Br. at 32 ("Many of the letters and intercepts in this case were . . . without any foundation"). Aside from this general claim, however, Herrera fails to specify the exhibits he references or their specific purported foundational infirmities. Indeed, the record citations he provides in the body of his brief refer to exhibits that were never admitted at trial (*see* Op. Br. at 27, *citing* 7 R. 88-91), or to exhibits for which the objection below was based on a ground other than foundation or, contrary to his claim on appeal, where no objection

was made below (*see* Op. Br. at 26-27). The Government is therefore unable to respond to this portion of Herrera's argument, and it should be deemed waived for his failure to adequately brief it. *See United States v. Avants*, 367 F.3d 433, 442 (5th Cir. 2004).

Alternatively, Herrera has not shown that the district court abused its discretion in admitting any trial exhibits. With respect to the recorded phone calls in this case, the court did not abuse its discretion or plainly err in finding that the government established a sufficient foundation for their admission (*see, e.g.*, 4 R. 110-17 (discussing Exhibits 314, 316, 318, & 320, relating to the Title III intercepts of co-conspirator Danny Tarin); 5 R. 112-14, 127; 7 R. 203-09, 222-27, 242; 8 R. 9-10, 23-24, 27-28 (discussing 196, 210, 211, 248, 330, relating to Alvarez's and Cardoza's prison phone calls); 7 R. 14-19 (Exhibit 325); 8 R. 13-16 (Exhibit 258, relating to Cardoza's prison conversations with Mona); 10 R. 92-93 (Exhibit 222); 5 R. 142, 158-59 (Exhibit 198); 9 R. 205-06 (Exhibit 304, relating to Enriquez's confession). *See* Fed. R. Evid. 901 (requirement of authentication "is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims," including from testimony of a witness with knowledge or, for identifying a voice, an "opinion based upon hearing the voice at any time under circumstances

connecting it with the alleged speaker"); *United States v. Lance*, 853 F.2d 1177, 1181 (5th Cir. 1988).

Additionally, Herrera has not demonstrated that the admission of English-language translations of BA-coded and Spanish-language letters and phone conversations was an abuse of the court's discretion or plainly erroneous. For instance, FBI Special Agent Enrique Corral testified that he speaks Spanish, that he listened to the recorded conversations of Danny Tarin, and that the transcripts accurately reflected the recordings (*see* 4 R. 111-17).[107] Additionally, the record shows that El Paso Police Officer Andres Sanchez, who interpreted the BA code in many of the letters and audio conversations admitted at trial, was proficient in interpreting BA code and Spanish (7 R. 174-80; *see also* 7 R. 216-18, 245-48; 8 R. 19-30). Sanchez further testified that he listened to the audio recordings, and that the transcripts accurately reflected those recordings (*see* 7 R. 204-05, 222-23, 225-26, 227; 8 R. 13-14, 25-26 (relating to Exhibits 196, 211, 248, 258, & 330). During his testimony, Sanchez also provided English-language translations of several coded BA letters (*see, e.g.*, 8 R. 31-32 (Exhibit 39)). Other witnesses, including BA members, testified that other English-language transcripts accurately reflected their audio

---

[107] The defendants collectively objected to the admission of this evidence on relevance grounds, not foundational grounds (*see* 4 R. 116-22).

91

recordings (*see, e.g.*, 5 R. 142-43 (Exhibit 198); 7 R. 16-17 (Exhibit 325); 9 R. 206 (Exhibit 304); 10 R. 92 (Exhibit 222)). This testimony satisfies the government's burden of producing evidence that is "sufficient to support a finding that the matter in question is what its proponent claims." Fed. R. Evid. 901(a). Moreover, when various defense counsel raised objections to the translation of certain exhibits, the court invariably overruled the objections on this ground, but permitted defense counsel to cross-examine the proponent on his translation (*see, e.g.*, 4 R. 123-24).[108] Accordingly, should this Court hold that Herrera properly raised his challenge to the admission of evidence, the district court did not abuse its discretion or plainly err in finding there was proper foundation for admitting the transcripts and translations.

### VII. THE DISTRICT COURT PROPERLY DENIED ENRIQUEZ'S MOTION TO SUPPRESS HIS PRE-ARREST STATEMENTS AFTER FINDING THAT ENRIQUEZ WAS NOT IN CUSTODY WHEN QUESTIONED AND THAT HIS STATEMENT TO DETECTIVES WAS VOLUNTARILY MADE.

(Enriquez Issue 2, Op. Br. at 24-33)

**A.    Standard of Review**

In reviewing a ruling on a motion to suppress, the district court's legal conclusions are reviewed de novo; its factual findings, only for clear error, viewing

---

[108] The government trial attorney noted that all defendants, including Herrera, received the audio recordings and their English-language translations before trial "since the first time we gave out the bulk discovery" (4 R. 124).

the evidence in the light most favorable to the prevailing party. *United States v. Charles*, 469 F.3d 402, 405 (5th Cir. 2006). A factual finding by the district court is clearly erroneous only if, based on our review of the entire record, we are "left with the definite and firm conviction that a mistake has been committed." *Anderson v. Sch. Bd. of Madison County*, 517 F.3d 292, 296 (5th Cir. 2008) (citation and internal quotation marks omitted)."Where a district court's denial of a suppression motion is based on live oral testimony, the clearly erroneous standard is particularly strong because the judge had the opportunity to observe the demeanor of the witness." *United States v. Santiago*, 410 F.3d 193, 197 (5th Cir. 2005).

## B.    Facts Relating to the Suppression Issue

On December 6, 2006, drug dealer Jose Luis Oviedo was murdered in his apartment on Frutas Street in El Paso (18 R. 4-5). Through their investigation, police learned that a BA member named Adam "Serio" Munoz was involved (18 R. 5). Police also learned from Munoz's cell phone records that Munoz had contacted a landline telephone number on Park Street before and after the murder (*id.*).

On December 21, 2006, after learning that Enriquez resided at the Park Street address, El Paso Police Detective Yvette Nevarez and her partner, Detective Ramon

Sanchez, went to his home (18 R. 5-7).[109] Nevarez advised Enriquez that she was investigating a murder on Frutas Street and asked Enriquez if he would accompany the detectives to police headquarters to answer some questions (18 R. 8, 45). Enriquez agreed (*id.*).

Once they arrived at headquarters, Enriquez was *Mirandized*, but not handcuffed or searched (18 R. 8, 26-27, 28).[110] During the less-than-one-hour interview, Enriquez denied having any knowledge about the murder and claimed that a neighbor received the phone call placed to his landline from Munoz's cell phone number (18 R. 9, 10). The detectives then drove Enriquez back to his home (*id.*).

After further investigation, Detectives Nevarez sought to interview Enriquez again, believing he had more information than initially provided (18 R. 11, 44-45). On January 8, 2007, Detectives Nevarez and Sanchez met Enriquez at his work site and asked him to accompany them to police headquarters for more questioning (18 R. 11, 12). Enriquez "was more than willing to go" (18 R. 12).

---

[109] Before arriving at his home, Detective Nevarez called Enriquez and told him she was investigating a case and needed to speak with him (18 R. 6). She did not provide any additional details about the case over the phone (*id.*).

[110] Detective Nevarez testified that she takes criminal suspects into custody, the suspects are thoroughly searched for weapons and drug paraphernalia, and their property is removed and placed in a bag (18 R. 3, 25). The suspect is then handcuffed (18 R. 4). When those suspected of involvement in criminal activity are questioned, but not taken into custody, police simply ask them if they have any weapons, but do not otherwise search them or inventory their property (*id.*). In all cases, both custodial and non-custodial, the interviewees are *Mirandized* (18 R. 4, 25).

94

After arriving at police headquarters, Nevarez read Enriquez his *Miranda* rights for a second time (18 R. 12, 13, 45). However, Enriquez was assured he was not under arrest, and he was neither handcuffed nor searched (18 R. 14-15, 36, 46, 50). Without providing any specific information or going into much detail, the detectives informed Enriquez that they had gained additional information inculpating him in the murder (18 R. 13-14, 35). Enriquez "put his head down" and agreed to make a statement (18 R. 14). The detectives then informed Enriquez that they would begin recording the interview (18 R. 14, 48).[111]

Following the start of the recording, the detectives read Enriquez his *Miranda* rights in both English and Spanish (18 R. 15-16, 37, 45).[112] Enriquez then signed an acknowledgment that he received those rights, and offered a statement (18 R. 16-18). The recorded interview lasted less than 35 minutes, for a total interview time of less than 50 minutes (18 R. 21-22, 37-38). Following the interview, the detectives drove Enriquez back to his home (18 R. 22). Enriquez was never arrested by the detectives,

---

[111] Detective Nevarez testified that the period of time she and Detective Sanchez spoke with Enriquez before the recorded interview began "[c]ouldn't have been more than 10 or 15 minutes" (18 R. 14; *see also* 18 R. 44 (related testimony of Detective Sanchez)).

[112] The detectives spoke with Enriquez in English, and Enriquez spoke English during his testimony at the suppression hearing (*see* 1 ER. 202 n.2; 18 R. 49). Additionally, Enriquez did not require the assistance of an interpreter at trial (3 R. 105-06).

nor did the El Paso District Attorney's Office proceed with any charges (18 R. 38, 51).

On January 9, 2008, a year after his interview with El Paso police detectives, Enriquez was indicted in this case. On August 22, 2008, Enriquez filed a motion to suppress his pre-arrest statement to Detectives Nevarez and Sanchez, claiming that his statement was non-consensual in violation of the Fifth Amendment privilege against self-incrimination and involuntary in violation of the Due Process Clause (1 ER. 133-39). The government filed a response (1 ER. 150-59).

On September 9, 2008, the district court held a hearing on the motion (18 R.). In addition to the facts described above, Detective Sanchez testified that he told Enriquez that Enriquez was a witness (18 R. 51). Detective Sanchez denied that he ever told Enriquez that, if Enriquez provided a statement, he would likely not be arrested (*id.*). Detective Nevarez confirmed this account (18 R. 22, 36).

Enriquez testified during the suppression hearing that he only agreed to answer questions on December 21, 2006, because the detectives, "with a badge and a gun on the side," told him that he "needed to go with them" (18 R. 54). On January 8, 2007, Enriquez claimed that the detectives, again, arrived at his home, told him "to get in the [police] car with them, because they needed to talk to me," and began asking questions as soon as Enriquez got in the car (18 R. 55, 56). During this conversation

96

in the car, Enriquez stated that Detective Sanchez, "guarantee[d] me if I would cooperate with him, I wouldn't be doing no time" (18 R. 56, 58, 60, 67).

Although Enriquez admitted that the detectives read the *Miranda* card to him at police headquarters, he claimed he did not understand when they read it in either English or Spanish (18 R. 56-57). Enriquez also claimed that he did not understand his *Miranda* rights and, despite ten prior arrests, had never been read his *Miranda* rights in the past (18 R. 57, 59, 66). He further denied that he signed the *Miranda* card produced by the government (18 R. 59, 61-62). Though he claimed he asked the detectives whether he was under arrest "two or three times," Enriquez stated that he did not believe he was free to leave the interview (18 R. 58).

On September 30, 2007, the court denied the Enriquez's motion in a written order, finding that Enriquez was not in custody at the time of his questioning, and that he had not shown that his will was overborne to the extent that his pre-arrest statements were involuntarily made as would constitute a coerced confession (1 ER. 201-08). Specifically, with respect to his Fifth Amendment claim, the court found that Enriquez voluntarily accompanied the detectives to police headquarters (1 ER. 206). He was assured on multiple occasions that he was not under arrest, was never patted down or searched, and none of his property was taken from him (*id.*). Moreover, the court found that Enriquez's total combined interview time—including travel

time—was less than two hours, split between two separate meetings, "a time span that could hardly lead a reasonable person to believe he was under arrest" (*id.*). Finally, the court found Enriquez's subjective beliefs about his custody status and understanding of his *Miranda* rights "lack[ed] credibility," in light of his ten prior arrests (1 ER. 206 n.7). Accordingly, because "the objective circumstances mitigate in favor of finding that [Enriquez] was not in custody, as he was neither formally arrested nor was his freedom restrained in any away associated with formal arrest," the district court found *Miranda* inapplicable to the case and that Enriquez's Fifth Amendment rights had not been violated (1 ER. 206-07).

With respect to his voluntariness claim, the court similarly found that, "given the totality of circumstances, [Enriquez]'s pre-arrest statements could hardly be considered coerced in the sense that his will was overborne" (1 ER. 208). Specifically, the court cited the short duration of the interviews, the fact that Enriquez was read his rights multiple times and assured he was not under arrest, and the incredible testimony of Enriquez at the suppression hearing, during which he claimed for the first time that Detective Sanchez specifically "guaranteed" Enriquez that he would not serve any time if he cooperated (1 ER. 207-08). Accordingly, the court found, Enriquez's pre-arrest statements were voluntarily given and not coerced and, thus, his Due Process rights were not violated (1 ER. 208).

C.    **Legal Argument**

On appeal, the Enriquez claims the district court erroneously denied his suppression motion, arguing, as his did below, that his pre-arrest statement was non-consensual in violation of his Fifth Amendment privilege against self-incrimination and involuntary in violation of his right to fundamental fairness under the Due Process (Op. Br. at 24-33). His claim is meritless. The district court did not clearly err in finding that Enriquez was not in custody at the time of his questioning, and that his statement to detectives was voluntarily given.

1.    Enriquez was not in custody at the time he made his statement.

The Fifth Amendment protects a defendant's privilege against self-incrimination and prohibits the prosecution from using statements "stemming from custodial interrogation . . . unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Miranda v. Arizona*, 384 U.S. 436, 444(1966). However, *Miranda*'s procedural safeguards attach "only where there has been such a restriction on a person's freedom as to render him 'in custody.'" *Stansbury v. California*, 511 U.S. 318, 322 (1994).

To determine whether an individual was "in custody," thereby invoking the protections of the Fifth Amendment, a court must "examine all of the circumstances

surrounding the interrogation, but ultimately ask 'whether there [was] a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *Id.* In answering this question, the court must examine how a reasonable person in the suspect's position would have understood the situation; the subjective intent of the officer and the defendant is not relevant to the custody determination. *See United States v. Bengivenga*, 845 F.2d 593, 596-97 (5th Cir. 1988). Neither a defendant's presence in a station house nor his status as a suspect at the time of questioning dictates a finding that a defendant was "in custody." *California v. Beheler*, 463 U.S. 1121, 1125 (1983).

In this case, the district court properly determined that Enriquez was not "in custody" the meaning of *Miranda* when he was questioned by detectives. Enriquez willingly agreed to accompany the detectives to police headquarters to answer questions. He was informed on several occasions that he was not under arrest, but that he was a witness to the murder investigation. Enriquez was not handcuffed or searched, nor was his property inventoried. The detectives did not threaten or physically restrain his freedom of movement in any way. Finally, Enriquez met with the detectives for a combined total of less than one hour and fifty minutes, including travel time, split between two separate meetings, "a time span that could hardly lead a reasonable person to believe he was under arrest" (1 ER. 206). During his second

interview, Enriquez agreed to make his recorded statement only 10 to 15 minutes after his conversation with detectives began. Under these circumstances, Enriquez was not in custody at the time detectives questioned him about his knowledge about the murder. *See Oregon v. Mathiason*, 429 U.S. 492, 495 (1977) (holding that a suspect was not in custody where suspect voluntarily came to patrol office after officer requested a meeting, officer advised defendant that he wanted to talk about a burglary and that he believed the suspect was involved, suspect spoke with officer for half an hour, and at end of interview, suspect was released to leave); *United States v. Collins*, 972 F.2d 1385, 1405 (5th Cir. 1992) (defendant not "in custody" where he was told he was not under arrest and was free to leave, was not arrested at end of interview, and only restraint experienced was when agents searched his person). Therefore, the detectives' questioning did not constitute a custodial interrogation and did not invoke the protections of the Fifth Amendment privilege against self-incrimination.[113]

---

[113] Even if this Court were to find that Enriquez was in custody for *Miranda* purposes, the record also demonstrates that Enriquez knowingly and voluntarily waived his *Miranda* rights before he made his statement to detectives. As the district court found, "Detectives Nevarez and Sanchez exhibited great caution . . . in ensuring that Defendant understood his rights" (1 ER. 206 n.7), *Mirandizing* Enriquez each time they questioned him and taking care to memorialize the *Miranda* warning—and his acknowledgment of his rights—on a recorded video (*see* Ex. 204). Moreover, the court found that Enriquez's contention that he did not understand his rights "lack[ed] credibility" in light of his ten prior arrests (1 ER. 206 n.7).

2.    <u>Enriquez's statement was voluntary.</u>

Next, Enriquez argues that his statement to police was involuntary (Op. Br. at 28). Specifically, he suggests that he "was detained for a period of time long before the interrogation that was recorded," and that he "was promised that if he provided a statement then he would likely not be arrested" (Op. Br. at 31). His argument is without merit. The district court did not clearly err in finding that his statement was voluntary.

Even where a defendant is not in "custody," for Miranda purposes, a confession still might be coerced in violation of the fundamental fairness guaranteed by the Due Process Clause where, under the totality of circumstances, "a defendant's will was overborne in a particular case." *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973); *see also Nenno v. Quarterman*, 489 F.3d 214, 216-17 (5th Cir. 2007) (non-custodial confessions evaluated under Due Process Clause for fundamental fairness). The government satisfies its burden of proving the voluntariness of a confession if it demonstrates that, "under the totality of the circumstances, the statement is the product of the accused's free and rational choice." *United States v. Broussard,* 80 F.3d 1025, 1033 (5th Cir. 1996). The focus of this Court's voluntariness inquiry must be on the police actions, as "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process

Clause of the Fourteenth Amendment." *Colorado v. Connelly,* 479 U.S. 157, 167 (1986). Moreover, that coercive conduct must cause the confession. *Id.* at 164.

In this case, the record supports the district court's finding that Enriquez's statement was voluntarily given and not coerced. Enriquez agreed to speak with detectives about the murder. As the district court observed, the defendant then met with Detectives Nevarez and Sanchez for a total of no more than one hour and fifty minutes over the course of two meetings, one month apart. The defendant was read his Miranda rights four times in that time period, and assured that he was not under arrest, but just a witness. The detectives wore plain clothes, did not brandish or display their firearms, did not use any violence, and plainly informed the defendant that they were investigating the murder on Frutas Street. Although the defendant claimed for the first time during the suppression hearing, contrary to both detectives' testimony, that he was expressly "guaranteed" he would not serve any time if he cooperated, the district court reasonably rejected this testimony as incredible, particularly given the absence of this crucial allegation in Enriquez's suppression motion. Accordingly, the district court did not clearly err in its finding that the defendant's confession, under the totality of circumstances, was voluntarily made. The suppression motion was properly denied and the Court should reject Enriquez's argument on this point.

# VIII. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION WHEN IT DENIED ENRIQUEZ'S MOTION FOR SEVERANCE PURSUANT TO FEDERAL RULE OF CRIMINAL PROCEDURE 14.

(Enriquez Issue 3, Op. Br. at 34-39)

## A. Standard of Review

This Court reviews a denial of a Rule 14 motion for an abuse of discretion. See *United States v. Restrepo,* 994 F.2d 173 (5th Cir. 1993); *United States v. Toro,* 840 F.2d 1221 (5th Cir. 1988).

## B. Facts Relating to Severance

On January 9, 2008, the grand jury returned an 11-count indictment against Enriquez and 15 co-defendants. The indictment charged various RICO and controlled substance violations that occurred between January 1, 2003, and January 9, 2008, as part of the BA criminal enterprise. Enriquez was personally named in three counts of the indictment, including a Hobbs Act conspiracy, a drug trafficking conspiracy, and murder in aid of racketeering charge.

On August 22, 2008, Enriquez filed a motion for severance, claiming that irreconcilable differences existed between himself and his co-defendants; that the evidence against his co-defendants would create a "spill-over" effect; that his Sixth Amendment right to confront and cross-examine witnesses will be infringed by the introduction of inculpating evidence; and that the evidence against him was *de*

104

*minimis* compared to the evidence against his co-defendants (*see* 1 ER. 129-31). The government filed a response, arguing that the joinder of all 15 defendants was proper and that Enriquez had not satisfied his burden of proving severance was warranted under any of the cited grounds (1 ER. 140-46).

On September 15, 2008, the district court denied Enriquez's motion in a written order, finding that Enriquez "failed to satisfy his burden of proving that any potential harm as to his four (4) arguments outweighs the interest of judicial economy in holding a joint trial on this RICO case" (1 ER. 177-84). Specifically, the court found that Enriquez "failed to show the substance of any possible co-defendant's testimony and whether that co-defendant would actually testify at a separate trial"; failed to show how the three counts for which he was indicted were separate and distinct from the remaining eight; failed to establish that the redaction of identifiers in Co-Defendant Eric Saucedo's statements would still violate his Sixth Amendment rights;[114] and "failed to show that his *de minimis* argument is no more than a quantitative disparity argument that cannot justify a severance" (1 ER. 184). Thus, the court found, "Enriquez has failed to establish that he would suffer compelling prejudice that outweighs the interest of judicial economy" (*id.*).

---

[114] As noted above, Eric Saucedo pleaded guilty and testified at trial.

## C.    Legal Argument

On appeal, Enriquez argues that the district court erred in refusing to sever his trial from that of his co-defendants. His argument should be rejected. The district court did not abuse its discretion in declining to require the government to try Enriquez separately as he has failed to demonstrate any "specific and compelling prejudice" resulting in an unfair trial required for reversal.

Rule 14 of the Federal Rules of Criminal Procedure permits a district court to order that a properly-joined defendant be tried separately from his co-defendant. *See* Fed. R. Crim. P. 14(a). However, the federal judicial system favors joint trials of defendants who are indicted together, in the interest of both efficiency and to "avoid . . . the inequity of inconsistent verdicts." *Zafiro v. United States*, 506 U.S. 534, 537 (1993). This is particularly true in cases, like this one, in which the charged offense is a conspiracy. *See United States v. Simmons*, 374 F.3d 313, 317 (5th Cir. 2004); *United States v. Neal*, 27 F.3d 1035, 1045 (5th Cir. 1994).

Moreover, severance is not required in every case in which prejudice to a defendant would result from a joint trial."[I]t is well settled that defendants are not entitled to severance merely because they may have a better chance of acquittal in separate trials." *Zafiro*, 506 U.S. 540 (citations omitted). Instead, a court should exercise its discretion under Federal Rule of Criminal Procedure 14 to grant separate

106

trials "only if there is a *serious* risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro,* 506 U.S. at 539 (emphasis added); *see also United States v. Bermea,* 30 F.3d 1539, 1572 (5th Cir. 1994). Accordingly, this Court has held that in order to demonstrate that a district court abused its discretion in declining to grant a separate trial, the defendant must show that: (1) the joint trial prejudiced him to such an extent that the district court could not provide adequate protection; and (2) the prejudice outweighed the government's interest in economy of judicial administration. *United States v. Peterson*, 244 F.3d 285, 393 (5th Cir. 2001); *see also United States v. McGuire*, 608 F.2d 1028, 1031 (5th Cir. 1979) (noting that a court's balance of potential prejudice against the interest in judicial economy is "a consideration involving substantial discretion").

Enriquez first argues, as he did below, that "irreconcilable differences" existed between himself and his co-defendants, such that he was prevented from soliciting "exculpatory evidence" from his co-defendants that "would have been available to [him] in a separate trial" (Op. Br. at 35-36). The district court properly denied his motion on the ground (*see* 1 ER. 179-80). Significantly, both below and on appeal, Enriquez does not identify this "exculpatory evidence" other than mere conclusory speculation, nor has he identified which of his three non-testifying co-defendants

would have actually provided such "evidence" had he been tried separately.[115]

Accordingly, although a defendant might suffer prejudice where "essential exculpatory evidence that would be available to [him] tried alone were unavailable in a joint trial," *Zafiro*, 506 U.S. at 538-39, Enriquez has wholly failed to meet his burden of proving a "bona fide need for the co-defendant's testimony, the substance of the testimony, the exculpatory nature and effect of the testimony, and that the co-defendant would in fact testify." *Neal*, 27 F.3d at 1047; *see also United States v. Nguyen*, 493 F.3d 613, 616 (5th Cir. 2007) (requiring an affidavit from the alleged testifying co-defendant); *United States v. Sparks*, 2 F.3d 574, 583 & n. 10 (5th Cir. 1993) (mere assertions that codefendants would testify for a defendant if severance is granted do not establish grounds for severance). Accordingly, his claim on this ground fails.

Enriquez next argues that severance was warranted because he suffered prejudicial "spillover" from evidence offered to prove the eight counts with which he was not charged (Op. Br. at 36-37). As "[a] defendant raising a claim of prejudicial spillover," Enriquez "bears an extremely heavy burden" of showing that the jury would be prevented from making a reliable judgment. *See United States v. Friedman,*

---

[115] Enriquez did not cross-examine his two co-defendants, Mona and Herrera, who elected to testify at trial (*see* 13 R. 42, 184).

854 F.2d 535, 563 (2d Cir. 1988). "[T]he mere presence of a spillover effect does not ordinarily warrant severance." *United States v. Pofahl*, 990 F.2d 1456, 1483 (5th Cir. 1993). Moreover, although there exists an increase in the risk of prejudice when co-defendants have "markedly different degrees of culpability," *Zafiro*, 506 U.S. at 539, "a quantitative disparity in the evidence 'is clearly insufficient in itself to justify severance.'" *Neal*, 27 F.3d at 1045, *quoting United States v. Harrelson*, 754 F.2d 1153, 1175 (5th Cir. 1985).

In this case, Enriquez was named in three of the 11 counts, which included allegations that he, as a BA member, conspired to extort drug dealers with violence and threats of violence (Count 3); conspired with BA members to traffic heroin, cocaine, and marijuana (Count 5); and committed murder to aid the BA's racketeering activities (Count 11). As the district court found, these three counts "were substantially interrelated to the acts [that] led to the Indictment" of his five other co-defendants, as Enriquez was alleged to have "adhered to a behavioral protocol for the advancement of the Barrio Azteca criminal enterprise" (1 ER. 181).[116]

---

[116] None of the cases Enriquez cites in his Opening Brief support his argument that his trial should have been severed due to the risk of spillover prejudice from evidence offered against the RICO defendants. For instance, he cites *United States v. Cortinas*, 142 F.3d 242 (5th Cir. 1998), a conspiracy case involving the Bandido Motorcyle Gang, for the purported proposition that he was "substantially prejudice[d]" by the violent criminal activities of his co-defendants. However, severance was required in *Cortinas* because the defendants had ended their involvement in the alleged conspiracy before the Bandidos became involved, and
(continued...)

Moreover, the district court properly instructed the jury to limit its consideration of evidence to the appropriate defendant (1 PR. 344-45). *See United States v. Bermea,* 30 F.3d 1539, 1572 (5th Cir. 1994) ("Any prejudice created by a joint trial can generally be cured through careful jury instructions."). The jury is presumed to have followed its instruction. *Pofahl*, 990 F.2d at 1483, *quoting Zafiro*, 506 U.S. at 540. Indeed, the jury in this case actually acquitted Enriquez of Count 11, demonstrating its ability to separate the evidence and properly apply it only to those against whom it was offered. *Compare Neal*, 27 F.3d at 1045. Thus, the defendant has not demonstrated how the district court abused its discretion by declining to sever Enriquez's case on this ground.

Finally, Enriquez argues that the evidence against him, in relation to his co-defendants, was *di minimis* and warranted a severance (Op. Br. at 38). As noted above, a quantitative disparity in evidence does not justify a severance in this Circuit. *Neal*, 27 F.3d at 1045. Furthermore, the evidence against Enriquez at trial included a videotaped confession of him admitting he went to murder victim Jose Oviedo's home with Munoz to collect *cuota*. As the district court found, this act was

---

[116] (...continued)

therefore the evidence was highly prejudicial and irrelevant. *Id.* at 248. In contrast, in this case, Enriquez was involved in the criminal activities contemporaneously with the RICO defendants, and evidence of their activities is relevant to charges against him. *See United States v. Fernandez*, 559 F.3d 303, 317 (5th Cir. 2009) (distinguishing *Cortinas* on similar grounds).

"inextricably intertwined" with the other allegations in the indictment (1 ER. 183).

As such, the defendant failed to meet his burden of proving that any potential

prejudice outweighed the strong interest in a joint trial. Accordingly, he failed to

demonstrate that the district court abused its discretion in refusing to order that he be

separately tried and this Court should reject his argument on this ground. [117]

---

[117] Enriquez also cursorily argues that the admission of unspecified out-of-court statements violated his Sixth Amendment right to confront and cross-examine a witness (Op. Br. at 37-38). His argument on this point is bewildering. Below, Enriquez argued that the admission of Co-Defendant Eric Saucedo's statement, which he claimed inculpated him, violated his Confrontation rights. The district court appropriately found that any inculpatory reference to Enriquez in Saucedo's statement could be redacted in accordance with the requirements set forth in *Bruton v. United States*, 391 U.S. 123 (1968) (1 ER. 181-82). *See Richardson v. Marsh*, 481 U.S. 200, 208-09 (1987). However, not only did Saucedo's out-of-court statement not implicate Enriquez (*see, e.g.*, 9 R. 91-94, 136, 157-58, 163), but Saucedo ultimately testified at trial and was subject to cross-examination. As the defendant appears to concede (Op. Br. at 38), no other out-of-court statement inculpating Enriquez was made by any other co-defendant, making any further redactions unnecessary.

# IX. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION BY IMPLEMENTING SEVERAL JUROR ANONYMITY MEASURES, INCLUDING WITHHOLDING SOME IDENTIFYING JUROR INFORMATION AND ORDERING THE U.S. MARSHALS TO PROVIDE SECURE OFF-SITE JUROR PARKING AND TRANSPORTATION TO THE JURORS BETWEEN THE OFFSITE PARKING AND THE COURTHOUSE.

(Perea Issue 2, Op. Br. at 11-16; Cardoza Issue 1, Op. Br. at 15-20; Alvarez Issue V, Op. Br. at 39-43)

## A.    Standard of Review

A district court's decision to empanel an anonymous jury is reviewed for abuse of discretion. *United States v. Edwards*, 303 F.3d 606, 613 (5th Cir. 2002); *United States v. Krout*, 66 F.3d 1420, 1426 (5th Cir. 1995). Similarly, a court's implementation of security measures is reviewed for abuse of discretion. *See United States v. Nicholson*, 846 F.3d 277, 279 (5th Cir. 1988).

## B.    Facts Relating to the Jury Anonymity Measures Implemented by the District Court

As noted above, this case involved a multi-count indictment charging the defendants with multiple RICO violations, crimes of violence in furtherance of their racketeering activities, a drug trafficking conspiracy, and money laundering, all committed by the highly-regimented Barrio Azteca prison gang from 2003 to 2008. Although Perea, Cardoza, and Alvarez were in prison for the duration of the conspiracy, the indictment alleged that all three men, as the top-ranking BA members,

112

directed the BA's illegal activities—including murders and extortion—from their prison perches. Additionally, the indictment alleged the BA's connections with a powerful Mexican drug cartel, headquartered directly across the border from El Paso.

On October 8, 2008, the district court issued a *sua sponte* order directing that the selected jury remain anonymous and that the U.S. Marshals Service provide secure off-site juror parking and transportation to the jurors between the off-site parking and the courthouse (*see* 1 PR. 168-70). In its order, the court explained that "numerous" defendants in the case were charged with "extortion, money laundering, importation and distribution of controlled substances, and murder" (1 PR. 168). Due to the nature of the case, "as well as the probability of greater than usual media attention," the district court expressed its concerns "for the safety and privacy of the jurors before, during, and after the conduct of the trial, as well as for their continued objectivity." Accordingly, the court ordered that the "additional procedures should be adopted to assist the jury in performing its duties" (*id.*).

The district court also issued a proposed jury questionnaire and solicited from counsel "objections, suggestions, or comments" regarding the questionnaire (1 PR. 216-23). The questionnaire required the venire to provide the court with general biographical information, including age, ethnic background, marital status, city of residence, length of residence, home ownership, English proficiency, family make-up,

memberships and affiliations, prior military service, occupation and the nature of employment, general employment duties, education, training, prior jury experience, law enforcement affiliation, and criminal history (*id.*). The questionnaire also requested more specific information about the prospective jurors' (and their family members') prior gang affiliations or incarcerations, prior gang-related crime victimization, knowledge of the BA, and exposure to information about this case and the degree of that exposure (*id.*). The questionnaire did not request the venire members' names, residential addresses, or employers (*id.*). The government soon filed a response, requesting that the government also voir dire the venire about their Spanish-language proficiency (1 PR. 224-25). No defendant submitted any pleading regarding the questionnaire.

At the status conference on October 31, 2008, the defendants objected to the court's *sua sponte* order, noting the prejudicial nature of the "additional procedures" and its effect on their exercise of peremptory challenges (see 2 R. 40-49). While the court agreed to disclose the prospective jurors' "part of town" of residence, it otherwise overruled the defendants' objections (2 R. 42-43, 47, 49). The court explained that it felt the order was implemented "not necessarily for [the jury's] safety," but because it wanted the jurors "to feel safe about serving . . . nobody is

going to know who they are when they come back with a verdict or where they can be found" (2 R. 44).

During its voir dire of the jury venire, the district court carefully queried the venire to ensure that no prospective jurors would be influenced by the anonymity and security measures (3 R. 86-88). Moreover, all six defendants were permitted to individually voir dire the venire (3 R. 70-86).

Following the sentencing, all six defendants filed a motion for new trial, claiming that the manner in which the jury was transported to and from the courthouse during the trial was unduly prejudicial (*see, e.g.*, 1 A.R. 1607). The court rejected this argument in a written order (*see* 1 A.R. 1620-22). The court then expounded upon its reasoning for implementing the order:

> Here, the instant case involves a prison gang accused of engaging in organized crime. Indeed, the BA's structure is para-military in nature. Further, while no threat was ever perceived against a juror, undoubtedly the BA, with its extensive ties to the [Juarez drug cartel, *La Linea*] had the capacity to harm jurors. The majority of the defendants faced sentences of life, and the case garnered extensive media coverage as early as the arraignment phase when Defendants were first arrested on the federal charges. This last factor—extensive media coverage—was the factor of most concern to the court. Indeed, before and after impaneling the Jury, the Court expressed a number of times that it had no concern for the safety of the Jury, but that it wanted to ensure the privacy of those who served (1 A.R. 1621).

The court then rejected the defendants' contention that the off-site parking was prejudicial. It explained that the secure, off-site location (Fort Bliss Army Post) was selected over other options based simply on its "central location and proximity to the courthouse," and that, "[a]t no time," did the U.S. Marshals who escorted the jurors by bus "ever display a weapon" (*id.*). Additionally, the court observed that two of the jurors opted not to park at the secure, off-site parking, but arrived at the courthouse via other means (*id.*). Finally, the court explained that it "made repeated assurances to the Jury that the provided transportation was to ensure anonymity and nothing more" (*id.*).

## C.    Legal Argument

On appeal, Perea, Cardoza, and Alvarez challenge the anonymity measures implemented by the district court, namely the court's decision to omit some of the prospective jurors' identifying information and the court's order for the Marshals to provide transportation for the empanelled jurors between a secure, off-site parking site and the courthouse.[118] In light of the facts of this case, the district court's implementation of these jury anonymity measures was not tantamount to an abuse of its discretion.

---

[118] While all the defendants raised objections below, only Perea, Cardoza, and Alvarez have raised the issue in their opening briefs. Thus, Mona, Herrera, and Enriquez have waived the issue on appeal.

116

A court's decision to implement juror anonymity provisions due to its interest in juror protection "must be balanced against the defendant's interest in effective voir dire and the presumption of innocence." *United States v. Edwards*, 303 F.3d 606, 613 (5th Cir. 2002), *citing United States v. Krout*, 66 F.3d 1420, 1427 (5th Cir. 1995). The decision to empanel an anonymous jury is within the discretion of the district court. *United States v. Sanchez*, 74 F.3d 562, 564 (5th Cir. 1996). Factors that may support a district court's decision include: (1) the defendants' involvement in organized crime; (2) the defendants' participation in a group with the capacity to harm jurors; (3) the defendants' past attempts to interfere with the judicial process or witnesses; (4) the potential that, if convicted, the defendants will suffer a lengthy incarceration and substantial monetary penalties; and (5) extensive publicity that could enhance the possibility that jurors' names would become public and expose them to intimidation and harassment. *Krout*, 66 F.3d at 1427.

Although the district court must generally base its decision to implement anonymity measures on "more than mere allegations or inferences of potential risk," such as the indictment and affidavits submitted by the parties, "[a] lesser showing might be adequate where specific evidence exists linking the defendant to organized crime." *Krout*, 66 F.3d at 1427 & n.7. Moreover, in view of the totality of the circumstances, the district court must "make a sensitive appraisal of the climate

117

surrounding a trial and a prediction as to the potential security or publicity problems that may arise during the proceeding." *United States v. Branch*, 91 F.3d 699, 723-24 (5th Cir. 1996) Ultimately, "the use of anonymous juries will be upheld where evidence at trial supports the conclusion that anonymity was warranted." *Id.*; *Edwards*, 303 F.3d at 613.

In this case, as the district court found, the circumstances surrounding the case supported the implementation of juror anonymity provisions. First and most importantly, this case involves the "the paradigmatic situation justifying an anonymous jury." *Edwards*, 303 F.3d at 613. According to the indictment and the trial testimony, Perea, Cardoza, and Alvarez were the highest-ranking members of a violent prison gang that engaged in organized crime (*see, e.g.*, 1PR. 412-50). This highly-structured, paramilitary-structured organization has an estimated 3,500 members in the El Paso-Juarez area alone, most of whom have prior criminal convictions (*see* 4 R. 110; 8 R. 125-26; 12 R. 83).[119] *Compare United States v. Darden*, 70 F.3d 1507, 1532-33 (8th Cir. 1995) (anonymity provisions upheld where defendants participated in violent organized criminal enterprise that had "many

---

[119] The Barrio Azteca remains a highly-active criminal organization. In fact, the U.S. Attorney for the Western District of Texas recently announced the indictment of 35 BA members and associates—including Co-Defendant Eduardo Ravelo—for various racketeering charges, including the murder of a U.S. consulate employee. *See United States v. Lopez*, EP:10-CR-02213-KC (W.D. Tex. Mar. 9, 2011) (indictment unsealed).

members and associates who remained at large throughout the trial"). The gang also has extensive ties with a Juarez drug cartel. In this situation, "the safety of the jurors becomes an overriding concern." *Id., citing United States v. Salvatore,* 110 F.3d 1131, 1143-44 (5th Cir. 1997) (upholding anonymous jury in case involving organized crime defendants), *overruled on other grounds by Cleveland v. United States*, 531 U.S. 12 (2000), and *Krout,* 66 F.3d at 1427 (upholding anonymous jury in prosecution of members of Texas "Mexican Mafia"). This is particularly true where all three defendants faced (and received) life sentences, and where the facts at trial showed that Perea directly ordered at least one murder from his prison cell (*see* 7 R. 109-10, 135-36; 8 R. 65-67, 69).

In addition, contrary to the defendants' contentions on appeal, the BA has, indeed, made past attempts to interfere with the judicial process and witnesses. The evidence at trial demonstrated that the BA was well-connected within law enforcement and judicial circles. Special Agent Mikeska explained that the BA had connections within the El Paso Police Department, the El Paso Count Sheriff's Office, the jail, courthouses, and with a variety of other individuals, who would provide them with information (12 R. 116-17). For instance, in addition to having one co-indicted BA associate employed with the Office of the Federal Public Defender (5 R. 116), an El Paso police officer provided information to the BA leadership,

including leaking the identity of the FBI's primary cooperator (10 R. 256-58; 12 R. 18). The evidence at trial also demonstrated that the BA would murder or assault those who cooperated with law enforcement (*see, e.g.*, 6 R. 316-17; 10 R. 229-30, 237, 244; 11 R. 8). *Compare Krout*, 66 F.3d at 1427-28 (upholding jury anonymity provisions where gang "murder[ed] or attempt to murder members suspected of informing authorities," "had been linked to dozens of murders," and "sought to corrupt law enforcement authorities to further their goals").

Finally, the district court reasonably found that the "extensive media coverage" of the case from its inception weighed in favor of juror anonymity provisions (1 A.R. 1621). The record demonstrates the media's substantial interest in the case. Not only was the district court required to take prophylactic efforts to gauge the venire's exposure to this coverage (1 PR. 222), but media reports throughout the trial prompted the court to caution the jury on several occasions to avoid media sources (*see, e.g.*, 5 R. 3-5; 8 R. 8). In fact, the court noted that this extensive media coverage—and its effect on juror privacy—"was the factor of most concern to [it]" (1 A.R. 1621). This Court has previously approved of anonymity provisions under similar circumstances. *See Edwards*, 303 F.3d at 614; *United States v. Branch*, 91 F.3d 699, 723-24 (5th Cir. 1996); *Krout*, 66 F.3d at 1428. Accordingly, in light of

these factors, the court did not abuse its discretion when it implemented anonymity provisions in this case.

In addition to challenging the court's discretionary decision to implement anonymity provisions, the defendants also challenge the degree of these provisions. Specifically, they argue that the non-disclosure of certain identifying information and the transportation of the empanelled jurors between a secure, off-site parking and the courthouse created unfair prejudice and diminished their presumption of innocence. These arguments are without merit. In this case, the court's anonymity measures struck a reasonable balance between the defendants' rights and the protection of the jurors.

First, with respect to the "anonymity" of the jurors, the information withheld from the parties was limited. In referring to such juries as "anonymous," this Court has previously cautioned against "painting with too broad a brush." *Branch*, 91 F.3d at 723. As in *Branch,* the jury here was "anonymous" only "in the most literal sense." *Id.* The parties had access to the venire's "area of town" of residence, type of employment, and the extensive information contained in the detailed questionnaire (*see* 1 PR. 216-23; 2 R. 42-43). In light of this information, "the defendants are hard-pressed in demonstrating that they were prejudiced in any way during voir dire." *Edwards*, 303 F.3d at 614-15.

Second, with respect to the transportation of the jurors between a secure, off-site parking and the courthouse, the court's decision was similarly reasonable under the unique facts of this case. Here, the court found that this measure—along with withholding certain identifying information—would dispel possible fear by jurors for their safety, protect their privacy, and promote impartial verdicts. Several courts have held that similar precautionary steps taken in cases involving allegations of racketeering and violence did not create any undue prejudice. *See United States v. Carson*, 455 F.3d 336, 356 (D.C. Cir. 2006) (remarking that trial court's jury security procedures, including having the U.S. Marshals Service transport jurors to the courthouse from undisclosed locations, are "often taken in cases such as this involving allegations of racketeering, violence and, especially, witness or juror tampering"); *United States v. Darden*, 70 F.3d 1507, 1532-34 (8th Cir. 1995) (upholding assembling jury in secret location and transporting jurors to and from courthouse in U.S. Marshal vans); *United States v. Maldonado-Rivera*, 922 F.2d 934, 971 (2d Cir.1990) (approving of "secure transportation for the jurors to and from court" as well as "substantial numbers of armed guards on the premises"). Moreover, similar to *Krout*, the court permitted two of the jurors to opt out of this arrangement, one of whom simply self-parked at the courthouse each day (1 A.R. 1621). *Compare Krout*, 66 F.3d at 1427 n.5. Indeed, the jury in this case demonstrated that the

122

measures did not undermine its ability to be impartial by acquitting one of the six

defendants of a serious count, and hanging on a separate count for another defendant.

*See Darden*, 70 F.3d at 1534 (security measures did not undermine jury's ability to

be impartial where jury acquitted two if the defendants and carefully selecting which

predicate acts it found to be proven in regard to each of the other seven); *United*

*States v. Paccione*, 949 F.2d 1183, 1193 (2d Cir. 1991) (finding that "the fact that the

jury acquitted each of the defendants on several counts strongly indicates that [the use

of an anonymous jury] did not induce any lack of objectivity"). Accordingly, the court

did not abuse its discretion in implementing these procedures, and the defendants'

arguments on this point should be rejected.

## X. THE DISTRICT COURT PROPERLY DECLINED TO GRANT PEREA'S AND CARDOZA'S REQUEST FOR A NEW TRIAL AFTER DETERMINING THAT NO *BRADY* VIOLATION OCCURRED.

(Perea Issue 1, Op. Br. at 6-11; Cardoza Issue 6, Op. Br. at 40-44)

### A.    Standard of Review

While this Court generally reviews a district court's decision to grant a motion

for a new trial for abuse of discretion, *United States v. Robertson*, 110 F.3d 1113,

1117 (5th Cir. 1997), if the reason for the motion is an alleged *Brady*[120] violation then

this Court reviews the district court's legal determinations de novo. *United States v.*

---

[120] *Brady v. Maryland*, 373 U.S. 83 (1963).

*Martin,* 431 F.3d 846, 850 (5th Cir. 2005). However, because this Court reviews *Brady* claims "'at an inherent disadvantage' because of the cold record, [it] must accord due deference to the trial court's [factual findings] on the alleged *Brady* error." *United States v. Miller*, 520 F.3d 504, 514 (5th Cir. 2008)*, quoting United States v. Sipe,* 388 F.3d 471, 479 (5th Cir. 2004); *see also United States v. Hughes*, 230 F.3d 815, 819 (5th Cir. 2000) (factual findings with respect to *Brady* claims for failure to disclose exculpatory evidence are reviewed for clear error).

## B.    Relevant Facts

Following the sentencing,  Perea, Cardoza, Alvarez, Mona, and Herrera filed a motion for new trial (1 PR. 1599-1604; 1 CR. 1658-62).[121] In their motions, Perea and Cardoza essentially claimed that information contained in their presentence reports concerning the activities of other co-defendants and cooperators was never disclosed to them in discovery, and that this information would have diminished their own guilt at trial and impeached trial witnesses (*see id.*). Specifically, they claimed they never received the information cited in the presentence report about murders ordered by BA members Eduardo Ravelo and Miguel Angel Esqueda, in which they

---

[121] While each defendant filed a separate motion, the district court observed that all the motions asserted identical arguments and sought the same relief (1 AR. 1604 n.1). In fact, the court noted that "many—if not all—of the motions appear to be no more than Defendant Benjamin Alvarez's Motion copied four (4) additional times" (*id.*). Alvarez, Mona, and Herrera have abandoned their claims on this issue on appeal.

claimed two testifying cooperators, Gustavo Gallardo and Gerardo Hernandez, were involved.[122] The probation officer who compiled the report obtained the information contained in those paragraphs from FBI investigative reports provided by the government (1 PR. 1615-19, 1629 & n.3).[123]

The government filed a response (1 PR. 1614-26; *see also* 1 CR. 1674-86). In it, the government explained that it had twice provided copies of those particular FBI investigative reports to defense counsel: before trial began and during trial, at the request of defense counsel (1 PR. 1620-21; *see also* 2 R. 21-24; 6 R. 3-15, 18-19). Moreover, the government argued that the information cited by defense counsel was not *Brady* material (1 PR. 1621-24).

On June 8, 2009, the court denied the motions in a written order (1 PR. 1636-55; 1 CR. 1703-22). First, the court agreed with the government that it had not suppressed any evidence:

Defendants contend that they never received in discovery the information that formed the basis of the PSR. The Government counters

---

[122] Neither Perea nor Cardoza specified the relevant paragraphs in the presentence report. However, Alvarez's motion cited Paragraphs 56, 57, 62, 63, 64, and 65, and Perea's and Cardoza's objections fit within the facts discussed in those paragraphs (*see* 1 PR. 1614-15 & n.2).

[123] Specifically, the information came from various FBI Form 302s, which are documents generated by the FBI whenever an agent questions a cooperating individual (*see* 11 R. 20). In that situation, the Form 302 would summarize the information provided by the cooperator (*id.*).

that Defendants received the 302 reports from which the information was taken on several occasions. The Court agrees with the government.

A comparison between the PSR and the 302 reports [that] form the basis of the PSR reveals that the PSR recounts, nearly verbatim, the information contained in the 302 reports. For example, Paragraph 56 is an abridged version of two (2) 302 reports, relating that Jesus Arguelles Palos ("Palos") had been murdered at a restaurant in Ciudad Juarez and indicating that a confidential informant ("CI") believed that Perea sent a letter ordering this murder. In the presence of the Court, Defendants' attorneys raised—during trial—their belief that the government had not disclosed all 302 reports. Counsel for the Government indicated that discovery of the 302 reports had been made available and that Defendants' attorneys were invited to review the 302 reports in the Government office. Indeed, Defendants' attorneys later acquiesced, agreeing that the government had, in fact, complied with discovery and had provided the 302 reports to Defendants. Further, the court ordered, and the record reflects, that the Government disclosed anew the 302 reports in an altered format, as per the request of the Defendants' attorneys.

(1 PR. 1664-65, *citing* 6 R. 3).[124] "Undoubtedly," the court concluded, "the government at no time suppressed the evidence—the 302 reports—that formed the basis of the PSR" (1 PR. 1665; *see also* 1 PR. 1671 n. 9 ("The Court reiterates that the 302 reports at issue in the instant Motion, and upon which the PSR was based, *were most definitely produced* by the Government, at the latest, during trial." (Emphasis added)).

Additionally, the court found that, even if the government had suppressed the reports, the information contained in those reports was immaterial to the defendants' guilt or innocence (1 PR. 1673).[125] Specifically, it found that the evidence contained

---

[124] The district court cited the following exchange between it and Perea's trial counsel, Gary Weiser, in support of its findings:

> Mr. Weiser: I was advised yesterday during one of the breaks . . . that there were additional 302s involving Mr. Gallardo. This morning I was provided with those additional 302s.
>
> . . . The Court: Why . . . were these 302s provided so late to begin with?
>
> Mr. Weiser: Your Honor, the 302s were provided. And let me clarify that point. I haven't seen them, but one of my co-counsel indicates it was part of the discovery that was provided.

(1 PR. 1665-66 n.7, *citing* 6 R. 3). The district court also observed that Mr. Weiser acknowledged during the same exchange that the government trial counsel "has complied in good faith with the rules," and that Cardoza's attorney was present during the exchange and did not contradict Mr. Weiser's statements to the court (*id.*, *citing* 6 R. 8).

[125] In reviewing whether the evidence referenced in the presentence report was favorable to the defendants, the court found that Paragraph 56 did not present any exculpatory or impeaching evidence; Paragraphs 57, 62, 63, and 65, reporting that Ravelo ordered four

(continued...)

in Paragraphs 57, 62, 63, 64, and 65—"indicat[ing] that Ravelo and Esqueda murdered the listed individuals themselves or ordered the green lights [that] directed these murders"—did not "negate Defendants' own culpability in the instant case" for several reasons. First, the court found that the trial testimony established that an order to murder required the approval of three *capos*, and that Perea, Cardoza, and Alvarez were *capos*:

> [T]he testimony at trial established that an order required the approval of three (3) BA *capos*. Multiple witnesses identified Perea, Cardoza, and Alvarez as *capos*. Further, despite the difficulty Perea, Cardoza, and Alvarez had in communicating beyond prison walls, correspondence from these particular defendants was reportedly received by various BA members—copies of which were received into evidence at trial and in which handwriting was verified. Indeed, Cardoza reportedly sent a letter ordering the green light on Palos, and although intercepted by the FBI, Perea sent a letter ordering [David] Merez's murder (1 PR. 1671).

Second, the court observed that Ravelo's and Enriquez's culpability did not negate Perea and Cardoza's culpability because such orders often occurred due to BA infighting that caused great confusion amongst the lower ranks (1 PR. 1671-72).

---

[125] (...continued)

> murders, contained potentially exculpatory evidence favorable to the defendants; and Paragraph 64, which implicated Ravelo and Gallardo in the abduction and murder or Mike "Chato" Flores, contained potentially exculpatory evidence favorable to the defendants and evidence that could be used to impeach Gallardo, who testified at trial (1 PR. 1666-69).

Finally, and "most importantly," the court observed that Ravelo's and Enriquez's culpability in specific murders did not negate Perea's and Cardoza's culpability because Perea and Cardoza were both found guilty of a RICO conspiracy:

> Here, evidence of the participation of all five (5) of the listed Defendants in the RICO conspiracy was thorough and extensive. The government submitted intercepted letters and wire-tapped phone calls. Additionally, the government entered into evidence extensive records detailing Perea, Cardoza, and Alvarez's acceptance of BA funds into their prisoner accounts. Eight (8) BA members and one (1) BA associate testified against Defendants, and Mona testified on his own behalf. At the very least, the evidence at trial established that Defendants agreed to the overall objective of the RICO conspiracy in as much as Defendants were members—inclusive of high-ranking members—of the BA. In short, in addition to the evidence charged above, the Jury believed that Defendants were guilty beyond a reasonable doubt of RICO conspiracy. Thus, while the evidence included in the PSR suggests that Ravelo and Esqueda were responsible for the murders discussed in Paragraphs 57, 62, 63, 64, and 65, this evidence does not negate Defendants' own involvement in the RICO conspiracy at issue, as Defendants' participation in those specific murders is irrelevant (1 PR. 1671-73).

Moreover, in addition to finding that the exculpatory information contained in the presentence report was immaterial, the court also found that the impeachment evidence with respect to Gallardo was immaterial (1 PR. 1676).[126] First, it found that

---

[126] The court correctly rejected the defendants' claims that the presentence report contained information that could have been used to impeach Gerardo "Little Man" Hernandez. Specifically, the court found, "Hernandez never disclosed any personal knowledge of any of the events he related, and the PSR does not disclose any involvement on Hernandez's part in any murder" (1 PR. 1674). Moreover, the court explained, "Defendants' attorneys thoroughly impeached Hernandez on the basis of his criminal history and his incentives for

(continued...)

the evidence of Gallardo's participation in Chato Flores' murder was immaterial because Gallardo was extensively cross-examined about his participation in the murder at trial and "could not be any further impeached as to his participation in the abduction and murder of Flores as he was *already*" (1 PR. 1674-75 (emphasis in original)). Second, the court found that the defendants had "thoroughly impeached Gallardo on the basis of his extensive criminal history and his motives as testifying as a cooperating witness" (1 PR. 1675). Specifically, the court noted that Gallardo testified during cross-examination that he received only 144 months' imprisonment for his federal offense of importing more than 2000 pounds of marijuana, and served only 72 months due to his cooperation with government in a previous murder investigation (*id.*). Additionally, Gallardo testified that he was sentenced to 15 years' imprisonment for trafficking 100 kilograms of cocaine in 2007 and that he hoped to reduce this sentence by testifying (*id.*). "In short," the court found, "Gallardo was thoroughly impeached on the basis of his extensive criminal history and his history of cooperating with the Government such that any evidence revealed in the PRS—had it not already been provided to Defendants—could not have been used to significantly undermine Gallardo's credibility" (1 PR. 1675-76). Accordingly, "having found the

---

[126] (...continued)
    testifying against Defendants" (*id.*).

exculpatory and the impeachment evidence immaterial," the district court denied Perea's and Alvarez's motions (1 PR. 1676, 1678).

## C.    Legal Argument

On appeal, Perea and Cardoza challenge the district court's denial of their motions for new trial. Specifically, they claim that the district court erroneously found that the government had complied with its disclosure obligations under *Brady*. Their claims are meritless. The district court properly denied Perea's and Cardoza's motions.

In *Brady v. Maryland*, the Supreme Court held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment." 373 U.S. 83, 87 (1963). Thus, in order to receive a new trial based on a *Brady* violation, "a defendant must show that (1) evidence was suppressed; (2) the suppressed evidence was favorable to the defense; and (3) the suppressed evidence was material to either guilt or punishment." *United States v. Runyan*, 290 F.3d 223, 245 (5th Cir. 2002).

In this case, the district court did not clearly err when it determined that the government had not suppressed evidence. As the court correctly found, the government timely disclosed the information referenced in Paragraphs 56, 57, 62, 63, 64, and 65 in the form of the relevant FBI investigative reports used to compile those

paragraphs. Several weeks before trial, the government trial attorney sent a letter to all the defendants' counsel, inviting them to examine all of the relevant reports (*see* 2 R. 21; 6 R. 11).[127] On the fourth day of trial, while Gallardo was still on the stand,[128] the government, again, provided the reports in an altered format, at the request of the defendants' attorneys (6 R. 18-19). Indeed, Perea's trial counsel acknowledged that he received all the reports in discovery, and that "the U.S. Attorney has complied in good faith with the rules" (6 R. 3, 8). Cardoza's attorney was present and did not contest Perea's counsel's statements. Accordingly, the district court did not clearly err in finding that the government did not suppress the evidence.

Moreover, even if the government had suppressed the evidence, the district court did not clearly err in finding that the evidence was immaterial to Perea's and Cardoza's guilt and punishment. "Evidence is material under Brady when there is a 'reasonable probability' that the outcome of the trial would have been different if the suppressed evidence had been disclosed to the defendant." *Runyan*, 290 F.3d at 245; *see also Strickler v. Greene*, 527 U.S. 263, 290 (1999) (materiality inquiry analyzes

---

[127] None of the attorneys requested that the government identify all of the informants and third parties in any of the reports (6 R. 11).

[128] While Perea's and Cardoza's had already completed their cross-examination of Gallardo, the court agreed to give them another opportunity to cross-examine him following the government's re-disclosure of the reports in their altered format (*see, e.g.*, 6 R. 94). At Perea's request, the court also limited the government's use of the contested reports on direct examination (6 R. 14-15)

whether "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict").

Here, the evidence contained in Paragraphs 57, 62, 63, 64, and 65 of the presentence report did not negate Perea's and Cardoza's own culpability. First, as the district court found, the trial testimony established that an order to murder required the approval of three *capos* (*see, e.g.*, 5 R. 272; 6 R. 101-02; 7 R. 120; 8 R. 220), and that Perea, Cardoza, and Alvarez were three of the five BA *capos*. Additionally, Perea and Cardoza were both found guilty of conspiring with other BA members—including Ravelo and Esqueda—to commit various RICO violations, including murder. Thus, even if the evidence in the PSR suggested that Ravelo and Esqueda were personally responsible for specific murders, that evidence did not negate Perea's and Cardoza's own culpability in the RICO conspiracy because their participation in those specific murders was irrelevant.

In addition, the district court did not clearly err when it found that the impeachment evidence with respect to Gallardo was immaterial. Below, Gallardo was extensively cross-examined about his participation in Chato Flores' murder (*see, e.g.*, 6 R. 23, 47-60), rendering the evidence detailed in the presentence report cumulative, and, thus, immaterial. *See Miller*, 520 F.3d at 515 (reiterating that no *Brady* violation occurs when the undisclosed evidence is merely cumulative of other evidence). Also,

as the district court observed, Gallardo was thoroughly impeached on the basis of his extensive criminal history and his motives to testify in order to receive a reduced sentence (*see, e.g.*, 5 R. 241-49, 263-65, 281-82, 284-85; 6 R. 27-28, 63-64). Thus, as the district court correctly found, "any evidence revealed in the PRS—had it not already been provided to Defendants—could not have been used to significantly undermine Gallardo's credibility" any further (1 PR. 1675-76). *See United States v. Hughes*, 230 F.3d 815, 820-21 (5th Cir. 2000) (where a witness is thoroughly impeached on other grounds, the materiality of suppressed evidence will not be such that it could undermine confidence in the verdict). Finally, because the evidence of Perea's and Alvarez's guilt of the RICO conspiracy charge was "thorough and extensive"—supported by the testimony of eight BA members, one BA associate, a variety of law enforcement officers, and a plethora of evidence including wiretapped phone calls, bank records, and extensive correspondence—any further impeachment of Gallardo was immaterial. *See Miller*, 520 F.3d at 515 & n.26, *citing United States v. Weintraub*, 871 F.2d 1257, 1262 (5th Cir. 1989) ("Courts have found, for example, that impeachment evidence improperly withheld was not material where the testimony of the witness who might have been impeached was strongly corroborated by additional evidence supporting a guilty verdict."). Accordingly, because the evidence was neither suppressed nor material, the district court properly denied Perea's and

Alvarez's motions for a new trial on this basis. This Court should reject their challenge to the district court's ruling.

## XI. THE DISTRICT COURT DID NOT PLAINLY ERR IN IMPOSING LIFE SENTENCES FOR CARDOZA AND HERRERA FOR THEIR RICO CONSPIRACY CONVICTIONS (COUNT 2); HOWEVER, THE GOVERNMENT DOES NOT OPPOSE REMAND FOR RESENTENCING FOR MONA ON THE BASIS OF HIS *APPRENDI* CLAIM.

(Cardoza Issue 7b, Op. Br. at 46-47; Herrera Issue 3, Op. Br. at 40-41; Mona Issue 3, Op. Br. at 49-52)

### A.    Standard of Review

When a defendant fails to complain to the district court regarding his sentencing, this Court applies plain error review. *United States v. Vasquez*, 216 F.3d 456, 459 (5th Cir. 2000). In order to vacate the defendant's sentence under this standard, there must be: (1) error; (2) that is plain; and (3) that affects substantial rights. *United States v. Cotton*, 535 U.S. 625, 631 (2002). If all three conditions are met, this Court may address the forfeited error only if "the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Id.*

### B.    Legal Argument

On appeal, Cardoza, Herrera, and Mona challenge the terms of life imprisonment imposed for Count 2, the RICO conspiracy. All three defendants claim that the sentence exceeded the statutory maximum sentence authorized by the jury's

verdict, in violation of *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000) (Cardoza Op. Br. at 46-47; Herrera Op. Br. at 40-41; Mona Op. Br. at 49-52). Cardoza's and Herrera's claims are meritless, as neither can demonstrate that the district court plainly erred in imposing their life sentences. However, the government does not oppose remand for resentencing in Mona's case.

In *Apprendi*, the Supreme Court held that, other than evidence of a prior conviction, "any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 530 U.S. at 490. However, on plain error review, a defendant is not entitled to *Apprendi* relief whenever a judge imposes a sentence exceeding the statutory maximum authorized by the jury's verdict. *See United States v. Cotton*, 535 U.S. 625, 633 (2002); *United States v. Green,* 293 F.3d 886, 891 (5th Cir. 2002). On the contrary, even in those situations where a court fails to explicitly instruct the jury to make a finding that would increase the statutory maximum, this Court need not correct the *Apprendi* error where the evidence establishing that finding was "overwhelming" and "essentially uncontroverted." *Cotton*, 535 U.S. at 632-33; *see also United States v. Warneke*, 310 F.3d 542, 550 (7th Cir. 2002) (holding that "[b]ecause [the defendant] did not make an *Apprendi*-like argument in the district court, and did not ask for a special verdict distinguishing [two predicate RICO acts,

136

only one of which carried a term of life imprisonment], only plain error could justify reversal now").

In this case, the penalty provision applicable to any violation of § 1962 authorizes a maximum sentence of 20 years' imprisonment "or for life if the violation is based on a racketeering activity for which the maximum possible penalty includes life imprisonment." § 1963(a). Here, the jury found that Cardoza, Herrera, and Mona were guilty of conspiring to violate § 1962(c)—and, thus, conspiring to participate in the conduct of the BA's affairs through a pattern of racketeering activity—in violation of § 1962(d). This conspiracy was based racketeering activity for which the maximum possible penalty for the most serious racketeering offense was life imprisonment. *See Warneke*, 310 F.3d at 549 ("The maximum penalty following a RICO conviction depends on the maximum penalty for the most serious predicate offense."). Specifically, the conspiracy was based on several acts of first degree murder, in violation of section 19.02(b) of the Texas Penal Code, and a drug trafficking conspiracy, in violation of sections 841(a)(1) and 846, both of which impose a maximum term of imprisonment of life (1 PR. 362-86). *See* Vernon's Tex. Pen. Code §§ 12.32, 19.02(c) (establishing maximum penalty of life imprisonment for first degree murder); 21 U.S.C. §§ 841(b)(1)(A)(i), (b)(1)(A)(ii), 846 (establishing

maximum penalty of life imprisonment for conspiring to possess with intent to distribute one kilogram or more of heroin or five kilograms or more of cocaine).

With respect to Cardoza and Herrera, they cannot demonstrate that the court plainly erred by imposing a life sentence on Count 2 because the jury explicitly found beyond a reasonable doubt that both men participated in the conduct of the BA's affairs through a pattern of racketeering activity for which the maximum penalty included life imprisonment. Specifically, by virtue of its special verdicts in Count 1, the jury found that Cardoza and Herrera conspired to possess with intent to distribute either one kilogram or more of heroin or five kilograms or more of cocaine in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(i), (b)(1)(A)(ii), 846, as part of its determination that Cardoza and Herrera committed Racketeering Act 2 (1 PR. 405, 408). Accordingly, because the jury found Cardoza and Herrera responsible for Racketeering Act 2, neither defendant can demonstrate reversible error with respect to this same determination under Count 2 on plain error review. *See Warneke*, 310 F.3d at 550 (holding district court did not plainly err under *Apprendi* where it failed to provide a special verdict for the jury to distinguish the racketeering acts on which its RICO conspiracy guilty verdict was based where jury also found defendant responsible for predicate act carrying maximum of life imprisonment, reasoning that "[t]he important finding was made by the jury, on the right standard. So no injustice

has been done; the error turns out to have been wholly formal"); *United States v. Fernandez*, 388 F.3d 1199, 1259-60 (9th Cir. 2004) (holding that, even if the verdict for RICO conspiracy did not include any specific findings, no plain error in imposing life sentence where jury explicitly found that defendant had conspired to murder three people as predicate acts for count one and his participation in the conspiracy to violate RICO included his conspiracies to commit substantive RICO violations); *see also Cotton*, 535 U.S. at 631 (appellate court may address the forfeited error only if "the error seriously affects the fairness, integrity, or public reputation of judicial proceedings").

With respect to Mona, however, in light of the circumstances of the case, the government does not oppose remand for resentencing.

## XII. THE DISTRICT COURT DID NOT CLEARLY ERR IN RELYING ON UNCONTROVERTED FACTS CONTAINED THE PRESENTENCE REPORT.

(Herrera Issue 3, Op. Br. at 35-37; Enriquez Issue 4, Op. Br. at 39-46)

**A.    Standard of Review**

This Court reviews a district court's factual findings for clear error. *United States v. Trujillo*, 502 F.3d 353, 356 (5th Cir. 2007). "A factual finding is not clearly erroneous if it is plausible in light of the record as a whole." *Id.* "Giving due regard to the opportunity of the district court to judge the credibility of the witnesses," thus

Court "will deem the district court's factual findings clearly erroneous only if, based on the entire evidence," it is "left with the definite and firm conviction that a mistake has been committed." *Id.* (internal quotations omitted).

## B.    Legal Argument

On appeal, Herrera and Enriquez appear to challenge the district court's reliance on the presentence report at sentencing (Herrera Op. Br. at 35-37; Enriquez Op. Br. at 39-46).[129] Their claims are meritless. The district court did not clearly err in relying on uncontroverted facts contained in the presentence report.

In making factual findings for sentencing purposes, the district court may consider any evidence "which bears sufficient indicia of reliability to support its probable accuracy, including hearsay evidence." *United States v. Solis*, 299 F.3d 420,

---

[129] In their statement of the issue, both Herrera and Enriquez make the identical claim that "[t]he Trial Court erred in sentencing the Appellant based on improper information in the Pre-Sentence Report and failure to consider the entire spectrum of sentencing guidelines" (Herrera Op. Br. at 35; Enriquez Op. Br. at 39). Consistent with this statement, Enriquez appears to object to the district court's reliance on "the entire PSR, which is fundamentally flawed," "based on facts not presented at trial," and "relies on uncorroborated, unaired, and untested statements and assertions in FBI reports and so-called confidential sources" (*see* Enriquez Op. Br. at 39). However, while Herrera fleetingly references the proposed relevant conduct calculation in the presentence report—which he claims was based on "numerous and voluminous information that was not proven or mentioned in trial" (Herrera Op. Br. at 37)—the body of his brief only appears to raise an *Apprendi*-based challenge to his sentence on Count 2 (*see, e.g.*, 37-43), which the government addresses under Issue XI, *supra*. Accordingly, the government believes that Herrera has waived any argument regarding the district court's reliance on the presentence report, *see Yohey v. Collins*, 985 F.2d 222, 224-25 (5th Cir. 1993), and incorporates his argument on this point only out of an abundance of caution.

455 (5th Cir. 2002) (internal quotation marks and citation omitted); *see also* U.S.S.G. § 6A1.3(a) ("In resolving any dispute concerning a factor important to the sentencing determination, the court may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy."). If the defendant takes issue with the evidence, he "bears the burden of demonstrating that the information cannot be relied upon because it is materially untrue, inaccurate or unreliable." *United States v. Rodriguez*, 602 F.3d 346, 363 (5th Cir. 2010). A presentence report "generally bears sufficient indicia of reliability to be considered as evidence by the sentencing judge in making factual determinations." *Trujillo*, 503 F.3d at 357. As with all evidence, the defendant bears the burden of showing that the information in the presentence report is materially untrue. *United States v. Valdez*, 453 F.3d 252, 262 (5th Cir. 2006).

In this case, the district court did not clearly err in relying on the information contained in the presentence report. In response to Enriquez's similar objections below, the probation department explained that the information contained in its report was obtained from trial testimony; FBI investigative reports; statements provided by confidential sources, such as testifying cooperator Eric Saucedo; and the defendant's

own statements to law enforcement (*see* Enriquez PSR Add. at 3-4, 6).[130] At

sentencing, the district court then found that the information contained in the report

was "reliable" (17 R. 28). Furthermore, neither Enriquez nor Herrera provided any

testimony or evidence that this source of information was unreliable.[131] *Compare*

*United States v. Nava*, 624 F.3d 226, 231 (5th Cir. 2010) (defendant failed to show

---

[130] While Enriquez claims on appeal that Paragraph 61 relies on information "provided by an unnamed [confidential source]," which was "uncorroborated" and should have been "disregarded" (Enriquez Op. Br. at 40-41), the probation department appropriately explained that the information "was gleaned from FBI investigative reports and is considered reliable information" (Enriquez PSR Add. at 4). *See United States v. Nava*, 624 F.3d 226, 231-32 (5th Cir. 2010) (statements by municipal police officer and DEA task force officer about what had been said during universal meeting of gang leadership had sufficient indicia of reliability to consider them at sentencing); *United States v. West*, 58 F.3d 133, 138 (5th Cir.1995) (court may consider uncorroborated hearsay evidence during sentencing proceedings). In any event, the information provided by this particular confidential source—that Enriquez was a soldier in the BA who assisted Adam Munoz with the collection of *cuota*, that Enriquez confessed that he was collecting *cuota* with Munoz when he heard a gunshot, and that Munoz had given Enriquez some gloves to get rid of—was similar to the evidence offered at trial (*see, e.g.*, 9 R. 91-100, 107, 153-55, 163-64, 199, 208-09, 210-11, 212, 214, 215, 232, 247-48, 253-54; Exs. 204, 205).

[131] "To demonstrated the severity of the flaws in the PSR," Enriquez mistakenly claims on appeal that Paragraph 240 "incorrectly states that [he] 'agreed with the Factual Basis provided by the Government during the plea proceedings,'" when he was actually convicted by a jury (Enriquez Op. Br. at 41). However, when Enriquez raised this identical claim below (*see* Enriquez Obj. at 4), the probation department agreed with him and revised the final version of the report accordingly (*see* Enriquez PSR Add. at 6-7; PSR ¶ 241).

Additionally, Enriquez mistakenly cites "Paragraph 290" as another example of the so-called "flaws" in the presentence report, claiming that the report inaccurately set forth a maximum term of imprisonment of life, instead of the actual 20-year-maximum contained in 18 U.S.C. § 1951 (Op. Br. at 43-44). However, when both the government and Enriquez brought this error to the attention of the probation department following the initial disclosure of the report, the probation department agreed and corrected the error in its revised report (*see* Enriquez PSR Add. At 1, 13-14; PSR ¶¶ 291, 292). Indeed, the court reiterated at sentencing that Enriquez faced a maximum term of 20 years' imprisonment (17 R. 52).

information contained in the PSR is untrue where he failed to explain why specific sources were unreliable). Because the facts contained in the presentence report were supported by an adequate evidentiary basis and the defendants failed to present any rebuttal evidence, the district court was permitted to adopt these facts. *See United States v. Cabrera,* 288 F.3d 163, 172-74 (5th Cir. 2002); *United States v. Cooper*, 274 F.3d 230, 239 (5th Cir. 2001). Accordingly, the district court did not clearly err in adopting the PSR's factual findings and this Court should reject Herrera's and Enriquez's claim on this point.

## XIII. **THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION WHEN IT DECLINED PEREA'S REQUEST FOR AN EVIDENTIARY SENTENCING HEARING.**

(Perea Issue 3, Op. Br. at 16-18)

### A.    **Standard of Review**

This Court reviews the denial of an evidentiary sentencing hearing for abuse of discretion. *United States v. Henderson,* 19 F.3d 917, 927 (5th Cir. 1994).

## B.    Relevant Facts

Following the jury's verdict on December 2, 2008, the court set a sentencing date of April 1, 2009 (1 PR. 463).[132] The probation department then prepared a presentence report, which it distributed to the parties on March 17, 2009. In it, the probation department noted that Perea was a BA captain "who directed members of the enterprise in carrying out unlawful and other activities in furtherance of the conduct of the BA enterprise's affairs," including "promot[ing] and demot[ing] members, pronouncin[ing] disciplinary measures, and direct[ing] how drug proceeds are distributed to BA members within the various prison facilities" (PSR ¶ 46; *see also* PSR ¶ 233). It also stated that, as a BA captain, Perea was aware that those who failed to pay a *cuota*, failed to abide by the BA rules, or interfered with the affairs of the BA enterprise would receive severe punished, including death (PSR ¶¶ 51, 52).

Furthermore, the report estimated that the BA collected at least $960,000 in *cuota* throughout the course of the conspiracy, based on "statements provided by several BA members, [confidential sources], and witnesses" to the FBI (PSR ¶ 92; *see also* PSR ¶¶ 89-91). Additionally, the report held Perea accountable for the total amount of narcotics attributed to the RICO conspiracy, consisting of 67.1 kilograms

---

[132] On the date of sentencing, the court originally set a sentencing date of February 24, 2009 (1 PR. 456). Two weeks later, this date was reset to April 1 (1 PR. 463).

144

of heroin, 258 kilograms of cocaine, and 1,075.64 kilograms of marijuana (PSR ¶¶ 93, 167; *see also* PSR ¶¶ 101-66). Finally, based on FBI investigative reports and interviews, the report held Perea accountable for the murders of Ruben Tagle (PSR ¶¶ 53, 66); Jesus Arguelles Palos (PSR ¶¶ 54-57, 66); Jose Luis Oviedo (PSR ¶¶ 58-61, 66); Mike "Chato" Flores (PSR ¶¶ 64, 66); Ivan Ortiz and Jesus Vital (PSR ¶¶ 62, 66); Arturo Jaramillo Morillon (PSR ¶¶ 63, 66); and David Merez (PSR ¶¶ 65, 66). Specifically, the report noted that Perea was the BA captain "authorizing the 'green light' on the above-mentioned individuals" (PSR ¶ 66).

On March 25, 2009, Perea filed a motion requesting an evidentiary sentencing hearing, arguing that "[t]he Offense Conduct portion of the   Pre-Sentence Investigation Report raises a series of unadjudicated extraneous offenses which are not supported by evidence either admitted at trial or provided by way of written discovery." (1 PR. 1586). Specifically, Perea took issue with the report's findings with respect to the total amount of *cuota* collected over the course of the conspiracy; the drug quantities attributed to him; and the murders attributed to him (*id.* at 1586-87).

Two days later, on March 27, 2009, Perea filed written objections to the report, arguing that there was no evidence to support many of the relevant conduct determinations proposed in the report (*see* Perea Obj. at 1-6). These objections

referenced the same relevant conduct determinations cited in his request for an evidentiary hearing (*id.*).[133]

On April 1, 2009, the probation department issued an addendum to its initial report, responding to Perea's objections. With respect to his objection to the total amount of *cuota* collected, the probation department responded:

> The figure contained in paragraph 92 of the presentence report was provided by the FBI agent. According to the FBI agent, after careful review of all the corroborating information provided by confidential sources, the FBI concluded that the collection of $960,000 in *cuota* was a conservative figure (PSR Add. at 5).

Additionally, with respect to the drug quantity determination attributable to Perea, the probation department reiterated that Perea, as *capo*, was responsible for the quantities of drugs distributed by BA members during the course of the conspiracy (PRS Add. at 6-7). Finally, with respect to the murders attributable to Perea, the probation department, after citing the specific sources of its information, declined to amend its report on those grounds (see PSR Add. at 3-5, 11, 15).

On the same date, the court district court denied Perea's request for an evidentiary hearing in a written order (*see* Sealed Order, Apr. 1, 2009).[134] In it, the

---

[133] On the same date, the court reset the sentencing hearing in order to give defense counsel more time to file objections to the presentence report (1 PR. 1590-91; *see also* 1 PR. 1592).

[134] On appeal, Perea mistakenly claims his "motion was denied by inaction" (Perea Op. Br. at 17). However, at the sentencing hearing on April 13, 2009, Perea's trial counsel, Mr.
(continued...)

court found that there was "no dispute of material fact regarding the amount of laundered proceeds ($960,000) or the drug quantities (67.1 kilograms of heroin, 258 kilograms of cocaine, and 1075.64 kilograms of marijuana)" and, in any event, "[t]hese findings are not material to the defendant's sentence" (*id.*). It also found that "the evidence at trial sufficiently established by a preponderance of evidence that a victim was killed under circumstances that would constitute murder" (*id.*). It further found that "the murder was foreseeable to the defendant" (*id.*).

On April 13, 2009, the court conducted a joint sentencing hearing of all six defendants, including Perea. During the hearing, the court indicated its awareness of the contents of the presentence report (*see, e.g.*, 17 R. 6, 22, 33, 34, 38), and its familiarity with the defendants' objections to that report (*see, e.g.*, 17 R. 5, 19, 24). It also entertained Perea's reiterated objections to the report (*see* 17 R. 5-15).

However, the court then overruled Perea's objections (17 R. 12-13). It explained that Perea, as one of "the heads of the organization," would held accountable for all of the foreseeable predicate acts of violence, threats, drug trafficking, money laundering, and murder that occurred during the course of the BA's RICO conspiracy (17 R. 5, 12). Specifically, the court stated:

---

[134] (...continued)
  Weiser, indicated his awareness of the court's order (*see* 17 R. 13).

[I]f you're the head or participate in an organization that regularly threatens violence, regularly deals in drugs, regularly launders money, regularly commits murder, then it's foreseeable that any one of these acts that takes place with that organization is accountable to them (17 R. 12).

The court also expressly found that the information in the presentence report was "reliable" (17 R. 28). The court then imposed Perea's sentence.

## C.    Legal Argument

On appeal, Perea claims that the district court abused its discretion when it declined his request for an evidentiary sentencing hearing (Op. Br. at 16-18).[135] His claim is meritless.

A district court is not required to hold a full-blown evidentiary hearing in resolving sentencing disputes. *United States v. Maurer,* 226 F.3d 150, 151-52 (2d Cir. 2000) (per curiam). Rather, the court must only afford the defendant some opportunity to rebut the government's allegations." *Id.* Consequently, where a defendant is given an opportunity to review the presentence report and file formal objections, the court's denial of an evidentiary hearing is not an abuse of discretion.

---

[135] On appeal, Perea claims that the information contained in the presentence report was comprised of "unexpected allegations . . . neither supported by the evidence at trial [n]or provided through the discovery process" (Perea Op. Br. at 16). However, following the sentencing, in response to Perea's request for a new trial, the court found that the FBI investigative reports that formed the basis of the information contained in the presentence report were disclosed to Perea before trial (1 PR. 1665; *see also* 1 PR. 1671 n. 9).

*United States v. Patten*, 40 F.3d 774, 777 (5th Cir. 1994)*, citing Henderson,* 19 F.3d at 927.

In this case, Perea received a copy of the presentence report before the hearing and filed extensive objections. He was also provided with an opportunity to present these objections to the district court during the sentencing hearing. Although Perea challenged the reliability of the information in the report, he never provided the district court with any contrary evidence. *Compare id.* Moreover, as the district court reasonably found, there was no dispute of material fact regarding the total amount of laundered proceeds or drug proceeds; these particular findings were immaterial to the defendant's sentence; and the trial evidence sufficiently established that the defendant should be held accountable for a foreseeable act of murder (Sealed Order, Apr. 1, 2009; *see also* 17 R. 10-11, 15, 19). Accordingly, the district court did not abuse its discretion by denying Perea's motion. This Court should reject Perea's challenge to his sentence on this ground.

## XIV. THE DISTRICT COURT DID NOT PLAINLY OR OTHERWISE ERR WHEN IT SENTENCED CARDOZA AND ALVAREZ TO A TERM OF IMPRISONMENT THAT FELL WITHIN THE ADVISORY GUIDELINE RANGE.

(Cardoza Issue 7a, Op. Br. at 45-46; Alvarez Issue VI, Op. Br. at 43-45)

**A.    Standard of Review**

Generally, this Court reviews a post-*Booker* sentence for reasonableness under an abuse of discretion standard. *See United States v. Alonzo*, 435 F.3d 552, 554 (5th Cir. 2006). However, where a defendant fails to raise a procedural objection to his sentence below, this Court reviews the sentence for plain error only. *United States v. Simmons*, 568 F.3d 564, 566 (5th Cir. 2009); *United States v. Mondragon-Santiago*, 564 F.3d 357, 360 (5th Cir. 2009). Under this standard, this Court must determine if there is an error that "is plain and affects substantial rights." *United States v. Olano*, 507 U.S. 725, 732 (1993). Even under these circumstances, this Court will not exercise its discretion to correct any error unless it "seriously affects the fairness, integrity, or public reputation of judicial proceedings." *United States v. Cotton*, 535 U.S. 625, 631 (2002).

**B.    Legal Argument**

For the first time on appeal, Cardoza and Alvarez challenges the procedural reasonableness of their sentences, arguing that the district court failed to consider the

statutory sentencing factors in determining their sentences.[136] Their claims are meritless. The district court did not plainly err in imposing terms of imprisonment that fell within the advisory guideline range.

This Court reviews a post-*Booker* sentence to ensure that the district court did not err procedurally by, for example, treating the guidelines as mandatory, failing to consider the § 3553(a) factors, or failing to adequately explain the chosen sentence. *United States v. Mondragon-Santiago*, 564 F.3d 357, 360 (5th Cir. 2009); *see also Gall v. United States*, 552 U.S. 38, 51 (2007). However, when imposing its sentence, the district court need not engage in "robotic incantations that each statutory factor has been considered." *United States v. Smith*, 440 F.3d 704, 707 (5th Cir. 2006). Moreover, where the court imposes a sentence within a properly-calculated guideline range, this Court "will infer that the judge has considered all the factors for a fair sentence set forth in the Guidelines." *United States v. Mares*, 402 F.3d 511, 519 (5th Cir. 2005); *see also Rita v. United States*, 551 U.S. 338, 350-51 (2007).

In this case, the district court did not commit any procedural error, much less any clear or obvious procedural error, when sentencing Cardoza and Alvarez. The

---

[136] Neither Cardoza nor Alvarez challenge the substantive reasonableness of their sentences, but only claim that their sentences were procedurally unreasonable because the district court failed to consider the § 3553(a) factors (*see* Cardoza Op. Br. at 45-46; Alvarez Op. Br. at 43-45).

record supports that the district court implicitly considered the statutory sentencing factors in § 3553(a). *United States v. Izaguirre-Losoya*, 219 F.3d 437, 440 (5th Cir. 2000) (proceedings need only imply consideration of the § 3553(a) factors). For instance, the presentence reports provided a comprehensive evaluation of the nature and circumstances of Cardoza's and Alvarez's various offenses and their respective history and characteristics. Based on their total offense levels and criminal history categories, the report recommended an advisory guideline range of life imprisonment for Counts 1, 2, and 5, and 240 months' imprisonment on Count 4 (Cardoza PSR ¶¶ 399, 400; Alvarez PSR ¶¶ 410, 411). The probation department further explained that it had not identified any factors under § 3553 warranting a sentence outside the advisory guideline range (Cardoza PSR ¶ 86; Alvarez PSR ¶ 438).

At the joint sentencing on April 13, 2009, the court–which had presided over the entire month-long trial of the defendants—imposed sentences within those properly-calculated ranges (17 R. 22, 37). In doing so, the court indicated its awareness of the contents of the presentence report (*see, e.g.*, 17 R. 6, 22, 33, 34, 38), and its familiarity with the defendants' objections to that report (*see, e.g.*, 17 R. 5, 19, 24). The court also expressly found that the information in the presentence report was "reliable" (17 R. 28). Moreover, the court indicated its awareness of both the advisory guideline ranges (17 R. 18, 37), and its discretion to impose a sentence outside those

ranges (17 R. 18-19, 37-38, 57). Indeed, the court explained that it would impose life sentences for Alvarez and Cardoza "under these circumstances," regardless of the advisory guideline range (17 R. 18-19; *see also* 17 R. 37-38, 57).[137] The record further supports that the district court rejected Alvarez's attorney's request for a more lenient sentence under the § 3553(a) factors (17 R. 36).[138] In light of this record and the presumption that district courts know the applicable law and apply it correctly, *United States v. Gonzalez*, 250 F.3d 923, 930 (5th Cir. 2001), Cardoza and Alvarez have failed to establish that the district court committed any procedural error in imposing their within-guidelines sentences, much less plainly so. Accordingly, this Court should reject their challenge to the procedural reasonableness of their sentences.

---

[137] During the same sentencing hearing, the court exercised its discretion to sentence Enriquez below the advisory guideline range (*see* 17 R. 54, 56).

[138] When Alvarez's defense counsel, Mr. Perez, stated during sentencing that he "believe[d], Your Honor, that [Alvarez] deserves a chance that under the factors of 3553(a)," the court replied, "18 Criminal History points, Mr. Perez? . . . He deserves another chance?" (17 R. 36).

## CONCLUSION

For the foregoing reasons, the defendants' convictions and sentences should be affirmed.

Respectfully submitted,

JOHN E. MURPHY
United States Attorney

/s/ *Elizabeth Berenguer*

By:  ELIZABETH BERENGUER
Assistant United States Attorney

## CERTIFICATE OF SERVICE

I hereby certify that on March 15, 2011, I filed this document with the Fifth Circuit Court of Appeals using the CM/ECF filing system, which will cause a copy of the document to be delivered to Joe Spencer, Patrick Lara, Maria Ramirez, John Gates, Francisco Macias, and Robert Perez, counsel for the defendants-appellants.

/s/ *Elizabeth Berenguer*

ELIZABETH BERENGUER
Assistant United States Attorney

<u>REVISED CERTIFICATE OF COMPLIANCE</u>
<u>(PLACE THIS AS LAST DOCUMENT IN YOUR BRIEF BEFORE THE BACK COVER)</u>

Pursuant to 5TH CIR. R. 32.2 and 3, the under signed certifies this brief complies with the type-volume limitations of FED. R. APP. P. 32(a)(7).

1. EXCLUSIVE OF THE EXEMPTED PORTIONS IN 5TH CIR. R. 32.2, THE BRIEF

CONTAINS (select one):

    A.  **38,227 words**, OR

    B. _____ lines of text in monospaced typeface.

2. THE BRIEF AS BEEN PREPARED (select one):

    A.  In proportionally spaced typeface using:

    Software Name and Version: **Corel WordPerfect X4**

    in (Typeface Name and Font Size): **TimesNewRoman, 14pt** OR

    B.  In monospaced (nonproportionally spaced) typeface using:

    Typeface name and number of characters per inch:

    _____

3.  THE UNDERSIGNED UNDERSTANDS A MATERIAL MISREPRESENTATION IN

COMPLETING THIS CERTIFICATE, OR CIRCUMVENTION OF THE TYPE-VOLUME

LIMITS IN FED. R. APP. P. 32(a)(7), MAY RESULT IN THE COURT'S STRIKING THE

BRIEF AND IMPOSING SANCTIONS AGAINST THE PERSON SIGNING THE BRIEF.

                                         **/s/ *Elizabeth Berenguer***
                                           Signature of filing party

    (PLACE THIS AS LAST DOCUMENT IN BRIEF BEFORE BACK COVER)